UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **5 STAR INVESTMENT GROUP, LLC,** | ) | **CASE NO. 16-30078-hcd** |
| **5 STAR PORTLAND HOLDINGS, LLC,** | ) | |
| **5 STAR INVESTMENT GROUP V, LLC,** | ) | |
| **5 STAR COMMERCIAL, LLC,** | ) | **SUBSTANTIVELY CONSOLIDATED** |
| **5 STAR INVESTMENT GROUP VII, LLC,** | ) | **CHAPTER 11s** |
| **5 STAR HOLDINGS, LLC,** | ) | |
| **5 STAR INVESTMENT GROUP III, LLC,** | ) | |
| **5 STAR INDIANA HOLDINGS, LLC,** | ) | |
| **5 STAR INVESTMENT GROUP II, LLC,** | ) | |
| **5 STAR INVESTMENT GROUP IV, LLC** | ) | |
| **and 5 STAR CAPITAL FUND, LLC,** | ) | |
| | ) | |
| **Debtors.** | ) | |
| | ) | |
| | ) | |
| **DOUGLAS R. ADELSPERGER, TRUSTEE FOR** | ) | **ADV. PROC. NO. _____** |
| **THE SUBSTANTIVELY CONSOLIDATED** | ) | |
| **BANKRUPTCY ESTATES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **EARL D. MILLER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff Douglas R. Adelsperger (the "Trustee"), Chapter 11 trustee for the substantively consolidated bankruptcy estates of 5 Star Investment Group, LLC, 5 Star Portland Holdings, LLC, 5 Star Investment Group V, LLC, 5 Star Commercial, LLC, 5 Star Investment Group VII, LLC, 5 Star Holdings, LLC, 5 Star Investment Group III, LLC, 5 Star Indiana Holdings, LLC, 5 Star Investment Group II, LLC, 5 Star Investment Group IV, LLC

and 5 Star Capital Fund, LLC (collectively the "Debtors"), by counsel, files his adversary complaint (the "Complaint") against defendant Earl D. Miller ("Miller"), and states as follows:

**JURISDICTION**

1.       Pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure, this is an adversary proceeding to avoid and to recover transfers and property of the estate under Bankruptcy Code §§ 541, 544, 548 and 550 and IND. CODE §§ 32-18-2-14, -15 and -17.

2.       This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334.

3.       Venue is proper in the United States Bankruptcy Court for the Northern District of Indiana pursuant to 28 U.S.C. § 1409.

4.       This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(E)(H).

5.       Pursuant to Local Rule B-7016-1, the Trustee consents to the entry of final orders and/or judgments by the Bankruptcy Judge.

**PARTIES**

6.       Trustee Douglas R. Adelsperger was appointed as the Chapter 11 trustee for the Debtors on February 29, 2016.  On June 24, 2016, the Debtors' bankruptcy cases were consolidated under Case Number 16-30078-hcd (the "Consolidated Estates").

7.       Miller was an Indiana resident and the Debtors' owner and manager when the Debtors filed for bankruptcy relief and when he committed the acts set forth in this Complaint.  Miller presently resides in Colorado and he is believed to reside at 2120

Ramsgate Terrace, Colorado Springs, Colorado 80919.  He maintains a mailing address at P.O. Box 573, Woodland Park, Colorado 80866.

## OVERVIEW

8.      Between February 2014 and July 2015, Miller received a total of $1,585,588.07 from two of the Debtors, 5 Star Investment Group, LLC ("5 Star Investment Group") and 5 Star Commercial, LLC ("5 Star Commercial").

9.      Of that amount, Miller paid $1,369,289.64 to his former business partner, Matthew D. Gingerich ("Gingerich"), to purchase Gingerich's interest in the business.

10.      Miller received the remaining $216,298.43 from 5 Star Investment Group and 5 Star Commercial as owner distributions.

11.      When the distributions were made to Miller, the Debtors, including 5 Star Investment Group and 5 Star Commercial, were insolvent.

12.      Moreover, Debtors 5 Star Commercial and 5 Star Capital, Fund LLC ("5 Star Capital"), under Miller's sole management and at his direction, lost $2.2 million by investing in highly speculative business ventures as a result of his failure to conduct any reasonable due diligence.

13.      The Trustee asserts that the transfers made by 5 Star Investment Group and 5 Star Commercial to Miller were fraudulent, and seeks to avoid and recover them from Miller.

14.      The Trustee asserts that pursuant to IND. CODE § 23-18-5-7, Miller is liable to 5 Star Investment Group and 5 Star Commercial for the amounts of all distributions that he received when the companies were insolvent.

15.    The Trustee asserts that Miller's conduct also amounted to a breach of his fiduciary duties owed to 5 Star Commercial, 5 Star Capital and 5 Star Investment Group.

16.    Further, the Trustee asserts that Miller breached his fiduciary duties owed to all of the Debtors, causing the Debtors to suffer damages exceeding twenty million dollars ($20,000,000).

## GENERAL ALLEGATIONS

### The 5 Star Entities' Background

17.    5 Star Investment Group and 5 Star Commercial are two of numerous[1] business entities (the "5 Star Entities" or the "Entities") that were owned by Miller and/or Gingerich.

18.    5 Star Investment Group's business operations initially comprised of purchasing and rehabilitating distressed single-family homes in the South Bend, Indiana, area.   The company would raise funds by issuing short-term, interest-only, fixed-rate promissory notes to investors.  The notes were to be secured by mortgages on the homes the company purchased, although some unsecured notes were issued to investors with higher interest rates.

