## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT ("Agreement") is made effective July 29, 2014 ("Effective Date") by and between **Matthew D. Gingerich** ("Seller") and **Earl D. Miller** ("Buyer").

### Recitals

A.     Seller owns a fifty percent interest in each of the limited liability companies listed on the attached Exhibit A (individually, "Company" and collectively, "Companies").

B.     For the purposes of this Agreement, each of Seller's fifty percent interest in each Company and Seller's fifty percent interests in more than one Company are individually referred to as "Interest" and collectively as "Interests".

B.     Seller desires to sell to Buyer all of Seller's Interests and Buyer desires to purchase from Seller all of Seller's Interests pursuant to the terms and conditions of this Agreement.

### Agreement

IT IS NOW THEREFORE in consideration of the foregoing and, for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

1.     Sale of Interests.     At Closing (as defined below), Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase from Seller all of Seller's Interests in all of the Companies.   The total purchase price for all of the Interests shall be Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) ("Purchase Price") payable pursuant to this Section 1 and subject to this Agreement.

1.1.     At Closing, Buyer shall pay to Seller in immediately available funds Four Hundred Thousand and 00/100 Dollars ($400,000.00) ("First Payment").

1.2.     On or before August 30, 2014, Buyer shall pay to Seller in immediately available funds Four Hundred Thousand and 00/100 Dollars ($400,000.00) ("Second Payment") plus interest calculated pursuant to this Section 1.

1.3.     On or before October 30, 2014, Buyer shall pay to Seller in immediately available funds Four Hundred Fifty Thousand and 00/100 Dollars ($450,000.00) ("Third Payment") plus interest calculated pursuant to this Section 1.

1.4.     Buyer shall pay to Seller in immediately available funds the following payments ("First Installment") with interest calculated pursuant to this Section 1 on or before the following dates (individually, "First Installment Payment" and collectively, "First Installment Payments"): (i) interest only payments on or before January 25, 2015, April 25, 2015, July 25, 2015, October 25, 2015, January 25, 2016 and April 25, 2016 and (ii) Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) plus interest on or before July 25, 2016.

1.5.     The remaining One Million and 00/100 Dollars ($1,000,000.00) of the Purchase Price ("Second Installment") shall be payable in equal monthly installments of

**EXHIBIT 1**

principal and interest (individually, "Second Installment Payment" and collectively, "Second Installment Payments") in the amount of Twelve Thousand Six Hundred Fifty-Nine and 92/100 Dollars ($12,659.92) beginning on August 25, 2016 and continuing on the twenty-fifth (25th) day of each month thereafter until July 25, 2024, at which time the entire unpaid balance and accrued interest of the Second Installment shall be due and payable in full without notice or demand.

      1.6.   The entire unpaid Purchase Price, included, but not limited to, the Second Payment, the Third Payment, the First Installment and the Second Installment, shall bear interest from the Effective Date until paid to Seller at a rate of eight percent (8%) per annum, compounded monthly; provided that interest on the Second Installment shall bear interest from July 25, 2016 until paid to Seller at a rate of five percent (5%) per annum, compounded monthly.   All Payments (as defined below) of the Purchase Price shall be applied first to fees and costs, if any, due from Buyer to Seller, then to accrued but unpaid interest, then to any unpaid and past due Purchase Price, then to the unpaid Purchase Price.   Buyer may prepay any part or all of the unpaid Purchase Price; provided that any such prepayment made after July 25, 2016 shall be applied to the Second Installment Payments in the inverse order of their due dates.   In the event that any of the Second Payment, Third Payment, First Installment Payments or Second Installment Payments are made more than ten (10) days after the due date of such Payment, then Buyer shall immediately owe Seller and shall pay to Seller by the due date of the next Payment an amount equal to two percent (2%) of the Payment which was more than ten (10) days late.   In the event of an Event of Default (as defined below) by Buyer, the unpaid Purchase Price, at the option of Seller, shall become immediately due and payable in full.

      1.7.   For the purposes of this Agreement, "Payment" shall mean individually any of the Second Payment, Third Payment, First Installment Payments and Second Installment Payments, and "Payments" shall mean collectively any or all of the Second Payment, Third Payment, First Installment Payments and Second Installment Payments.

      2.   <u>Transfer of Interests</u>.   At Closing, Seller shall deliver to Buyer the Assignment attached as Exhibit B to this Agreement transferring to Buyer all of Seller's Interests in all of the Companies, resigning as a member, manager, officer and director of all of the Companies, releasing all rights, title and interests in and to any Company property and releasing all claims against Buyer and the Companies.   At Closing, Seller shall also return to Buyer any and all Company property in his possession, including, but not limited to, all books and records of any Company, Credit Cards (as defined below), any other credit cards, debit cards, wireless internet cards, keys, computers and cell phones.

      3.   <u>Pledge of Interests</u>.

      3.1.   <u>Stock Pledge</u>.   As security and collateral for Buyer's obligation to pay all of the Second Payment, Third Payment, First Installment and Second Installment, all Payments and interest related thereto and all other obligations of Buyer pursuant to this Agreement and notwithstanding any term to the contrary in this Agreement, Buyer hereby pledges, grants a security interest in and assigns to Seller all of Buyer's right, title and interest in and to all of the Interests in all of the Companies ("Pledge").   At Closing,

**EXHIBIT 1**

Buyer shall deliver to Seller the assignment attached as Exhibit C to this Agreement. Seller agrees to hold the assignment pursuant to the terms of this Section 3.

3.2.    The Pledge shall continue in full force and effect until the entire Purchase Price and accrued interest has been paid in full; provided that, so long that there is not an uncured Event of Default (as defined below) and no delinquent Payment, for every Fifty Thousand and 00/100 Dollars ($50,000.00) paid by Buyer to Seller of the Purchase Price, a one percent (1%) Interest in each Company shall be released from the Pledge.  Any Interests released from this Pledge shall be deemed released without any further action taken by Buyer or Seller.

3.3.    Unless there is an Event of Default (as defined below), Buyer shall be entitled to vote all of the Interests.  If such an Event of Default has occurred, Buyer shall forfeit in favor of Seller the right to vote the Interest subject to this Pledge.  Buyer shall also cause Seller to be immediately appointed as manager of each of the Companies along with Buyer and cause Seller to immediately be member (not a transferee) of each Company with all rights of Buyer.