19.    5 Star Investment Group would then lease the homes to buyers that were not qualified for conventional financing and work with them to improve their credit so that the buyers could ultimately finance and purchase the homes.  5 Star Investment Group would

---

[1] The 5 Star Entities comprise of the Debtors and the following non-Debtors: 5 Star Investment Group I, LLC, 5 Star Investment Group VI, LLC, 5 Star Investment Group VIII, LLC, 5 Star Investment Group IX, LLC, 5 Star Investment Group XI, LLC, 5 Star Investing, LLC, 5 Star Indiana Holdings, LLC, 5 Star Portland Holdings, LLC, 5 Star Management Solutions, LLC, National Real Estate Group LLC, A-Z Builders LLC, Multi Family Holdings LLC, 5 Star Fund I LLC and 5 Star Fund II LLC.

charge a fee to each prospective buyer for the option to purchase a home, which would be applied to the home's pre-determined sale price.

20.     After it sold a home to a buyer, 5 Star Investment Group would repay its investors from the sale proceeds and retain any surplus.

21.     In an attempt to comply with state and federal securities laws and regulations, new investments would be raised by a 5 Star Entity issuing promissory notes to a limited number of investors and under a certain total dollar amount.  In most circumstances, the investors' funds were then loaned to a different 5 Star Entity to fund the real estate investments as well as to pay the Entity's operating costs.  For this reason, many of the 5 Star Entities had little or no assets except for notes receivable from other Entities[2].

**Miller's Relationship with the 5 Star Entities**

22.     In 2008, Gingerich contacted Miller to assist with raising funds for 5 Star Investment Group.

23.     Miller used his extensive ties and contacts within the local Amish community to raise substantial amounts for the 5 Star Entities; between 2009 and 2012, the Entities raised approximately $12.1 million dollars from primarily novice investors.

24.     In late 2009, Gingerich and Miller became 50/50 owners of the 5 Star Entities' businesses.

25.     In 2013, the 5 Star Entities expanded their business to the rehabilitation, development and sale of single family homes in Portland, Oregon (the "Portland Business"),

---

[2] The 5 Star Entities that had no assets other than accounts receivable from other Entities did not file for bankruptcy.  Moreover, while the 5 Star Entities' documented loans to other Entities in their accounting records as "notes receivable", the intercompany loans were never formally documented with promissory notes.

and purchasing interests in apartment complexes (the "Multi-Family Business").  Gingerich developed and oversaw the Portland Business, and Miller did the same for the Multi-Family Business.  Miller helped the 5 Star Entities raise approximately $13.6 million from investors in 2013.

26.    Despite Miller's success in raising cash for the 5 Star Entities, the Entities were losing money.

27.    For example, in 2014, 5 Star Commercial had approximately $660,000 in assets[3] and $1.7 million in liabilities; its net income in 2014 was approximately $34,000. That same year, 5 Star Investment Group had approximately $8.6 million in assets and $12.6 million in liabilities; it had *no* net income in 2014, but instead had a net loss of approximately $760,000.  This pattern was common for all of the 5 Star Entities.

28.    The Entities expended substantial amounts on real estate investments that could not generate any revenue for several years.  Meanwhile, the Entities' only significant operating income was generated by renting houses.  Because the 5 Star Entities' investments were funded entirely from the issuance of promissory notes to their investors, the Entities' monthly debt servicing costs were considerable compared to the income the Entities generated.  The Entities' monthly debt servicing costs were also increasing.

**The Indiana Securities Division Complaint**

29.    Miller and 5 Star Investment Group failed to properly disclose fund raising activities with the appropriate state and federal agencies.

---

[3] 5 Star Commercial's assets were primarily notes payable from other 5 Star Entities.

30.     On January 9, 2014, the Securities Division for the State of Indiana filed an administrative complaint against 5 Star Investment Group and Miller for the offering and sale of over $1 million in unregistered and non-exempt securities and for transacting business as an unregistered agent in violation of IND. CODE §§ 23-13-3-1 and 23-13-4-2.

31.     On April 17, 2015, 5 Star Investment Group and Miller entered into a consent agreement with the State of Indiana under which Miller agreed to pay a $5000 civil penalty.

**Miller's Purchase of Gingerich's
Interest in the 5 Star Entities**

32.     In May 2014, Miller and Gingerich began negotiating Miller's purchase of Gingerich's half-interest in the 5 Star Entities.

33.     On July 29, 2014, Miller and Gingerich entered into a "Unit Purchase Agreement" (the "UPA") in which Miller agreed to purchase Gingerich's interest in the 5 Star Entities for $2.5 million.

34.     A true and accurate copy of the UPA is attached to this Complaint as Exhibit 1 and is incorporated herein by reference.

35.     The UPA required Miller to *personally* make a series of payments, over the course of ten years, to purchase Gingerich's interest in the Entities.

**Distributions Made by 5 Star Commercial
and 5 Star Investment Group to Miller**

36.     5 Star Commercial and 5 Star Investment Group's poor financial conditions did not stop Miller from taking distributions from the companies.