3.4.    Unless there is an Event of Default, all dividends and distributions with respect to the Interests shall be paid to Buyer.  If such an Event of Default has occurred, Seller shall have the right to receive such dividends and distributions with respect to the Interests subject to this Pledge or exercise any other rights provided by this Section 3 and/or this Agreement.

3.5.    In the event of an Event of Default, Seller shall be entitled to: (i) collect and receive the Interests subject to this Pledge, including, but not limited to, any dividends and distributions, (ii) transfer or register in Seller's name the Interests subject to this Pledge, and (iii) vote the Interests subject to this Pledge.

3.6.    During the time in which any Interests remain subject to this Pledge or any of the Purchase Price and accrued interest remain unpaid, Buyer shall not (i) with respect to Interests subject to the Pledge, sell, assign, transfer, encumber or otherwise dispose of any Interest, any part of the Interests or any Interest or any of Buyer's rights, title or interest in the Interests, (ii) sell, assign, transfer, encumber or otherwise dispose any of his ownership interests in any or all of the Companies which he owned at Closing or any of the Interest no longer subject to the Pledge (collectively, "Buyer's Interests"), any part of Buyer's Interests or any of Buyer's rights, title or interest in Buyer's Interests, such that at any time Buyer has less than a controlling interest in any of the Companies (iii) sell, assign, transfer, encumber or otherwise dispose of any assets of the Companies, except in the ordinary course of the business of the Companies and (iv) purchase assets in connection with the business of the Companies in any other entity other than one of the Companies unless Buyer grants Seller a security interest in a proportionate amount of ownership interest in such entity equal to the proportion of Interests still subject to the Pledge at that time.

3.7.    Seller shall not be required to seek the remedies provided by this Pledge prior to or in lieu of any other remedy available to Seller.  Seller may look to Buyer and any remedies related to Buyer prior to enforcing and foreclosing the security interest provided by this Pledge.

**EXHIBIT 1**

4.    Post-Closing Obligations.

4.1.    Buyer shall complete the all of the following with ninety (90) days after Closing:

4.1.1. Buyer shall have Seller's name removed from the non-recourse loan in connection with Avalon Trace.

4.1.2. Buyer shall cause one of the Companies to pay off the note and mortgage on 1310 Spring Street, Mishawaka, Indiana.

4.1.3. Buyer shall have Seller removed as a guarantor on the investments with the Companies by the investors listed on the attached Exhibit D and any other investors with investments with the Companies personally guaranteed by Seller.

4.1.4. Buyer will remove Seller's name from and remove Seller as a guarantor from the following credit cards ("Credit Cards"): (i) the 5 Star Investment Group American Express, Bank of America and PNC and (ii) the 5 Star Commercial Chase.  In the event that Buyer cannot remove Seller's name from and remove Seller as a guarantor from the Credit Cards, Buyer shall or shall cause the Companies to payoff in full any balance and close each of the Credit Cards.

4.1.5. Buyer will have Seller removed from the loan with Interra Credit Union on that certain 2010 Ford Fusion.

4.2.    Seller shall complete the following after Closing within thirty (30) days after Closing:

4.2.1. Seller shall have the lease for the 2011 Cadillac Escalade put in his name only and shall remove any Company from the Lease.

4.2.2. Seller shall have the Comcast internet and phone services at his personal residence put in his name only and shall remove any Company from any obligation with respect to such internet and phone service.

4.2.3. Seller shall have the cell phone contract for Seller and Seller's wife put in the name of Seller and Seller's wife and shall remove the Company from any obligation with respect to such cell phone contract.

4.2.4. Seller shall transfer Life Lock and Trans Union into Seller's name and shall remove the Company from any obligation with respect to the foregoing.

5.    Representations and Warranties of Seller.  Seller represents and warrants to Buyer as follows:

5.1.    Seller owns the Interests free and clear of all liens and encumbrances.  Seller has no other ownership interests in the Companies other than the Interests.  There are no outstanding options, warrants or agreements of any kind related to the Interests.  No other person or entity has any right, whether by agreement or otherwise or present or future, in the Interests.  Seller has complete and unrestricted power to sell, convey, assign, transfer and deliver the Interests to Buyer.  Except for the

4

**EXHIBIT 1**

lien provided by Section 3 of this Agreement, the transfer of the Interests pursuant to this Agreement will pass to Buyer good, valid and marketable title to the Interests, free and clear of all liens, pledges, options, charges, and adverse claims of every nature.   Upon delivery of the Interests to Buyer pursuant to this Agreement, Buyer will have good, valid and marketable title to all of the Interests, and the Interests will be, when delivered, duly authorized, validly issued, fully paid and non-assessable, and free and clear of any and all liens, encumbrances, charges or claims.

5.2.    To the knowledge of Seller, the Companies have no material liabilities or obligations secured or unsecured (whether absolute or contingent) that are not shown on any Company balance sheet or financial statement or have otherwise been disclosed by Seller to Buyer.   To the knowledge of Seller, there are no any material claims or liability of any nature not fully reflected or reserved against in the financial statements of the Companies or any material liability or claim of any nature, except those incurred in the ordinary course of business, which Seller has not disclosed to Buyer.

5.3.    To Seller's knowledge and not otherwise disclosed to or known to Buyer, there are no or reasonably likely material adverse changes in the financial condition or in the operations, business, prospects, properties, assets or ownership interests, including, the Interests, of the Companies which Seller has not disclosed to Buyer.

5.4.    There are no conditions known to Seller and not otherwise disclosed to or known by Buyer with respect to the markets, facilities, personnel, suppliers or business relationships of the Companies which may materially and adversely affect the Companies' business or prospects.   To the Seller's knowledge and not otherwise disclosed to or known by Buyer, none of the Companies have received a notice of any violation of any applicable statute, regulation, code, ordinance or law with respect to any Company's business or properties not otherwise disclosed to Buyer.   To the knowledge of Seller and not otherwise disclosed to or known to Buyer, none of the Companies are in material violation of any any applicable statute, regulation, code, ordinance or law with respect to its business or properties, which violation would have a material adverse effect upon the business or results of operation of any of the Companies.