37.     Between February 2014 and July 2015, Miller took $477,546.22 in distributions from 5 Star Commercial (the "Commercial Distributions"):

| The Commercial Distributions | | The Commercial Distributions | |
| Date | Amount | Date | Amount |
| --- | --- | --- | --- |
| 2/3/2014 | 3,500.00 | 12/10/2014 | 50,000.00 |
| 3/3/2014 | 3,500.00 | 12/15/2014 | $6,000.00 |
| 3/5/2014 | 750.00 | 12/16/2014 | 250,000.00 |
| 4/3/2014 | 4,250.00 | 1/1/2015 | 7,075.00 |
| 5/1/2014 | 4,250.00 | 1/26/2015 | 17,786.30 |
| 6/1/2014 | 4,250.00 | 2/1/2015 | 7,075.00 |
| 6/27/2014 | 2,600.00 | 2/26/2015 | 12,659.92 |
| 7/2/2014 | 4,250.00 | 3/1/2015 | 7,075.00 |
| 7/29/2014 | 7,000.00 | 3/23/2015 | 5,000.00 |
| 7/29/2014 | 7,000.00 | 4/1/2015 | 7,075.00 |
| 7/29/2014 | 8,000.00 | 5/1/2015 | 7,075.00 |
| 8/29/2014 | 6,075.00 | 6/1/2015 | 7,075.00 |
| 8/29/2014 | 1,000.00 | 7/1/2015 | 7,075.00 |
| 10/1/2014 | 7,075.00 | 7/1/2015 | 7,075.00 |
| 11/1/2014 | 7,075.00 | Total: | $477,546.22 |
| 12/1/2014 | 7,075.00 | | |

38.     Miller used $280,446.22 of the Commercial Distributions to pay his personal obligations to Gingerich under the UPA.

39.     Further, 5 Star Commercial received no value for any of the Commercial Distributions.

40.     At no point between February 2014 and July 2015 did 5 Star Commercial's total assets exceed its total liabilities; it was insolvent.

41.     Similarly, between February 2014 and July 2015, Miller took $486,408.97 in distributions from 5 Star Investment Group (the "Investment Group Distributions"):

| The Investment Group Distributions | | The Investment Group Distributions | |
| Date | Amount | Date | Amount |
| --- | --- | --- | --- |
| 2/3/2014 | 2,000.00 | 6/3/2014 | 2,000.00 |
| 3/3/2014 | 2,000.00 | 7/1/2014 | 2,000.00 |
| 4/3/2014 | 2,000.00 | 10/28/2014 | 473,473.97 |
| 5/3/2014 | 2,000.00 | 3/5/2015 | 435.00 |

| The Investment Group Distributions | |
|---|---|
| Date | Amount |
| 6/26/2015 | 500.00 |

| The Investment Group Distributions | |
|---|---|
| Date | Amount |
| Total: | $486,408.97 |

42.     Miller used $473,473.97 of the Investment Group Distributions to pay his personal obligations to Gingerich under the UPA.

43.     Further, 5 Star Investment Group received no value for any of the Investment Group Distributions.

44.     At no point between February 2014 and July 2015 did 5 Star Investment Group's total assets exceed its total liabilities; it was insolvent.

### Miller's Misappropriation of 5 Star Commercial's Assets for His Personal Use and Benefit

45.     Between July 2014 and June 2015, Miller misappropriated at least $615,369.45 of 5 Star Commercial's assets for his own personal use and benefit.

46.     Although (a) Gingerich no longer had any interest in 5 Star Commercial, and (b) 5 Star Commercial had no obligations to Gingerich under the UPA, Miller caused 5 Star Commercial to make $550,000 in payments to Gingerich (the "Gingerich Distributions") for principal amounts Miller owed under the UPA, which Miller characterized as "partnership distributions" of 5 Star Commercial:

| The Gingerich Distributions | |
|---|---|
| Date | Amount |
| 7/29/2014 | $400,000.00 |
| 8/29/2014 | 150,000.00 |
| Total: | $550,000.00 |

47.     Similarly, although 5 Star Commercial had no obligations to Gingerich under the UPA, Miller caused 5 Star Commercial to make $65,369.45 in payments to Gingerich (the "Gingerich Interest Payments") for interest Miller owed under the UPA, which Miller characterized as "interest expenses" of 5 Star Commercial:

| The Gingerich Interest Payments | | The Gingerich Interest Payments | |
| --- | --- | --- | --- |
| Date | Amount | Date | Amount |
| 8/29/2014 | $14,729.77 | 5/20/2015 | 12,659.92 |
| 3/20/2015 | 12,659.92 | 6/15/2015 | 12,659.92 |
| 4/20/2015 | 12,659.92 | Total: | $65,369.45 |

48.     5 Star Commercial received no value for the Gingerich Distributions or the Gingerich Interest Payments.

**Miller's Venture Investments Through
5 Star Capital and 5 Star Commercial**

49.     In February 2015, Miller, despite having virtually **no experience** in commercial investments, created 5 Star Capital for the purposes of making investments (the "Venture Investments") in and/or for the benefit of several companies controlled by Julius Toth ("Toth") and Robert Foraker ("Foraker").

50.     Toth and Foraker's companies were purportedly developing environmentally friendly products, including a washing machine and pedal-operated wheelchair. As a part of the Venture Investments, Miller, acting on behalf of 5 Star Capital and/or 5 Star Commercial, transferred a total of $1,294,998.29 (a) for ownership interests in Toth and Foraker's companies, (b) to facilitate the purchase of real estate to be owned by companies Foraker created, and (c) in one instance, for no consideration whatsoever. Also as a part of

the Venture Investments, Miller, acting on behalf of 5 Star Capital and/or 5 Star Commercial,

loaned $950,000 to Toth and Foraker's companies, as follows:

| Promissory Notes Payable to 5 Star Capital from Toth & Foraker's Companies | | |
|---|---|---|
| Date | Maker | Loan Amount |
| 2/13/2015 | Green Resource Homes, Inc. | 100,000 |
| 2/13/2015 | Pedal Wheelchair, LLC | 100,000 |
| 2/18/2015 | 7 Heavens, LLC | 250,000 |
| 3/26/2015 | 7 Heavens, LLC | 500,000 |

### A.    The Venture Investments: 5 Star Capital's Interest in Green Resource Homes

51.    On February 13, 2015, Miller caused 5 Star Commercial, for the benefit of 5 Star Capital, to transfer $100,000 to purchase 5 Star Capital a one-third interest in Green Resource Homes, Inc. ("GRH"), an entity that Foraker had created only a few weeks earlier. The other two-thirds interests in GRH were held in equal parts by Foraker's company, Associated Countries in Technology International Incubator, Inc. ("ACT"), and Foraker, as the trustee for the Green Resource Homes Financial Trust for the benefit of Julius Toth, (the "Toth Trust"). After 5 Star Commercial purchased an interest in GRH, Miller was elected its President, CFO and Treasurer.