5.5.    There are no contracts, leases or agreements, whether oral or written, affecting the personal property, real property or any employee of any Company that Seller has not disclosed to or are otherwise known by Buyer.

5.6.    To Seller's knowledge and not otherwise disclosed to or known by Buyer, (i) there is no suit, action, arbitration, or legal, administrative or other proceeding or governmental investigation pending or, to the knowledge of Seller, threatened against any of the Companies, (ii) no Company is subject to any order, writ, injunction or decree of any federal, state or local court, department or agency or instrumentality and (iii) each Company has complied in all material respects with all applicable law, rules and regulations relating to the employment of labor, including laws relative to wages, hours and the payment or withholding of taxes for its employees.

5.7.    To Seller's knowledge and not otherwise disclosed to or known by Buyer, (i) each Company has paid in full all taxes, interest, penalties or assessments shown to be due on tax returns and reports filed by each Company or claimed in writing by taxing authorities to be due by each Company for all periods through and including the

**EXHIBIT 1**

date of Closing, (ii) all tax returns and reports filed by each Company are true and correct in all material respects and (iii) no governmental agency has or will have any basis for the filing of any tax lien or assessment against any asset of any Company.

5.8.    To Seller's knowledge and not otherwise disclosed to or known by Buyer, neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will result in the beach of any of the terms or provisions of, or constitute a default under the Articles of Organization, the Operating Agreement, or any lease, license, promissory note, conditional sales contract, commitment, indenture, mortgage, instrument or other agreement to which any Company is a party or by which its property is bound, or constitute an event which would permit any party to any such agreement to terminate or accelerate such agreement, or result in the creation or imposition of a lien, charge or encumbrance against any asset of any Company.

5.9.    Seller represents and warrants to Buyer as of the Effective Date that he has the power and authority to transfer the Interests and perform his obligations pursuant to this Agreement and that this Agreement constitutes the legal, valid and binding obligation of Seller in accordance with the terms of this Agreement.   Seller is not a party to or subject to any charter, mortgage, lien, lease, agreement, contract, instrument, law, rule, regulation, injunctions, ruling, order, judgment, or decree, or any other restriction of any kind or character, which would prevent the consummation of the transactions contemplated in this Agreement as of the Effective Date.

5.10.    Except as otherwise provided in this Agreement or as otherwise known or disclosed to Buyer, to the knowledge of Seller, no Company is a party to or subject to any charter, mortgage, lien, lease, agreement, contract, instrument, law, rule, regulation, injunctions, ruling, order, judgment, or decree, or any other restriction of any kind or character, which would prevent the consummation of the transactions contemplated in this Agreement as of the Effective Date.

6.    <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

6.1.    Buyer represents and warrants to Seller as of the Effective Date that he has the power and authority to transfer the Interests and perform his obligations pursuant to this Agreement and that this Agreement constitutes the legal, valid and binding obligation of Buyer in accordance with the terms of this Agreement.   Buyer is not a party to or subject to any charter, mortgage, lien, lease, agreement, contract, instrument, law, rule, regulation, injunctions, ruling, order, judgment, or decree, or any other restriction of any kind or character, which would prevent the consummation of the transactions contemplated in this Agreement as of the Effective Date.

6.2.    Except as otherwise provided in this Agreement or as otherwise known or disclosed to Seller, to the knowledge of Buyer, no Company is a party to or subject to any charter, mortgage, lien, lease, agreement, contract, instrument, law, rule, regulation, injunctions, ruling, order, judgment, or decree, or any other restriction of any kind or character, which would prevent the consummation of the transactions contemplated in this Agreement as of the Effective Date.

7.    <u>Indemnification</u>.

**EXHIBIT 1**

7.1.    All representations and warranties shall survive the Closing for a period of two (2) years from the Effective Date when they shall terminate, unless notice in writing of breach thereof was given prior to termination, except that representations and warranties in Sections 5.9 and 6.1 shall survive the Closing until extinguished by the appropriate statute of limitations.

7.2.    Seller agrees to indemnify and hold Buyer harmless from and against any losses, claims, damages, liabilities, costs and expenses, including, without limitation, debts, claims, liabilities, taxes, interest, penalties, damages, and attorney's fees and expenses asserted against, resulting to, imposed upon or incurred by Buyer or any Company, directly or indirectly, that are related to or arise from (i) Seller failing to perform any obligation, covenant or agreement pursuant to this Agreement and (ii) Seller breaching or there being a beach of any representation or warranty made by Seller pursuant to this Agreement.

7.3.    Buyer agrees to indemnify and hold Seller harmless from and against any losses, claims, damages, liabilities, costs and expenses, including, without limitation, debts, claims, liabilities, taxes, interest, penalties, damages, and attorney's fees and expenses asserted against, resulting to, imposed upon or incurred by Seller, directly or indirectly, that are related to or arise from (i) Buyer failing to perform any obligation, covenant or agreement pursuant to this Agreement, (ii) Buyer breaching or there being a beach of any representation or warranty made by Seller pursuant to this Agreement, (iii) the operations of any Company before, on or after the Effective Date and (iv) any matter relating to any Company, whether arising before, on or after the Effective Date, including, but not limited to, any matter relating to any investor.

7.4.    The indemnified party shall promptly and timely notify the indemnifying party in writing of the existence of any claim, liability, suit, demand or other matter to which the indemnified party claims the indemnifying party's indemnification obligations apply, including in such notice reasonable specificity as to the nature and amount of the claim under the indemnification and shall give the indemnifying party a reasonable opportunity to defend (including the right to compromise, adjust or settle) the same at the indemnifying party's own expense, with counsel of the indemnifying party's own selection; provided the indemnified party, at all times, has the right to participate fully in the defense at the indemnified party's own expense.   If, within thirty (30) days or such lesser period of time after written notice as is specified in such notice and is reasonable under the circumstances, the indemnifying party fails to defend, the indemnified party has the right, but not the obligation to undertake the defense of, and compromise or settle, the claim or other matters on behalf and for the account and at the risk of the indemnifying party, if the indemnifying party would have the responsibility to indemnify under this Section 7.4.  If the claim is one that cannot by its nature be defended solely by the indemnifying party without the assistance of the indemnified party, the indemnified party shall make available all information and assistance (at indemnifying party's expense) that indemnifying party may reasonably request.