52.    Upon information and belief, Toth, Foraker, ACT and the Toth Trust made no capital contributions to GRH.

53.    Foraker represented to Miller that GRH would either hold patents on "green technology" or would have an ownership interest in companies that held "green technology" patents. Specifically, GRH was to receive a license for "[p]atented technology known as ECO Innovations and Inventions" from Toth's companies.

54.    GRH was supposed to have used 5 Star Capital's $100,000 investment to purchase, for GRH, a one-fifth interest in another one of Foraker's companies, 3D Holographics Medical Imaging Inc., ("3DH").  GRH was supposedly going to use the funds to solicit additional investors to raise funds to acquire patents and assets.

55.    Upon information and belief, GRH never received a one-fifth interest in 3DH. Moreover, GRH never held or licensed any patents or owned an interest in any companies that owned patents.

56.    On July 1, 2015, Miller caused 5 Star Capital to transfer an additional $50,000 to GRH; Miller failed to obtain a debt instrument for this transfer.

**B.     The Venture Investments: 5 Star Capital's
        Payments Relating to the NASA K Building**

57.    On February 13, 2015, Miller caused 5 Star Commercial, for the benefit of 5 Star Capital, to loan $100,000 to GRH.  To document its loan, GRH executed a promissory note (the "GRH Note") in 5 Star Capital's favor which required GRH to make 27 consecutive monthly payments of $1000 beginning in March 2015.

58.    GRH was also supposed to have received a one-fifth ownership in another one of Foraker's companies, Aeronautics Center for Research and Development Inc. ("ACRD"). GRH was supposedly going to use the proceeds of the GRH Note as an earnest money deposit on a commercial property (the "NASA K Building") that ACRD would own.

59.    Upon information and belief, GRH never received any interest in ACRD.

60.    Although GRH had no interest in ACRD, on May 21, 2015, Miller directed 5 Star Capital to transfer $100,000 to GRH so that it could purportedly extend the closing date for ACRD's purchase of the NASA K Building.

61.    ACRD never purchased the NASA K Building and the $100,000 5 Star Capital paid to extend the closing date was never returned; the funds were forfeited.

62.    Moreover, GRH never made a single payment to 5 Star Capital on the GRH Note.

### C.    The Venture Investments: The Middlebury Building

63.    On March 27, 2015, Miller caused 5 Star Capital to transfer $20,000 as an earnest money deposit for GRH on a building (the "Middlebury Building") in Middlebury, Indiana.  Although it lacked loading docks, the Middlebury Building was to be used as a distribution center for "EcoWashers".

64.    In April 2015, Miller had the Middlebury Building appraised.  The appraiser warned Miller to "stay away from it" because it was "a zoning nightmare" and "a disaster."

65.    Despite the appraiser's advice, on May 7, 2015, Miller directed 5 Star Capital to pay $524,998.29 for GRH's purchase of the Middlebury Building.

66.    On or about February 16, 2016, despite this bankruptcy and a restraining order imposed by the U.S. Securities and Exchange Commission, Foraker caused GRH to sell the Middlebury Property for $300,000; the closing sale proceeds were sent to Foraker.

### D.    The Venture Investments: Loans to 7 Heavens and Pedal Wheelchair

67.    On February 13, 2015, Miller caused 5 Star Commercial, for the benefit of 5 Star Capital, to loan $100,000 to one of Toth's companies, Pedal Wheelchair, LLC ("Pedal Wheelchair").  Pedal Wheelchair executed a promissory note (the "Pedal Wheelchair Note") in 5 Star Capital's favor, which required it to repay 5 Star Capital by making 27 consecutive monthly payments of $1000 beginning in March 2015.

68.     On or about February 18, 2015, Miller caused 5 Star Commercial, for the benefit of 5 Star Capital, to loan $250,000 to another one of Toth's companies, 7 Heavens LLC d/b/a EcoWasher ("7 Heavens").  7 Heavens executed a promissory note (the "7 Heavens Note 1") in 5 Star Capital's favor, which required it to repay 5 Star Capital by making 27 consecutive monthly payments of $2500 beginning in March 2015.  The funds from the 7 Heavens Note 1 were purportedly to be used to "release" a container of "EcoWashers".  5 Star Commercial received nothing for its funds.

69.     On March 26, 2015, despite Pedal Wheelchair's, 7 Heavens' and GRH's existing defaults by having failed to make the first payments on their respective promissory notes, Miller caused 5 Star Capital to loan 7 Heavens an *additional* $500,000.  7 Heavens executed a secured promissory note (the "7 Heavens Note 2") in 5 Star Capital's favor, which required it to repay 5 Star Capital by making 27 consecutive monthly payments of $5000 beginning on May 15, 2015.  The funds from the 7 Heavens Note 2 were purportedly to be used to "release" two containers of "EcoWashers".