8.    Non-Compete.

8.1.    Seller acknowledges that (i) Buyer and the Companies operate the Companies' businesses and market its products, services and activities throughout the Restricted Territory (as defined below), (ii) Buyer and the Companies compete with other businesses that are or could be located in any part of the territories listed in this Section 8,

7

**EXHIBIT 1**

(ii) Buyer and the Companies have significate business interest in the areas and with the persons listed in this Section 8, (iv) the provisions and restrictions of this Section 8 are reasonable, including, but not limited to, with respect to duration, geographical area and scope, and necessary to protect and preserve the business interests of Buyer and the Companies, (v) the provisions and restrictions of this Agreement constitute a material inducement to Buyer to enter into this and (vi) Buyer and the Companies would be irreparably damaged if Seller were to breach the covenants set forth in this Section 8.

8.2.    During the period beginning on the Effective Date and continuing until July 29, 2019 ("Restricted Period"), Seller shall not, directly or indirectly, whether individually or as an owner, stockholder, partner, member, operator, manager, joint venturer, investor, consultant, or in any other capacity whatsoever, (i) contact or solicit or take investments from current investors of any Company as of the Effective Date for any reason, (ii) use or solicit money or funds from any investors, whether persons or entities, who live or are located within a three hundred (300) miles of the corporate limits of Middlebury, Indiana, to purchase real estate (ii) engage in buying and selling real estate for profit in the following Indiana Counties: St. Joseph County and Elkhart County, (iii) engage in buying and selling real estate for profit within the corporate limits of the following areas: Greensboro, North Carolina, Charlotte, North Carolina, San Antonio, Texas and Portland, Oregon and (iv) invest Seller's own money with any of the following individuals or any legal entities controlled by or in which any of the following individuals have an ownership interest: Randy Palazzo, Chris Sakys, Ed Bebenco, Carl Withers and Vinod Chopra.

8.3.    In the event of a breach by Seller of any covenant set forth in this Section 8, the term of such covenant will be extended by the period of the duration of such breach.

8.4.    If any covenant of this Section 8 is held to be unenforceable, such covenant should be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them, as a court of competent jurisdiction may determine to be enforceable, will be effective, binding, or enforceable against Seller.

8.5.    If an Event of Default by Seller occurs with respect to a breach of any covenant in this Section 8, Buyer shall be entitled to the following remedies against Seller: (i) liquidated damages in an amount of Ten Thousand and 00/100 Dollars ($10,000.00) for each Event of Default, (ii) injunctive or other equitable relief to restrain any continued or threatened breach or otherwise to specifically enforce the provisions of this Section 8, it being agreed that money damages alone would be inadequate to compensate Buyer and such breach would cause irreparable harm to Buyer and the Companies and (iii) recovery from Seller of the attorneys' fees and costs incurred by Buyer in enforcing this Section 8. Buyer and Seller agree that the liquidated damages as provided in this Section 8 are a fair and good faith estimate of the damages Buyer would suffer as a result of a breach of this Section 8 and that Buyer shall not be required to prove any actual damages or lost profits as a result of said breach.

9.    Events of Default.    For the purposes of this Agreement, the term "Event of Default" shall mean any of the following: (i) the making of any false or inaccurate representation in this Agreement, (ii) the breach of any representation and warranty made in this Agreement, or (iii) the failure to observe or comply with any provision or covenant in

**EXHIBIT 1**

this Agreement, and such default is not cured to the reasonable satisfaction of the non-defaulting party within thirty (30) days of the date notice of such default is given; provided, however, that with respect to Buyer failing to timely make a Payment, such failure shall be an Event of Default is such Payment is not made within thirty (30) days of such Payment's due date.   If an Event of Default occurs, the party not in default may seek the following remedies, which shall be cumulative and are not mutually exclusive, provided that Buyer's remedies for and Event of Default related to Section 8 of this Agreement shall be as set forth in Section 8.5 of this Agreement: (i) all legal and equitable remedies provided by this Agreement, (ii) all other legal and equitable remedies available and (iii) the reasonable attorneys' fees, expenses, and costs incurred in connection with an Event of Default.

      10.    Further Assurance and Survival of Terms.

      10.1.  Seller and Buyer hereby agree to execute such documents and perform such acts as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement.   Except as otherwise provided in this Agreement, the obligations, covenants, representations, warranties and agreement of the parties pursuant to this Agreement shall survive the closing of the transactions contemplated by this Agreement.

      10.2.  For a period of seven (7) years after the Effective Date, Buyer shall allow Seller reasonable access to the books and records of the Companies in order to evaluate any tax matter related to Seller.

      11.    Non-waiver.  No delay or failure by any party to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right, unless otherwise expressly provided in this Agreement.

      12.    Governing Law.  This Agreement shall be deemed to be made in and in all respects shall be interpreted, construed and governed by and in accordance with the law of the State of Indiana.

      13.    Severability of Provisions.  Without limiting any provision in Section 8 of this Agreement, the invalidity or unenforceability of any provision hereof, or any part of such provision, shall in no way affect the validity or enforceability of any other provision of this Agreement.

      14.    Counterpart Execution.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all such counterparts shall constitute a single instrument. The parties agree that a facsimile or electronic signature of a party hereto shall be deemed to be as legally effective and binding as a signed original.

      15.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective parties hereto, their legal representatives, successors and assigns.

      16.    Entire Agreement.   This Agreement constitutes the entire agreement of the parties, all prior negotiations and agreements, whether written or oral, having been merged into this Agreement.

**EXHIBIT 1**

17.    Closing.   The closing of the transactions contemplated by this Agreement ("Closing") shall occur on the Effective Date at a time and place mutually agreeable to Buyer and Seller.