**E.    The Venture Investments:
5 Star Capital's Interest in EcoWash**

70.     On March 30, 2015, Miller caused 5 Star Capital to transfer $250,000 to 7 Heavens to purchase a one-fifth interest in 7 Heavens.  However, instead of obtaining an interest in 7 Heavens, 5 Star Capital purportedly obtained a one-fifth interest in another one of Toth's companies, Eco II EcoWash, LLC ("EcoWash").  7 Heavens retained ownership of the remaining four-fifths of EcoWash.

71.    Although Pedal Wheelchair, 7 Heavens and GRH had failed to make *any* payments on their respective promissory notes, on July 13, 2015, Miller caused 5 Star Capital to transfer $250,000 to EcoWash.

72.    Miller did not obtain a promissory note for 5 Star Capital's $250,000 transfer to EcoWash, nor did 5 Star Capital receive any consideration for it.

**The Outcome of**
**Miller's Venture Investments**

73.    Between February and July 2015, Miller raised $1,475,000 from investors through 5 Star Capital and caused 5 Star Commercial and 5 Star Capital to invest a total of $2,244,998 in Toth and Foraker's companies:



\*    denotes interests that Toth and Foraker promised, but did not convey.
\*\*   ACRD never acquired ownership of this asset.

74.    5 Star Capital received only $3500 for Miller's $2,244,998 Venture Investments: in July 22, 2015, a $2500 payment was made on the 7 Heavens Note 1 and a

$1000 payment was made on the Pedal Wheelchair Note – the first and only payments on those notes.  To date, 5 Star Capital has not received any payments on the 7 Heavens Note 2 or the GRH Note.

75.    Despite the complexity of the Venture Investments and the amount of 5 Star Capital's investors' money at stake, Miller performed virtually no due diligence on Toth, Foraker or the Venture Investments.

76.    Miller failed to research Toth and Foraker's backgrounds, which would have revealed Toth's prior bankruptcy filing and seven civil lawsuits against Foraker and his businesses.  Miller also failed to obtain and/or review any financial statements, detailed business plans, sales statistics, contracts evidencing customer orders, or any other documents detailing Toth and Foraker's companies' financial condition.

77.    Miller failed to confirm whether GRH actually had acquired a one-fifth interest in 3DH and ACRD before transferring $125,000 to or for the benefit of GRH and $200,000 to or for the benefit of ACRD.

78.    5 Star Capital was insolvent from its inception as a result of Miller's Venture Investments.  In July 2015, 5 Star Capital's monthly interest obligations to its investors had exceeded $18,000 -- nearly *double* what 5 Star Capital should have been receiving from 7 Heavens, Pedal Wheelchair and GRH for their promissory notes, had those companies been making the required payments.

79.    Ultimately, 5 Star Capital ended up with a one-third interest in GRH and a one-fifth interest in EcoWasher.  Upon information and belief, 5 Star Capital's interests in EcoWasher and GRH are worthless.

80. Miller caused 5 Star Commercial to invest $550,000 in GRH, Pedal Wheelchair and 7 Heavens for 5 Star Capital's benefit.

81. Miller caused 5 Star Capital to invest $1,694,998.29 in GRH, 7 Heavens and EcoWasher.

82. Miller's Venture Investments lost $2,241,498.29, or 99.8% of the total amounts invested.

83. Miller's actions taken and/or his failures to act on behalf of 5 Star Commercial and 5 Star Capital relating to the Venture Investments were careless, incompetent, unreasonable and imprudent under the circumstances.

**The SEC Lawsuit**

84. In November 2015, the Federal Bureau of Investigation raided the 5 Star Entities' offices.

85. On November 5, 2015, the United States Securities and Exchange Commission (the "SEC") filed a lawsuit against Miller, 5 Star Commercial and 5 Star Capital Fund in the United States District Court for the Northern District of Indiana, Hammond Division, Cause Number 3:15-cv-00519, for violations of the Exchange Act, 15 U.S.C. § 78a *et seq.*, and the Securities Act, 15 U.S.C. § 77a *et seq.*

**The 5 Star Entities Under
Miller's Management and Control**

86. Under Miller's management and control, the 5 Star Entities, including the Debtors, were dependent upon each other.

87. Miller caused the 5 Star Entities, including the Debtors, to make material inappropriate transfers of investor funds among each other.

88.    Miller did not manage or account for the Debtors as stand-alone, independent entities.

89.    Moreover, under Miller's management and control, the Debtors used new investor funds to satisfy current investor obligations of principal and interest.  Miller's fund-raising activities perpetuated this cycle and deepened the Debtors' insolvency.

90.    Miller's actions taken and/or his failures to act on the Debtors' behalf were careless, incompetent, unreasonable and imprudent under the circumstances.

## COUNT I

### Action to Avoid Fraudulent Transfers
### From 5 Star Commercial Pursuant to 11 U.S.C. §§ 544 and 548
### and IND. CODE §§ 32-18-2-14, -15 and -17

91.    The Trustee restates the allegations in paragraphs one through 90 of this Complaint as if fully repeated here and incorporates them herein by reference.

92.    The Commercial Distributions in the amount of $477,546.22 were made within the four years preceding the date of the Debtors' bankruptcy petitions.

93.    5 Star Commercial made the Commercial Distributions:

A)    with the actual intent to hinder, delay or defraud creditors; and/or

B)    without 5 Star Commercial receiving a reasonably equivalent value in exchange for them; and

i.    while 5 Star Commercial was engaged or was about to engage in business or transaction(s) for which its remaining assets were unreasonably small in relation to the business or transaction(s); or

   ii.  when 5 Star Commercial intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay the debts as they became due.