18.    Life Insurance.   Seller has two life insurance policies on the life of Buyer with Northwestern Mutual with the policy numbers of 19090855 and 18949922 in the amounts of $100,000.00 and $350,000.00, respectively ("Life Insurance Policy").   In the event that Buyer dies prior to paying the Purchase Price in full, the proceeds from the Life Insurance Policy shall reduce the remaining unpaid Purchase Price on a dollar for dollar basis; provided that Buyer shall not be released from and shall still owe to Seller any unpaid and delinquent amounts of the Purchase Price.   In the event that such proceeds are not sufficient to pay the entire unpaid Purchase Price, then Seller shall have the option to foreclose on the Pledge for the remaining Interests.   In the event that such proceeds are greater than the unpaid Purchase Price, Seller shall retain the excess proceeds and such excess proceeds shall remain the property of Seller.

IN WITNESS WHEREOF, Buyer and Seller have each executed this Agreement as of the date indicated below.

SELLER:

Matthew D. Gingerich

Date: <u>July 29, 2014</u>

BUYER:

Earl D. Miller

Date: <u>7-29-2014</u>

**EXHIBIT 1**

## Exhibit A

### Companies

1. 5 Star Investment Group, LLC

2. 5 Star Investment Group I, LLC

3. 5 Star Investment Group II, LLC

4. 5 Star Investment Group III, LLC

5. 5 Star Investment Group IV, LLC

6. 5 Star Investment Group V, LLC

7. 5 Star Investment Group VI, LLC

8. 5 Star Investment Group VII,LLC

9. 5 Star Investment Group VIII,LLC

10. 5 Star Investment Group IX, LLC

11. 5 Star Investment Group XI, LLC

12. 5 Star Investing, LLC

13. 5 Star Commercial, LLC

14. 5 Star Portland Holdings, LLC

15. 5 Star Indiana Holdings, LLC

**EXHIBIT 1**

Exhibit B

## ASSIGNMENT

For the consideration in that certain Unit Purchase Agreement of even date herewith by and among Matthew D. Gingerich and Earl D. Miller, Matthew D. Gingerich does hereby sell, assign and transfer to Earl D. Miller all of his Interests (as defined in the Unit Purchase Agreement) and does hereby constitute and appoint Earl D. Miller as his true and lawful attorney-in-fact, to make such transfer within the books and records of the Companies (as defined in the Unit Purchase Agreement).

Matthew D. Gingerich hereby resigns with respect to each Company (as defined in the Unit Purchase Agreement) as a member, manager, officer and director of such Company.

Except as otherwise provided in the Unit Purchase Agreement, Matthew D. Gingerich hereby releases any and all claims he has or may have against any of the Companies.

_____
Matthew D. Gingerich

Date: July 29, 2014

rci
c

12

**EXHIBIT 1**

Exhibit C

## ASSIGNMENT

For the consideration in that certain Unit Purchase Agreement of even date herewith by and among Matthew D. Gingerich and Earl D. Miller and as required by the Pledge (as defined in the Unit Purchase Agreement), Earl D. Miller, upon an Event of Default (as defined in the Unit Purchase Agreement) does hereby sell, assign and transfer to Matthew D. Gingerich all of the Interests (as defined in the Unit Purchase Agreement) subject to the Pledge and does hereby irrevocably constitute and appoint Matthew D. Gingerich as his true and lawful attorney in fact, for and in his name, to sell, assign and transfer any of the Interests subject to the Pledge and for that purpose to make and execute all necessary acts of assignment and transfer thereof, including, but not limited to, to make such transfer within the books and records of the Companies (as defined in the Unit Purchase Agreement).

_Earl Miller_
**Earl D. Miller**

Date: _7-29-14_

**EXHIBIT 1**

## Exhibit D

| Investor Name | Property | Amount |
|---|---|---|
| Lonnie Bontrager | 1113 N Terry | $25,000 |
| Marcus Schmucker | 1113 N Terry | $40,000 |
| Mevin Bontrager | 2025 SE Harold | $40,000 |
| Reuben Lengacher | 2025 SE Harold | $55,000 |
| Raymond Miller | 2025 SE Harold | $40,000 |
| Aaron Schmucker | 2025 SE Harold | $20,000 |
| Vernon Miller | 2025 SE Harold | $27,000 |
| Samuel Schwartz | 2025 SE Harold | $30,000 |
| Ben Lantz | 2025 SE Harold | $28,096 |
| Doug Burkholder | 2134 N Rodney | $40,000 |
| Robert Cross | 2134 N Rodney | $20,000 |
| James & Loretta Graber | 2134 N Rodney | $20,000 |
| Delmar Hochstelter | 2134 N Rodney | $40,000 |
| Dorcas Shildt | 2134 N Rodney | $47,000 |
| Benjamin Wagler | 2134 N Rodney | $40,000 |
| Micheal Walther | 2134 N Rodney | $25,000 |
| Leonard Yoder | 3109 NE 81st | $30,000 |
| Elizabeth Schwartz | 3109 NE 81st | $25,000 |
| Alvin Lengacher | 3136 NE 47th | $75,000 |
| Ivan Miller | 3136 NE 47th | $85,000 |
| Terry & Karen Andrews | 4134 N Michigan | $20,000 |
| William Adamczky | 4134 N Michigan | $55,500 |
| Ervin Byler | 4134 N Michigan | $100,000 |
| Robert Cross | 4134 N Michigan | $20,000 |
| Wayne Laffoon | 4134 N Michigan | $35,500 |
| Robert Hershman | 4524 N Michigan | $25,000 |
| Joan Muhling | 4524 N Michigan | $35,000 |
| Maxine Pletcher | 4524 N Michigan | $46,000 |
| Jerry Carpenter | 6951 N Olympia | $60,000 |
| Lester Graber | 6951 N Olympia | $50,000 |
| Andrew Graber | 6951 N Olympia | $20,000 |
| Lucy Bawel | 7212 N Portsmouth | $60,000 |
| Vernon Miller | 7212 N Portsmouth | $42,000 |
| Marcus Schmucker | 7212 N Portsmouth | $30,000 |
| Norman Schmucker | 7212 N Portsmouth | $28,000 |
| James & Loretta Graber | 9005 N Oswego | $45,000 |
| Larry Kruse | 9005 N Oswego | $51,500 |
| Sam Schwartz | 9005 N Oswego | $15,000 |
| Olen Hochstelter | 9005 N Oswego | $61,000 |
| Enos Schmucker | 923 NE Beech | $15,000 |
| Shannon Long | Personal Guarentee | $31,736 |
| Jacob Schwartz | Personal Guarentee | $25,000 |
| | Total | $1,623,332 |