94. In the alternative, 5 Star Commercial A) made the Commercial Distributions without receiving a reasonably equivalent value in exchange for them, and B) was insolvent at that time or became insolvent as a result of the Commercial Distributions.

95. The Commercial Distributions are avoidable as fraudulent pursuant to 11 U.S.C. §§ 544 and 548 and IND. CODE §§ 32-18-2-14, -15 and -17.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller as follows: A) declaring that the Commercial Distributions in the amount of four hundred seventy-seven thousand five hundred forty-six dollars and twenty-two cents ($477,546.22) are avoidable pursuant to 11 U.S.C. § 548 and IND. CODE §§ 32-18-2-14, -15 and -17; B) avoiding the Commercial Distributions; and C) granting all other relief that is just and proper in the premises.

## COUNT II

### Action to Avoid Fraudulent Transfers From
### 5 Star Investment Group Pursuant to 11 U.S.C. §§ 544 and 548
### and IND. CODE §§ 32-18-2-14, -15 and -17

96. The Trustee restates the allegations in paragraphs one through 95 of this Complaint as if fully repeated here and incorporates them herein by reference.

97. The Investment Group Distributions in the amount of $486,408.97 were made within the four years preceding the date of the Debtors' bankruptcy petitions.

98. 5 Star Investment Group made the Investment Group Distributions:

   A)  with the actual intent to hinder, delay or defraud creditors; and/or

B)    without receiving reasonably equivalent value in exchange for them; and

i.    while it was engaged or were about to engage in business or transaction(s) for which its remaining assets were unreasonably small in relation to the business or transaction(s); or

ii.    when it intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay the debts as they became due.

99.    In the alternative, 5 Star Investment Group A) made the Investment Group Distributions without receiving a reasonably equivalent value in exchange for them, and B) was insolvent at that time or became insolvent as a result of the Investment Group Distributions.

100.    The Investment Group Distributions are avoidable as fraudulent pursuant to 11 U.S.C. §§ 544 and 548 and IND. CODE §§ 32-18-2-14, -15 and -17.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller as follows: A) declaring that the Investment Group Distributions in the amount of four hundred eighty-six thousand four hundred eight dollars and ninety-seven cents ($486,408.97) are avoidable pursuant to 11 U.S.C. § 548 and IND. CODE §§ 32-18-2-14, -15 and -17; B) avoiding the Investment Group Distributions; and C) granting all other relief that is just and proper in the premises.

## COUNT III

### Action for the Recovery of Avoided Transfers
### Pursuant to 11 U.S.C. § 550(a)

101.    The Trustee restates the allegations in paragraphs one through 100 of this Complaint as if fully repeated here and incorporates them herein by reference.

102.    Miller was the initial transferee of the Commercial Distributions.

103.    Miller was the initial transferee of the Investment Group Distributions.

104.    The Commercial Distributions and the Investment Group Distributions, to the extent each are avoided pursuant to Bankruptcy Code §§ 544 and 548 and IND. CODE §§ 32-18-2-14, -15 and -17, may be recovered by the Trustee pursuant to Bankruptcy Code § 550(a).

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller on Count III, as follows: A) in the amount of four hundred seventy-seven thousand five hundred forty-six dollars and twenty-two cents ($477,546.22) for the Commercial Distributions and four hundred eighty-six thousand four hundred eight dollars and ninety-seven cents ($486,408.97) for the Investment Group Distributions, for a total of nine hundred sixty-three thousand nine hundred fifty-five dollars and nineteen cents ($963,955.19), plus pre- and post-judgment interest from the date on which the Trustee demanded the transfers back, and the costs of this proceeding; B) declaring that the Trustee may recover nine hundred sixty-three thousand nine hundred fifty-five dollars and nineteen cents ($963,955.19) for the Commercial Distributions and Investment Group Distributions from the defendant Miller for the benefit of the Consolidated Estates

pursuant to Bankruptcy Code § 550(a); and C) granting all other relief that is just and proper in the premises.

## COUNT IV

### Action Against Miller for Unlawful Distributions
### Made by 5 Star Commercial Pursuant to IND. CODE § 23-18-5-7

105.    The Trustee restates the allegations in paragraphs one through 104 of this Complaint as if fully repeated here and incorporates them herein by reference.

106.    After giving effect to the Commercial Distributions, 5 Star Commercial was not able to pay its debts as they became due in the usual course of business.

107.    In the alternative, 5 Star Commercial's total assets were less than the sum of its total liabilities plus the amount that would be needed if the affairs of 5 Star Commercial were to be wound up at the time of the Commercial Distributions to satisfy any preferential rights that were superior to the rights of Miller receiving the Commercial Distributions.

108.    Miller assented to the Commercial Distributions.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller on Count IV in the amount of four hundred seventy-seven thousand five hundred forty-six dollars and twenty-two cents ($477,546.22) for the Commercial Distributions and the costs of this proceeding and grant all other relief that is just and proper in the premises.

## COUNT V

### Action Against Miller for Unlawful Distributions
### Made by 5 Star Investment Group Pursuant to IND. CODE § 23-18-5-7

109.    The Trustee restates the allegations in paragraphs one through 108 of this Complaint as if fully repeated here and incorporates them herein by reference.

110.    After giving effect to the Investment Group Distributions, 5 Star Investment Group was not able to pay its debts as they became due in the usual course of business.

111.    In the alternative, 5 Star Investment Group's total assets were less than the sum of its total liabilities plus the amount that would be needed if the affairs of 5 Star Investment Group were to be wound up at the time of the Investment Group Distributions to satisfy any preferential rights that were superior to the rights of Miller receiving the Investment Group Distributions.