**EXHIBIT 1**

07/29/2014  8:21:02 AM  Page 1

5 Star Payment Schedule

Compound Period ......... : Monthly

Nominal Annual Rate .... : 8.000 %

CASH FLOW DATA

| | Event | Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|---|
| 1 | Loan | 07/29/2014 | 2,100,000.00 | 1 | | |
| 2 | Payment | 08/30/2014 | 400,000.00 | 1 | | |
| | Fixed Principal (+Int.) | | | | | |
| 3 | Payment | 10/30/2014 | 450,000.00 | 1 | | |
| | Fixed Principal (+Int.) | | | | | |
| 4 | Payment | 01/25/2015 | Interest Only | 1 | | |
| 5 | Payment | 04/25/2015 | Interest Only | 1 | | |
| 6 | Payment | 07/25/2015 | Interest Only | 1 | | |
| 7 | Payment | 10/25/2015 | Interest Only | 1 | | |
| 8 | Payment | 01/25/2016 | Interest Only | 1 | | |
| 9 | Payment | 04/25/2016 | Interest Only | 1 | | |
| 10 | Payment | 07/25/2016 | 250,000.00 | 1 | | |
| | Fixed Principal (+Int.) | | | | | |
| 11 | Rate Change | 07/25/2016 | Rate: 5.000 % | Compounding: Monthly | | |
| 12 | Payment | 08/25/2016 | 12,659.92 | 96 | Monthly | 07/25/2024 |

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 07/29/2014 | | | | 2,100,000.00 |
| 1 | 08/30/2014 | 414,463.34 | 14,463.34 | 400,000.00 | 1,700,000.00 |
| 2 | 10/30/2014 | 472,742.22 | 22,742.22 | 450,000.00 | 1,250,000.00 |
| 2014 Totals | | 887,205.56 | 37,205.56 | 850,000.00 | |
| 3 | 01/25/2015 | 23,940.80 | 23,940.80 | 0.00 | 1,250,000.00 |
| 4 | 04/25/2015 | 25,167.04 | 25,167.04 | 0.00 | 1,250,000.00 |
| 5 | 07/25/2015 | 25,167.04 | 25,167.04 | 0.00 | 1,250,000.00 |
| 6 | 10/25/2015 | 25,167.04 | 25,167.04 | 0.00 | 1,250,000.00 |
| 2015 Totals | | 99,441.92 | 99,441.92 | 0.00 | |
| 7 | 01/25/2016 | 25,167.04 | 25,167.04 | 0.00 | 1,250,000.00 |
| 8 | 04/25/2016 | 25,167.04 | 25,167.04 | 0.00 | 1,250,000.00 |
| 9 | 07/25/2016 | 275,167.04 | 25,167.04 | 250,000.00 | 1,000,000.00 |
| Rate | 07/25/2016 | | 0.00 | 0.00 | 1,000,000.00 |
| | 07/25/2016 | Rate: 5.000 % | Compounding: Monthly | | |
| 10 | 08/25/2016 | 12,659.92 | 4,166.67 | 8,493.25 | 991,506.75 |
| 11 | 09/25/2016 | 12,659.92 | 4,131.28 | 8,528.64 | 982,978.11 |
| 12 | 10/25/2016 | 12,659.92 | 4,095.74 | 8,564.18 | 974,413.93 |
| 13 | 11/25/2016 | 12,659.92 | 4,060.06 | 8,599.86 | 965,814.07 |
| 14 | 12/25/2016 | 12,659.92 | 4,024.23 | 8,635.69 | 957,178.38 |
| 2016 Totals | | 388,800.72 | 95,979.10 | 292,821.62 | |