112.    Miller assented to the Investment Group Distributions.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller on Count V in the amount of four hundred eighty-six thousand four hundred eight dollars and ninety-seven cents ($486,408.97) for the Investment Group Distributions and the costs of this proceeding and grant all other relief that is just and proper in the premises.

## COUNT VI

### Action Against Miller for Breach of
### Fiduciary Duty to 5 Star Commercial

113.    The Trustee restates the allegations in paragraphs one through 112 of this Complaint as if fully repeated here and incorporates them herein by reference.

114.    As its manager, Miller owed 5 Star Commercial fiduciary duties, including but not limited to:

        A)    the duties of care, competence, and diligence,

        B)    the duty to act reasonably and to refrain from conduct that would be likely to damage 5 Star Commercial's business,

       C)      the duty to not use 5 Star Commercial's property for his own purposes or those of a third party, and

       D)      the duty to act loyally for 5 Star Commercial's benefit.

115.    By the actions described in this Complaint, Miller breached his fiduciary duties owed to 5 Star Commercial.

116.    As a result of Miller's breach of fiduciary duties, 5 Star Commercial has suffered damages comprising of:

       A)      $477,546.22 for the Commercial Distributions;

       B)      $550,000 for the Gingerich Distributions;

       C)      $65,369.45 for the Gingerich Interest Payments; and

       D)      $550,000 for the Venture Investments.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller on Count VI in the amount of one million six hundred forty-two thousand nine hundred fifteen dollars and sixty-seven cents ($1,642,915.67) for 5 Star Investment Group's actual losses resulting from Miller's breach of fiduciary duties and the costs of this proceeding and grant all other relief that is just and proper in the premises.

## COUNT VII

### Action Against Miller for Breach of
### Fiduciary Duty to 5 Star Capital

117.    The Trustee restates the allegations in paragraphs one through 116 of this Complaint as if fully repeated here and incorporates them herein by reference.

118.    As its manager, Miller owed 5 Star Capital fiduciary duties, including but not limited to:

        A)      the duties of care, competence, and diligence,

        B)      the duty to act reasonably and to refrain from conduct that would be likely to damage 5 Star Capital's business,

        C)      the duty to not use 5 Star Capital's property for his own purposes or those of a third party, and

        D)      the duty to act loyally for 5 Star Capital's benefit.

119.    By the actions described in this Complaint, Miller breached his fiduciary duties owed to 5 Star Capital.

120.    As a result of Miller's breach of fiduciary duties, 5 Star Capital has suffered damages comprising of $1,694,998.29 for the Venture Investments.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller on Count VII in the amount of one million six hundred ninety-four thousand nine hundred ninety-eight dollars and twenty-nine cents ($1,694,998.29) for 5 Star Capital's actual losses resulting from Miller's breach of fiduciary duties and the costs of this proceeding and grant all other relief that is just and proper in the premises.

## COUNT VIII

### Action Against Miller for Breach of
### Fiduciary Duty to 5 Star Investment Group

121.    The Trustee restates the allegations in paragraphs one through 120 of this Complaint as if fully repeated here and incorporates them herein by reference.

122.    As its manager, Miller owed 5 Star Investment Group fiduciary duties, including but not limited to:

        A)    the duties of care, competence, and diligence,

        B)    the duty to act reasonably and to refrain from conduct that would be likely to damage 5 Star Investment Group's business,

        C)    the duty to not use 5 Star Investment Group's property for his own purposes or those of a third party, and

        D)    the duty to act loyally for 5 Star Investment Group's benefit.

123.    By the actions described in this Complaint, Miller breached his fiduciary duties owed to 5 Star Investment Group.

124.    As a result of Miller's breach of fiduciary duties, 5 Star Investment Group has suffered damages comprising of $486,408.97 for the Investment Group Distributions.

**WHEREFORE**, the Trustee respectfully requests that the Court enter judgment in favor of the Trustee and against defendant Earl D. Miller on Count VIII in the amount of four hundred eighty-six thousand four hundred eight dollars and ninety-seven cents ($486,408.97) for 5 Star Investment Group's actual losses resulting from Miller's breach of fiduciary duties and the costs of this proceeding and grant all other relief that is just and proper in the premises.

## COUNT IX

### Action Against Miller for Counterfeiting and Forgery

125.    The Trustee restates the allegations in paragraphs one through 124 of this Complaint as if fully repeated here and incorporates them herein by reference.

126.    On or about April 16, 2015, Miller signed Marlin Schwartz's ("Schwartz") name on a personal guaranty of a lease (the "Lease") between 5 Star Commercial and Axis Capital, Inc ("Axis").

127.    A true and accurate copy of the Lease is attached to this Complaint as Exhibit 2 and is incorporated herein by reference.

128.    Miller did not inform Schwartz about the Lease, nor did he obtain Schwartz's consent to obligate him on the Lease.

129.    5 Star Commercial defaulted on the Lease, and Axis sought to enforce the Lease against Schwartz.

130.    Between September 30, 2015, and June 22, 2016, Schwartz made a total of $16,725.43 in payments on the Lease.

131.    Miller knowingly, intentionally and/or with the intent to defraud, made the Lease in such a manner that it purported to have been made by Schwartz.

132.    Miller's actions constitute counterfeiting under IND. CODE § 35-43-5-2(a)(1)(A) and forgery under IND. CODE § 35-43-5-2(d)(1).