**EXHIBIT 1**

07/29/2014  8:21:02 AM  Page 2

5 Star Payment Schedule

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 15 | 01/25/2017 | 12,659.92 | 3,988.24 | 8,671.68 | 948,506.70 |
| 16 | 02/25/2017 | 12,659.92 | 3,952.11 | 8,707.81 | 939,798.89 |
| 17 | 03/25/2017 | 12,659.92 | 3,915.83 | 8,744.09 | 931,054.80 |
| 18 | 04/25/2017 | 12,659.92 | 3,879.40 | 8,780.52 | 922,274.28 |
| 19 | 05/25/2017 | 12,659.92 | 3,842.81 | 8,817.11 | 913,457.17 |
| 20 | 06/25/2017 | 12,659.92 | 3,806.07 | 8,853.85 | 904,603.32 |
| 21 | 07/25/2017 | 12,659.92 | 3,769.18 | 8,890.74 | 895,712.58 |
| 22 | 08/25/2017 | 12,659.92 | 3,732.14 | 8,927.78 | 886,784.80 |
| 23 | 09/25/2017 | 12,659.92 | 3,694.94 | 8,964.98 | 877,819.82 |
| 24 | 10/25/2017 | 12,659.92 | 3,657.58 | 9,002.34 | 868,817.48 |
| 25 | 11/25/2017 | 12,659.92 | 3,620.07 | 9,039.85 | 859,777.63 |
| 26 | 12/25/2017 | 12,659.92 | 3,582.41 | 9,077.51 | 850,700.12 |
| 2017 Totals | | 151,919.04 | 45,440.78 | 106,478.26 | |
| 27 | 01/25/2018 | 12,659.92 | 3,544.58 | 9,115.34 | 841,584.78 |
| 28 | 02/25/2018 | 12,659.92 | 3,506.60 | 9,153.32 | 832,431.46 |
| 29 | 03/25/2018 | 12,659.92 | 3,468.46 | 9,191.46 | 823,240.00 |
| 30 | 04/25/2018 | 12,659.92 | 3,430.17 | 9,229.75 | 814,010.25 |
| 31 | 05/25/2018 | 12,659.92 | 3,391.71 | 9,268.21 | 804,742.04 |
| 32 | 06/25/2018 | 12,659.92 | 3,353.09 | 9,306.83 | 795,435.21 |
| 33 | 07/25/2018 | 12,659.92 | 3,314.31 | 9,345.61 | 786,089.60 |
| 34 | 08/25/2018 | 12,659.92 | 3,275.37 | 9,384.55 | 776,705.05 |
| 35 | 09/25/2018 | 12,659.92 | 3,236.27 | 9,423.65 | 767,281.40 |
| 36 | 10/25/2018 | 12,659.92 | 3,197.01 | 9,462.91 | 757,818.49 |
| 37 | 11/25/2018 | 12,659.92 | 3,157.58 | 9,502.34 | 748,316.15 |
| 38 | 12/25/2018 | 12,659.92 | 3,117.98 | 9,541.94 | 738,774.21 |
| 2018 Totals | | 151,919.04 | 39,993.13 | 111,925.91 | |
| 39 | 01/25/2019 | 12,659.92 | 3,078.23 | 9,581.69 | 729,192.52 |
| 40 | 02/25/2019 | 12,659.92 | 3,038.30 | 9,621.62 | 719,570.90 |
| 41 | 03/25/2019 | 12,659.92 | 2,998.21 | 9,661.71 | 709,909.19 |
| 42 | 04/25/2019 | 12,659.92 | 2,957.95 | 9,701.97 | 700,207.22 |
| 43 | 05/25/2019 | 12,659.92 | 2,917.53 | 9,742.39 | 690,464.83 |
| 44 | 06/25/2019 | 12,659.92 | 2,876.94 | 9,782.98 | 680,681.85 |
| 45 | 07/25/2019 | 12,659.92 | 2,836.17 | 9,823.75 | 670,858.10 |
| 46 | 08/25/2019 | 12,659.92 | 2,795.24 | 9,864.68 | 660,993.42 |
| 47 | 09/25/2019 | 12,659.92 | 2,754.14 | 9,905.78 | 651,087.64 |
| 48 | 10/25/2019 | 12,659.92 | 2,712.87 | 9,947.05 | 641,140.59 |
| 49 | 11/25/2019 | 12,659.92 | 2,671.42 | 9,988.50 | 631,152.09 |
| 50 | 12/25/2019 | 12,659.92 | 2,629.80 | 10,030.12 | 621,121.97 |
| 2019 Totals | | 151,919.04 | 34,266.80 | 117,652.24 | |
| 51 | 01/25/2020 | 12,659.92 | 2,588.01 | 10,071.91 | 611,050.06 |
| 52 | 02/25/2020 | 12,659.92 | 2,546.04 | 10,113.88 | 600,936.18 |
| 53 | 03/25/2020 | 12,659.92 | 2,503.90 | 10,156.02 | 590,780.16 |
| 54 | 04/25/2020 | 12,659.92 | 2,461.58 | 10,198.34 | 580,581.82 |
| 55 | 05/25/2020 | 12,659.92 | 2,419.09 | 10,240.83 | 570,340.99 |
| 56 | 06/25/2020 | 12,659.92 | 2,376.42 | 10,283.50 | 560,057.49 |
| 57 | 07/25/2020 | 12,659.92 | 2,333.57 | 10,326.35 | 549,731.14 |

**EXHIBIT 1**

5 Star Payment Schedule

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 58 | 08/25/2020 | 12,659.92 | 2,290.55 | 10,369.37 | 539,361.77 |
| 59 | 09/25/2020 | 12,659.92 | 2,247.34 | 10,412.58 | 528,949.19 |
| 60 | 10/25/2020 | 12,659.92 | 2,203.95 | 10,455.97 | 518,493.22 |
| 61 | 11/25/2020 | 12,659.92 | 2,160.39 | 10,499.53 | 507,993.69 |
| 62 | 12/25/2020 | 12,659.92 | 2,116.64 | 10,543.28 | 497,450.41 |
| 2020 Totals | | 151,919.04 | 28,247.48 | 123,671.56 | |
| 63 | 01/25/2021 | 12,659.92 | 2,072.71 | 10,587.21 | 486,863.20 |
| 64 | 02/25/2021 | 12,659.92 | 2,028.60 | 10,631.32 | 476,231.88 |
| 65 | 03/25/2021 | 12,659.92 | 1,984.30 | 10,675.62 | 465,556.26 |
| 66 | 04/25/2021 | 12,659.92 | 1,939.82 | 10,720.10 | 454,836.16 |
| 67 | 05/25/2021 | 12,659.92 | 1,895.15 | 10,764.77 | 444,071.39 |
| 68 | 06/25/2021 | 12,659.92 | 1,850.30 | 10,809.62 | 433,261.77 |
| 69 | 07/25/2021 | 12,659.92 | 1,805.26 | 10,854.66 | 422,407.11 |
| 70 | 08/25/2021 | 12,659.92 | 1,760.03 | 10,899.89 | 411,507.22 |
| 71 | 09/25/2021 | 12,659.92 | 1,714.61 | 10,945.31 | 400,561.91 |
| 72 | 10/25/2021 | 12,659.92 | 1,669.01 | 10,990.91 | 389,571.00 |
| 73 | 11/25/2021 | 12,659.92 | 1,623.21 | 11,036.71 | 378,534.29 |
| 74 | 12/25/2021 | 12,659.92 | 1,577.23 | 11,082.69 | 367,451.60 |
| 2021 Totals | | 151,919.04 | 21,920.23 | 129,998.81 | |
| 75 | 01/25/2022 | 12,659.92 | 1,531.05 | 11,128.87 | 356,322.73 |
| 76 | 02/25/2022 | 12,659.92 | 1,484.68 | 11,175.24 | 345,147.49 |
| 77 | 03/25/2022 | 12,659.92 | 1,438.11 | 11,221.81 | 333,925.68 |
| 78 | 04/25/2022 | 12,659.92 | 1,391.36 | 11,268.56 | 322,657.12 |
| 79 | 05/25/2022 | 12,659.92 | 1,344.40 | 11,315.52 | 311,341.60 |
| 80 | 06/25/2022 | 12,659.92 | 1,297.26 | 11,362.66 | 299,978.94 |
| 81 | 07/25/2022 | 12,659.92 | 1,249.91 | 11,410.01 | 288,568.93 |
| 82 | 08/25/2022 | 12,659.92 | 1,202.37 | 11,457.55 | 277,111.38 |
| 83 | 09/25/2022 | 12,659.92 | 1,154.63 | 11,505.29 | 265,606.09 |
| 84 | 10/25/2022 | 12,659.92 | 1,106.69 | 11,553.23 | 254,052.86 |
| 85 | 11/25/2022 | 12,659.92 | 1,058.55 | 11,601.37 | 242,451.49 |
| 86 | 12/25/2022 | 12,659.92 | 1,010.21 | 11,649.71 | 230,801.78 |
| 2022 Totals | | 151,919.04 | 15,269.22 | 136,649.82 | |
| 87 | 01/25/2023 | 12,659.92 | 961.67 | 11,698.25 | 219,103.53 |
| 88 | 02/25/2023 | 12,659.92 | 912.93 | 11,746.99 | 207,356.54 |
| 89 | 03/25/2023 | 12,659.92 | 863.99 | 11,795.93 | 195,560.61 |
| 90 | 04/25/2023 | 12,659.92 | 814.84 | 11,845.08 | 183,715.53 |
| 91 | 05/25/2023 | 12,659.92 | 765.48 | 11,894.44 | 171,821.09 |
| 92 | 06/25/2023 | 12,659.92 | 715.92 | 11,944.00 | 159,877.09 |
| 93 | 07/25/2023 | 12,659.92 | 666.15 | 11,993.77 | 147,883.32 |
| 94 | 08/25/2023 | 12,659.92 | 616.18 | 12,043.74 | 135,839.58 |
| 95 | 09/25/2023 | 12,659.92 | 566.00 | 12,093.92 | 123,745.66 |
| 96 | 10/25/2023 | 12,659.92 | 515.61 | 12,144.31 | 111,601.35 |
| 97 | 11/25/2023 | 12,659.92 | 465.01 | 12,194.91 | 99,406.44 |
| 98 | 12/25/2023 | 12,659.92 | 414.19 | 12,245.73 | 87,160.71 |
| 2023 Totals | | 151,919.04 | 8,277.97 | 143,641.07 | |