133.    As a result of Miller's actions, Schwartz has suffered actual damages in the amount of $16,725.43.

134.    On June 21, 2017, Schwartz, in his settlement agreement with the Trustee (the "Settlement Agreement"), assigned his interest in his claims against Miller to the Trustee.

135.    A true and accurate copy the Settlement Agreement is attached to this Complaint as Exhibit 3 and is incorporated herein by reference.

136.    Pursuant to IND. CODE § 34-24-3-1, the Trustee seeks to recover from Miller, among other things, three times the actual damages, as well as his court costs, collection and travel expenses and reasonable attorney's fees for this matter.

**WHEREFORE,** the Trustee respectfully requests that the Court enter judgment on Count IX in favor of the Trustee and against defendant Earl Miller A) in the amount of fifty thousand one hundred seventy-six dollars and twenty-nine cents ($50,176.29), B) grant the Trustee his court costs, collection and travel expenses and reasonable attorney's fees for this matter, and C) grant all other relief that is just and proper in the premises.

### COUNT X

### Action Against Miller for Breach of Fiduciary
### Duties Owed to All the Debtors

137.    The Trustee restates the allegations in paragraphs one through 136 of this Complaint as if fully repeated here and incorporates them herein by reference.

138.    Miller, as owner and manager of all the Debtors, owed the Debtors fiduciary duties, including but not limited to:

A)    duties of care, competence and diligence;

B)    the duty to act reasonably, prudently and to refrain from conduct that would likely damage the Debtors' business;

C)    the duty to not use the Debtors for his own purpose or those of a third party;

D)    the duty to act loyally for the Debtors' benefit; and

E)    the duty to act honestly and truthfully.

139.    By the actions described in this Complaint, Miller breached his fiduciary duties owed to the Debtors.

140.    During the Debtors' Section 341 meeting of creditors conducted on November 15, 2016, Miller, on behalf of the Debtors, refused to answer questions concerning the Debtors' assets, liabilities and operations and concerning his own conduct and actions that he took on behalf of the Debtors.

141.    A true and accurate transcript of Miller's testimony at the November 15, 2016, Section 341 meeting of creditors (the "341 Transcript") is attached to this Complaint as Exhibit 4 and is incorporated herein by reference.

142.    Exercising his Fifth Amendment right to avoid self-incrimination, Miller refused to answer the following questions regarding his breach of fiduciary duties owed to the Debtors:

A)    "[W]as it your intention to defraud the investors that lent money to 5 Star entities?" (341 Transcript, page 32, lines 22 through 23, cited hereafter as 341 Trans., 32: 22-23);

B)    "[A]re there any investor funds that were directed toward 5 Star entities that are not included in today's bankruptcy proceeding?" (341 Trans., 36: 11-14);

C)    "[A]t what point in time did you, representing 5 Star, knowingly begin to put more investment money into a mortgage than the property is worth?" (341 Trans., 38: 13-16);

D)    "Isn't it true, Mr. Miller, that the $1.9 million that was raised for the purchase of Twin Cities came from 5 Star investors?" (341 Trans., 52: 18-20);

E)    "With regard to Twin City, the ownership on the deed for that property is Twin City of Winston-Salem, LLC, an Indiana limited liability company.  Are you the owner of that limited liability company?" (341 Trans., 51: 25; 341 Trans., 52:1-4);

F)    "Isn't it true, Mr. Miller, you didn't put any of your own money into the investment in the North Carolina property?" (341 Trans., 56: 13-15);

G)    "Isn't it true Mr. Miller, that you also received compensation that's not been disclosed?" (341 Trans., 56: 21-22);

H)    "Mr. Miller, isn't it true that you made intercompany transfers to hide your efforts to defraud the investors?" (341 Trans., 58: 8-10);

I)    "Is it true, Mr. Miller, that over a hundred thousand dollars of investor money was transferred from 5 Star entities to Z Ministries?" (341 Trans., 59: 5-7);

J)    "Mr. Miller, did 5 Star investors' money go into Colonial Place Apartments?"[4] (341 Trans., 64: 10-11);

K)    "Did you accept funds from [the investors] by wire transfer?" (341 Trans., 83: 19);

L)    "Did you use the instrumentality of the United States Postal Service in the furtherance of your business enterprise of 5 Star entities?" (341 Trans., 83: 21-23);

M)    "Has all the cash that was received by 5 Star been adequately and properly accounted for?" (341 Trans., 86: 18-19); and

---

[4] Thereafter Miller was asked about 14 more apartment complexes.  (341 Trans., 64: 13-25; 341 Trans., 65: 1-25).

N)    "Mr. Miller, have you transferred any assets to any family member?"
(341 Trans., 86: 21-22).

143.    As a result of Miller's breaches of his fiduciary duties, the Debtors have
suffered damages exceeding $20,000,000.

**WHEREFORE,** the Trustee respectfully requests that the Court enter judgment in favor
of the Trustee and against defendant Earl Miller in the amount of twenty million dollars
($20,000,000), or other amount that the Court determines on Count X, for the Debtors' losses
resulting from Miller's breaches of his fiduciary duties and the costs of this proceeding and
grant all other relief that is just and proper in the premises.

Respectfully submitted,

**KOS & ASSOCIATES**

/s/ Edmund P. Kos
Edmund P. Kos (11234-49)

/s/ David M. Mustard
David M. Mustard (30056-02)

Attorneys for Douglas R. Adelsperger,
 Chapter 11 Trustee

203 West Wayne Street, Suite 402
Fort Wayne, Indiana 46802
Telephone: (260) 424-2790
Facsimile: (260) 424-1872
E-mail: ekos@ekoslaw.com