**EXHIBIT 1**

07/29/2014  8:21:02 AM  Page 4

## 5 Star Payment Schedule

|  | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 99 | 01/25/2024 | 12,659.92 | 363.17 | 12,296.75 | 74,863.96 |
| 100 | 02/25/2024 | 12,659.92 | 311.93 | 12,347.99 | 62,515.97 |
| 101 | 03/25/2024 | 12,659.92 | 260.48 | 12,399.44 | 50,116.53 |
| 102 | 04/25/2024 | 12,659.92 | 208.82 | 12,451.10 | 37,665.43 |
| 103 | 05/25/2024 | 12,659.92 | 156.94 | 12,502.98 | 25,162.45 |
| 104 | 06/25/2024 | 12,659.92 | 104.84 | 12,555.08 | 12,607.37 |
| 105 | 07/25/2024 | 12,659.92 | 52.55 | 12,607.37 | 0.00 |
| 2024 Totals | | 88,619.44 | 1,458.73 | 87,160.71 | |
| Grand Totals | | 2,527,500.92 | 427,500.92 | 2,100,000.00 | |

**EXHIBIT 1**

5 Star Payment Schedule

Last interest amount increased by 0.02 due to rounding.

**EXHIBIT 1**

## STATEMENT OF REPRESENTATION, CONSENT,
## AND WAIVER OF CONFLICT OF INTEREST

1.     Rule 1.7 of the Indiana Rules of Professional Conduct states the following:

Rule 1.7. Conflict of interest: Current Clients.

(a)     Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1)     the representation of one client will be directly adverse to another client; or

(2)     there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)     the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)     the representation is not prohibited by law;

(3)     the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4)     each affected client gives informed consent, confirmed in writing.

2.     J. Charles Zercher ("Zercher") represents Matthew D. Gingerich ("Gingerich") and Earl D. Miller ("Miller") and respective Indiana limited liability companies owned by them.

3.     Gingerich and Miller are entering into a transaction pursuant to which Miller is buying all of Gingerich's ownership interests in certain limited liability companies pursuant to that certain Unit Purchase Agreement between Gingerich and Miller ("Transaction").

4.     Gingerich and Miller desire Zercher to draft the Unit Purchase Agreement and related documents and advise them on structuring the Transaction.

**EXHIBIT 1**

5.    Zercher has advised Gingerich and Miller that they may seek their own independent counsel at any time.

6.    In the interest of time and because of Zercher's familiarity with Gingerich and Miller and the businesses associated with the transaction, Gingerich and Miller continue to desire that Zercher assist them with the Transaction and draft the Unit Purchase Agreement and related documents.

7.    Gingerich and Miller had agreed to a majority of the substantive terms of the Transaction prior to providing those terms to Zercher and have agreed on the remaining substantive terms on their own after discussions with Zercher, and each has shared with the other all communications with Zercher.

8.    Zercher reasonably believes that he has and will be able to provide diligent representation of each of Gingerich and Miller.

9.    Gingerich and Miller understand that potential conflicts exist between each of them in connection with the Transaction and the Unit Purchase Agreement and related document, including, but not limited to, the non-compete terms agreed to by Gingerich and the collateral security terms agreed to by Miller.

10.    However, Gingerich and Miller believe that in the interests of time to complete the Transaction and because of Zercher's familiarity with Gingerich and Miller and the businesses associated with the transaction, having Zercher draft the Unit Purchase Agreement and related documents and advise them in connection with the Transaction furthers the best interests of each of Gingerich and Miller.

11.    Gingerich and Miller acknowledge that each of them has been advised and provided an opportunity to consult with or hire independent counsel prior to signing this Statement of Representation, Consent, and Waiver of Conflict of Interest.

12.    At any time and for any reason, including, but not limited to, any past, present or future conflict of interest, or any change in circumstances, Gingerich or Miller may consult with or hire their own independent counsel.

13.    Gingerich and Miller hereby provide each of their informed consent to Zercher representing them in the Transaction and drafting the Unit Purchase Agreement and related documents and waive any concurrent conflicts of interest.

Dated this __29__ day of July, 2014.

| | |
|---|---|
| __Matthew D. Gingerich__ | __Earl D. Miller__ |

2

**EXHIBIT 1**