```
 1              UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF INDIANA
 2                  SOUTH BEND DIVISION

 3
      IN RE:                    ) CASE NUMBERS 16-30078 -
 4                              ) 16-30088
      5 STAR INVESTMENT GROUP,  )
 5    LLC, and associated       ) Chapter 11
      cases.                    )
 6                              )      COPY
               Debtors.         )
 7

 8
                    341 MEETING OF CREDITORS
 9                   (AUDIO TRANSCRIPTION)

10
                    DATE: November 15, 2016
11

12

13

14

15

16

17
          Transcribed by Tonya J. Kaiser, RPR, CMRS,
18               and Notary Public.

19

20

21

22            SUMMIT CITY REPORTING, INC.
           Certified Stenographic Court Reporters
23          203 West Wayne Street, Suite 406
               Fort Wayne, Indiana  46802
24          (260) 486-3954 | (800) 977-3376

25
```

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

Page 2

```
 1  APPEARANCES:
 2    Susan Jaffe Roberts, Esq., Assistant United States
          Trustee
 3
      Earl Miller, on behalf of the Debtors
 4
      Andrew Thompson, Esq., on behalf of Earl Miller
 5
      William R. Jonas, Jr., Esq., on behalf of the
 6      unsecured creditors
 7    Douglas R. Adelsperger, Esq, Chapter 11 Trustee
 8    Edward Kos, Esq., Kos & Associates, on behalf of the
          trustee
 9
      Matt Fisher, on behalf of William Adamczyk
10
      Samuel Swartz, investor
11
      Karen Andrews, investor
12
      Steve Height, investor
13
      Christopher Riley, Esq., on behalf of James Miller and
14      Joe Miller
15    Stan Baker, investor
16    George Horn, Esq., on behalf of Matthew Gingerich
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2            E X A M I N A T I O N S
 3
 4  Witness                                    Page
 5    EARL D. MILLER
 6      BY MR. JONAS.........................    9
 7      BY MR. KOS...........................   29
 8      BY MR. FISHER........................   35
 9      BY MR. SWARTZ........................   37
10      BY MS. ANDREWS.......................   38
11      BY MR. HEIGHT........................   39
12      BY MR. RILEY.........................   39
13      BY MR. BAKER.........................   40
14      BY MR. KOS...........................   51
15      BY MR. ADELSPERGER...................   78
16      BY ASSISTANT TRUSTEE ROBERTS.........   80
17      BY MR. ADELSPERGER...................   80
18      BY MR. KOS...........................   82
19      BY MR. KOS...........................   88
20      BY MR. HORN..........................   88
21      BY MR. ADELSPERGER...................   96
22      BY ASSISTANT TRUSTEE ROBERTS.........   97
23
24
25
```

Page 4

```
 1           P R O C E E D I N G S
 2  ASSISTANT TRUSTEE ROBERTS:  Good morning.
 3  Today is November 15, 2016.  It is
 4  10:00 a.m.  This is the continued meeting of
 5  creditors being held pursuant to Section 341
 6  of the bankruptcy code in the cases of 5
 7  Star Investment Group, LLC, Case Number
 8  16-30078; 5 Star Portland Holdings, LLC,
 9  Case Number 16-30079; 5 Star Investment
10  Group V, LLC, Case Number 16-30080; 5 Star
11  Commercial, LLC, Case Number 16-30081; 5
12  Star Investment Group VII, LLC, Case Number
13  16-30082; 5 Star Holdings, LLC, Case Number
14  16-30083; 5 Star Investment Group III, LLC,
15  Case Number 16-30084; 5 Star Indiana
16  Holdings, LLC, Case Number 16-30085; 5 Star
17  Investment Group II, LLC, Case Number
18  16-30086; 5 Star Investment Group IV, LLC,
19  Case Number 16-30087; and 5 Star Capital
20  Fund, LLC, Case Number 16-30088.
21      All of these cases are filed in the
22  Northern District of Indiana in the United
23  States Bankruptcy Court.  And by order of
24  the bankruptcy court, these Chapter 11 cases
25  have been substantively consolidated.  By
```

Page 5

```
 1  order of the bankruptcy court, Mr. Douglas
 2  Adelsperger was appointed Chapter 11 trustee
 3  of the consolidated debtors.
 4      My name is Susan Jaffe Roberts.  I am the
 5  assistant United States Trustee for the
 6  Northern District of Indiana with the
 7  Department of Justice and the office of the
 8  United States Trustee.
 9      The initial meeting of creditors was
10  conducted on February 29th, 2016.  A
11  continued meeting of creditors was held on
12  September 21st, 2016.
13      The purpose of this continued meeting of
14  creditors is to continue the examination of
15  the debtors under oath regarding their
16  financial affairs in these bankruptcy cases.
17  Again, this is not a judicial proceeding.
18  It's an administrative proceeding to conduct
19  a continued oral inquiry into the condition
20  of the 11 debtors.  We will ask questions
21  regarding the operations of the debtors,
22  both as individual limited liability
23  companies and, as appropriate, regarding the
24  operations of the debtors as a group.  The
25  debtors have filed their schedules of
```

Page 6

1    property and debts.
2        This meeting is being digitally recorded.
3    We will keep this recording for two years in
4    our South Bend office.  During that time,
5    you may come to our office and listen to the
6    recording of the meeting or you may send us
7    a blank writable CD, and we will make a copy
8    of the recording of the meeting for you.
9    You may also have a transcript of the
10   meeting made at your own expense.
11       During the meeting, you may be given the
12   opportunity to ask questions.  If you do,
13   you will be asked to identify yourself and
14   speak loudly and plainly so that the
15   recording is clear and accurate.  If we
16   cannot conclude the meeting today, for any
17   reason, I may continue the 341 and have it
18   be continued to a later date.  If that
19   happens, a notice of the date and continued
20   meeting will be sent out to all creditors
21   and parties in interest.
22       At the prior meeting of creditors, the
23   initial one, I asked questions on behalf of
24   the United States Trustee, as did the
25   Chapter 11 trustee, and a number of other

Page 7

1    creditors and parties in interest.  At
2    today's meeting, I will reserve any
3    additional questions for the United States
4    for later and will ask counsel for the
5    creditors committee, Mr. William Jonas, to
6    commence the questioning.  After that, we
7    will ask individual creditors who are in the
8    audience, who have not yet had their
9    opportunity to ask questions at one of the
10   prior meetings, to ask any questions that
11   they may have of the debtors.
12       Before we commence further, I will
13   administer the oath.
14       Mr. Miller, will you please identify
15   yourself for the record.
16   THE WITNESS:  Earl Miller.
17   ASSISTANT TRUSTEE ROBERTS:  Counsel?
18   MR. THOMPSON:  Andrew Thompson.
19   ASSISTANT TRUSTEE ROBERTS:  Mr. Miller,
20   would you please raise your right hand?  Do
21   you swear or affirm under penalty of perjury
22   that the testimony you give here today will
23   be the truth, the whole truth, and nothing
24   but the truth?
25   THE WITNESS:  I do.

Page 8

1    ASSISTANT TRUSTEE ROBERTS:  All right.  Once
2    again, please state your full name for the
3    record.
4    THE WITNESS:  Earl D. Miller.
5    ASSISTANT TRUSTEE ROBERTS:  And, Mr. Miller,
6    are the address and contact information that
7    you previously provided to the office of the
8    U.S. Trustee still correct?
9    THE WITNESS:  Yes.
10   ASSISTANT TRUSTEE ROBERTS:  Okay.  And may I
11   again see your picture I.D.?
12   THE WITNESS:  Yep.
13   UNIDENTIFIED FEMALE VOICE:  Sorry for the
14   interruption, Mr. Miller.  We've got this
15   nice system, so you need to speak into the
16   microphone.  You're going to have to hold it
17   and be a rock star.
18   THE WITNESS:  Okay.
19        (Inaudible)
20   ASSISTANT TRUSTEE ROBERTS:  Okay.  Thank
21   you.  Now, I'm going to ask creditors
22   committee counsel, Mr. Jonas, to commence
23   asking his questions.  When he is done, I
24   will call on others of you to ask questions,
25   and we will break for lunch at about 12:45

Page 9

1        p.m. and resume the meeting as needed an
2        hour later.  Mr. Jonas, please commence.
3            EXAMINATION OF EARL D. MILLER
4    BY MR. JONAS:
5    Q.   Good morning, Mr. Miller.  My name is Will Jonas.
6         I'm the counsel for the official committee of the
7         unsecured creditors in this case.  I'd like to
8         direct your attention to the spring of 2015 and
9         ask if during that time period you recall a
10        meeting with officials of the securities
11        department of the State of Indiana.
12   A.   Yes.
13   Q.   What was, what was the -- what was -- to your
14        understanding the reason that you went to meet
15        with securities officials of the State of
16        Indiana?
17   A.   Okay.  So I'm going to be taking the Fifth
18        Amendment today on questions.
19   Q.   Well --
20            ASSISTANT TRUSTEE ROBERTS:  If I might
21            interrupt, in order to take the Fifth
22            Amendment, please be aware that you may only
23            take the Fifth Amendment on an individual
24            question basis.  You can't take it blanket.
25            So that's one.  So you will need to, if you

**EXHIBIT 4**

Page 10

1          intend to assert your privilege, you will
2          need to assert it to each question that
3          you're asked.
4              As a further reminder, to the extent that
5          questions have already been raised about
6          particular information that you have
7          answered extensively in two prior meetings,
8          you will have waived the right to assert
9          that privilege again.  Mr. Jonas.
10     MR. THOMPSON:  I'm going to state for the
11          record that, that the witness is always
12          allowed to reassert their Fifth Amendment
13          right.  At any point in time, they can
14          revoke any waiver that they've made.  I
15          understand that the evidence collected can
16          be used as if it was -- as a waiver at the
17          time that he answered the question.  But he
18          is always allowed to reinstate his -- to
19          reassert his Fifth Amendment privilege.
20     ASSISTANT TRUSTEE ROBERTS:  All right.
21          Well, we'll beg to differ, and we will go
22          ahead and proceed question by question.
23     MR. THOMPSON:  That's fine.
24     ASSISTANT TRUSTEE ROBERTS:  Mr. Jonas.
25  Q.   (By Mr. Jonas) Thank you.  Mr. Miller, you

Page 11

1          indicated that there was a meeting with Indiana
2          state securities officials sometime in the spring
3          of 2015; is that correct?
4   A.   Plead the Fifth.
5              (A discussion was held off the record.)
6     ASSISTANT TRUSTEE ROBERTS:  I think if you
7          can just raise --
8     UNIDENTIFIED VOICE:  The group may be small
9          enough today that we can --
10     ASSISTANT TRUSTEE ROBERTS:  I think we're
11          okay today.
12     UNIDENTIFIED VOICE:  -- that we can get
13          along without that.
14  Q.   (By Mr. Jonas) Mr. Miller, where did that meeting
15          take place?
16  A.   Plead the Fifth.
17  Q.   Mr. Miller, do you recall the names of any of the
18          persons who were present at that meeting?
19  A.   Plead the Fifth.
20  Q.   Were you present at that meeting on behalf of the
21          5 Star entities?
22  A.   Plead the Fifth.
23  Q.   Were there any other persons present at that
24          meeting on behalf of the 5 Star entities?
25  A.   I plead the Fifth.

Page 12

1   Q.   Were there any other persons at that meeting that
2          you know their identity?
3   A.   I plead the Fifth.
4   Q.   After that meeting, did you return to South Bend
5          or Mishawaka to the offices of 5 Star and
6          continue to operate the business of 5 Star?
7   A.   I plead the Fifth.
8   Q.   Did 5 Star make any changes after that meeting in
9          the way that it accepted money from investors?
10  A.   I plead the Fifth.
11  Q.   Did 5 Star accept money from investors by wire
12          transfers?
13  A.   Plead the Fifth.
14  Q.   Did 5 Star accept money from investors in cash?
15  A.   I plead the Fifth.
16  Q.   Did 5 Star accept money from investors by
17          personal check?
18  A.   I plead the Fifth.
19  Q.   I want to move now to the period of July, 2015 --
20          of 2015.  And when we were here in September, you
21          indicated that that was the point at which you
22          brought Global in as the turnaround agent for the
23          company.  Do you recall that testimony, sir?
24  A.   I plead the Fifth.
25  Q.   Okay.  Do you recall any of the investors to whom

Page 13

1          those funds were returned?
2   A.   I plead the Fifth.
3   Q.   Do you recall what employee of 5 Star was
4          primarily responsible for raising those funds?
5   A.   I plead the Fifth.
6   Q.   Were the funds returned to investors returned
7          from the 5 Star account?
8   A.   I plead the Fifth.
9   Q.   Who made the determination which investors would
10          have money returned to them?
11  A.   I plead the Fifth.
12     ASSISTANT TRUSTEE ROBERTS:  Can you speak
13          up?
14     THE WITNESS:  Yeah.  I'm saying the same
15          thing, so...
16     ASSISTANT TRUSTEE ROBERTS:  You need to say
17          it --
18     THE WITNESS:  Louder.
19     ASSISTANT TRUSTEE ROBERTS:  -- every time
20          loudly and --
21     THE WITNESS:  Okay.
22     ASSISTANT TRUSTEE ROBERTS:  -- and clearly
23          for the record.
24     THE WITNESS:  All right.
25  Q.   (By Mr. Jonas) What records were made of the

Page 14

1  return of funds to investors in July of 2015?
2  A.  I plead the Fifth.
3  Q.  Were those made by 5 Star entities or by Global?
4  A.  I plead the Fifth.
5  Q.  Were those made at your direction or the
6      direction of someone else?
7  A.  I plead the Fifth.
8  Q.  Is it your intention to plead the Fifth to every
9      question that is asked today regardless of the
10     question?
11     ASSISTANT TRUSTEE ROBERTS:  Counsel, you may
12     not advise.
13     MR. JONAS:  I'd like the witness to answer
14     the question without conferring with counsel
15     first.
16 A.  That is my intention.
17 Q.  (By Mr. Jonas) What date is it, sir?
18 A.  The 14th.
19 Q.  In September you testified that you had a
20     75 percent interest in a company called Artisan
21     Builders.  Do you recall that testimony?
22 A.  I plead the Fifth.
23 Q.  Does Artisan Builders have any contracts -- did
24     it ever have any contracts with any of the 5 Star
25     entities?

Page 15

1  A.  I plead the Fifth.
2  Q.  Would you please hand me the piece of paper that
3      you just looked at?
4      MR. THOMPSON:  This is work product.  Yeah.
5      MR. JONAS:  It's a document that he looked
6      at.  I can ask for it.
7      MR. THOMPSON:  Well, then subpoena it.
8  Q.  (By Mr. Jonas) I'd like to ask for the production
9      of all of the, of the documents that you have
10     read and that you've written down today.
11     MR. THOMPSON:  If you'd submit that to me in
12     writing so we can make appropriate
13     objections, then we'll do that.
14     MR. JONAS:  Counsel, is it your intention to
15     instruct your client to not respond to any
16     question regardless of whether he has
17     previously testified to those subjects?
18     MR. THOMPSON:  Okay.  You asked me about my
19     intention.  I haven't been presented with
20     that opportunity or option at this moment.
21     What I am advising my client to do is to
22     take every appropriate step to preserve his
23     Fifth Amendment rights to the maximum extent
24     possible.  This is not the first nor the
25     second time that he has been before the

Page 16

1  committee.  But this is now the third time.
2  Okay?  He has not been charged with
3  anything.
4      These questions go to personal liability.
5  They also go to the prospect of some type of
6  charges for criminal liability.  There has
7  been zero, absolutely zero evidence produced
8  to show any reason to go forward with the
9  criminal case against my client.  It's
10 probably pretty well evident to most people
11 on the committee that whatever civil
12 liability is imposed against him is going to
13 be difficult or impossible ever to recover
14 because of his incredible lack of resources
15 because he didn't take anything from the
16 company or from the investors.
17     My client came to me with this situation
18 more than any other reason, more than any
19 other client I've ever had, with the desire
20 to help the investors recover their money.
21 He's already been before this committee
22 twice.  If the committee wants to go
23 forward, he will happily cooperate once an
24 appropriate grant of immunity has been given
25 to him.

Page 17

1  ASSISTANT TRUSTEE ROBERTS:  Okay.  I need to
2  just interrupt here.  And I'm speaking as
3  the assistant United States Trustee.  We are
4  here in a Section 341 meeting of creditors
5  pursuant to Section 341 of the bankruptcy
6  code.
7  MR. THOMPSON:  I understand.
8  ASSISTANT TRUSTEE ROBERTS:  Mr. Miller is
9  here in his capacity as the sole owner and
10 prepetitioned manager of the 11 entities,
11 which he voluntarily committed to the
12 oversight of the United States Bankruptcy
13 Court.  This is not a court hearing.
14 This is not a court hearing.  Pursuant to
15 Section 341 and 343 of the United States
16 bankruptcy code, a debtor in bankruptcy or
17 in a business bankruptcy, the principal of
18 the representative of the entity which is in
19 bankruptcy has an absolute duty under the
20 bankruptcy code to provide information with
21 respect to the liabilities and assets of the
22 debtors that -- and all of the information
23 that is in the schedules, petition, and the
24 statement of financial affairs of the
25 debtors.

Page 18

1    The information that Mr. Jonas is asking
2  Mr. Miller about, a good deal of it is
3  disclosed in these filings which are already
4  before the bankruptcy court, publicly noted,
5  and which are sworn to by him under
6  penalties of perjury.  His duty to respond
7  in this situation is not, is not sheltered.
8  He has an absolute duty under the code to
9  respond --
10  MR. THOMPSON:  I'm his --
11  ASSISTANT TRUSTEE ROBERTS:  -- to any -- and
12  I understand that you are asking Mr. Miller
13  to assert the Fifth to every single question
14  that is asked.  I'm merely instructing you
15  and I'm instructing everyone here with
16  respect to Mr. Miller's duties under the
17  bankruptcy code.
18    Mr. Jonas, if you would like to continue
19  your questions.
20  MR. THOMPSON:  If I may just briefly respond
21  to your comment about the absolute duty.
22  The absolute duty does not supersede his
23  absolute constitutional right, okay, under
24  the Fifth Amendment.  If this is a civil
25  proceeding, let's make it about a civil

Page 19

1  proceeding, and let's take the criminal
2  issues off the table.
3  MR. ADELSPERGER:  But --
4  MR. THOMPSON:  That can be done.
5  MR. ADELSPERGER:  -- not by -- may I?  Not
6  by anybody here.
7  MR. THOMPSON:  Not by anybody here, but the
8  SEC has been part of this as well, and they
9  have the power of -- they have enforcement
10  power by which they can, they can
11  potentially charge my client.
12  ASSISTANT TRUSTEE ROBERTS:  Okay.  We --
13  MR. THOMPSON:  And he wants to cooperate.
14  MR. ADELSPERGER:  That's painfully obvious
15  right now.  May I, may I -- I've got two
16  things.
17  ASSISTANT TRUSTEE ROBERTS:  Trustee.
18  MR. ADELSPERGER:  Trustee Doug Adelsperger.
19  One, I cannot read what's on those pieces of
20  paper right now.  I'd like to take a picture
21  from right here so that when we ask a judge
22  to have you turn them over, I can be
23  specific on what we want.  Will you consent
24  to me taking a photograph right now of what
25  I can see?

Page 20

1  MR. THOMPSON:  I can't do that right now.
2  There's nothing that I -- I'm probably going
3  to -- we work out the proper protections in
4  terms of attorney-client privilege.
5  MR. ADELSPERGER:  Sir, I can tell you right
6  now I am in no mood and no position --
7  MR. THOMPSON:  That's fine.
8  MR. ADELSPERGER:  -- to give your client any
9  protection.  Here's why:  He filed and
10  signed 11 bankruptcies.  Not 1, 11.  We are
11  entitled, not as a committee, but as the
12  trustee and the United States Trustee to
13  have 11 of these meetings.  And if that's
14  what he wants, if he wants to sit here and
15  talk and take the Fifth for 11 times, and
16  then go out in public and say, "But I want
17  to do what's right by the investors," to me
18  that seems a little self-serving.  All of
19  these questions have nothing to do with what
20  the SEC -- to date, has nothing to do with
21  what the SEC has brought up, any imaginary
22  criminal activity that is being
23  investigated, because I can assure you I'm
24  not investigating criminal activity.
25    I'm trying to piece together a puzzle, a

Page 21

1  very large puzzle on somewhere between 15
2  and 30 million dollars of investor money.
3  What happened to it?  Where is it?  How can
4  I go get it?  How can we bring it back in?
5  Those are the questions.
6  MR. THOMPSON:  Uh-huh.
7  MR. ADELSPERGER:  If he's going to take the
8  Fifth to those, we'll ultimately be in front
9  of some tribunal finding out to make sure --
10  can he be forced to answer those questions.
11  ASSISTANT TRUSTEE ROBERTS:  Okay.
12  MR. ADELSPERGER:  I get that.
13  MR. THOMPSON:  If you're talking about the
14  prospect of 11 creditors meetings with
15  creditors who may be here on any of those
16  different 11 times, and they may want to
17  come back every time, if you want to use
18  that kind of inefficient process, you're in
19  the process of reasking questions that you
20  say are already in the record again and
21  again --
22    (Indiscernible cross talk)
23  MR. ADELSPERGER:  With all due respect, he
24  started the snowball down the mountain, not
25  he.

**EXHIBIT 4**

Page 22

1    MR. THOMPSON:  I understand.
2    ASSISTANT TRUSTEE ROBERTS:  Okay.  We're not
3    going to have back and forth here.  Okay?
4    In terms of the asking of the questions,
5    this is how bankruptcy works.
6    MR. THOMPSON:  I understand.
7    ASSISTANT TRUSTEE ROBERTS:  In the
8    bankruptcy code, the meeting of the
9    creditors is specifically for the purpose
10   for creditors or in this case an appointed
11   trustee or the United States Trustee to be
12   able to delve into the information that has
13   been filed publicly with the court regarding
14   the affairs of the debtor.  And that is the
15   way that the bankruptcy system works under
16   the United States code.
17   MR. THOMPSON:  I understand.
18   ASSISTANT TRUSTEE ROBERTS:  We are now going
19   to proceed forward and allow Mr. Jonas to
20   continue with his questions.  Mr. Jonas.
21   MR. JONAS:  Thank you.
22  Q.  (By Mr. Jonas) Mr. Miller, are any of the
23   investors in the Ashley Park, Timber Hollow,
24   Avalon Trace apartment complex investors who also
25   invested in any of the 5 Star entities?

Page 23

1   A.  I plead the Fifth.
2   Q.  Are any of the investors in the Fairfax or Colony
3    Place apartment complexes the same as investors
4    in any of the 5 Star entities that are debtors in
5    these bankruptcy cases?
6   A.  I plead the Fifth.
7   Q.  Are any of the investors of Golden Asset
8    Management, LLC, or Utah Holdings the same
9    identity as investors in any of the 5 Star
10   bankruptcies that are involved in these cases?
11  A.  I plead the Fifth.
12  Q.  Are any of the investors in Timber Hollow
13   apartments also investors in the 5 Star
14   bankruptcies pending in this case?
15  A.  I plead the Fifth.
16  Q.  Are any of the investors in Twin City of
17   Winston-Salem the same identity as investors in
18   these cases?
19  A.  I plead the Fifth.
20  Q.  Are any of the investors of Southern Equity Group
21   Trust the same as investors in these bankruptcy
22   cases?
23  A.  I plead the Fifth.
24  Q.  Are any of the investors in TC Commercial the
25   same as investors in these cases?

Page 24

1   A.  I plead the Fifth.
2   Q.  Are any of the investors in Village Apartments of
3    Charleston, LLC, the same as investors in these
4    pending cases?
5   A.  I plead the Fifth.
6   Q.  Are any of the investors in Cedar Apartments in
7    Madison, Tennessee, the same as investors in
8    these bankruptcy cases?
9   A.  I plead the Fifth.
10  Q.  Are any of the investors in the Albion complex in
11   Houston, Texas, the same as investors in the 5
12   Star cases before this tribunal?
13  A.  I plead the Fifth.
14  Q.  Who else besides you and Kim Bruggeman are owners
15   of 5 Star Management Solutions, LLC?
16  A.  I plead the Fifth.
17      MR. THOMPSON:  May I ask a point of
18      clarification?  Wasn't it asserted that he
19      was the sole owner of all of these 11
20      companies?  Didn't you just ask a question
21      that presumes that there's another owner?
22      MR. JONAS:  5 Star Management Solutions is
23      not one of the debtors in this case, sir.
24      MR. THOMPSON:  Thank you.  I appreciate
25      that.

Page 25

1   Q.  (By Mr. Jonas) Have any of the 5 Star debtors in
2    these cases conducted business with any entity in
3    which Marlin Schwartz has an interest?
4   A.  I plead the Fifth.
5   Q.  Have any of the debtors in these bankruptcy cases
6    worked with a lawyer named Mr. Sherman from
7    Michigan?
8   A.  I plead the Fifth.
9   Q.  Have any of the debtors in these cases worked
10   with a lawyer named Charlie Zercher from
11   Nappanee, Indiana?
12  A.  I plead the Fifth.
13  Q.  Have any of the 5 Star entities involved in this
14   case had any dealings with a lawyer named Kim
15   Taylor from California?
16  A.  I plead the Fifth.
17  Q.  Have any of the 5 Star debtors done any business
18   with a lawyer named Cassidy Fritz in Elkhart?
19  A.  I plead the Fifth.
20  Q.  Have any of the entities that are involved in
21   this case done any business with a lawyer named
22   Norman Praet?
23  A.  I plead the Fifth.
24  Q.  What other lawyers have the debtors done business
25   besides the list I just gave you?

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016                                        Pages 26..29

Page 26

```
1   A.    I plead the Fifth.
2   Q.    Have any of the 5 Star entities done any business
3         with Andrew Thompson?
4   A.    I plead the Fifth.
5   Q.    Is Mr. Thompson the lawyer for 5 Star, or is he
6         the lawyer for you?
7   A.    I plead the Fifth.
8               MR. THOMPSON:  I want to make a note for the
9         record of the notes that were just shared
10        between the two attorneys so that when I ask
11        for counter-production, that we'll be --
12        you'll be aware of what I was referring to.
13              MR. ADELSPERGER:  You want to take a picture
14        of it?
15              MR. THOMPSON:  Sure.
16              MR. ADELSPERGER:  You can have it.  There
17        you go.
18              MR. JONAS:  Mr. Kos's note to me had a name
19        Andrew Thompson on it.
20              MR. THOMPSON:  I understand.  Thank you.
21              MR. JONAS:  You're welcome.  There are
22        partners of this case who are willing to be
23        transparent.
24              MR. THOMPSON:  And my client is one of them.
25              MR. JONAS:  That's a rather ironic
```

Page 27

```
1         statement, sir.
2               MR. THOMPSON:  Given that I asked for that
3         transparency in conversations that I had
4         leading up to this meeting, we could have
5         gotten a lot further if we had it.
6               ASSISTANT TRUSTEE ROBERTS:  I do want to ask
7         one question, if I may.  Mr. Thompson, you
8         are here, and for the record would you, not
9         your client, would you please clarify whom
10        you represent?
11              MR. THOMPSON:  Solely Mr. Miller.  I do not
12        represent the 5 Star companies in any way.
13              ASSISTANT TRUSTEE ROBERTS:  Thank you.
14        Mr. Jonas, please proceed.
15              MR. THOMPSON:  To further clarify, I didn't
16        advise the filing of this bankruptcy or the
17        seeking of the protection.  I was brought
18        into this case after it initiated for a
19        different purpose because of the
20        inefficiency of the proceedings, so and my
21        client's problems with retaining (inaudible)
22        counsel.
23              ASSISTANT TRUSTEE ROBERTS:  Thank you.
24        Mr. Jonas.
25   Q.   (By Mr. Jonas) Thank you.  Mr. Miller, your
```

Page 28

```
1         invocation of the Fifth Amendment right today,
2         was that -- has that been on behalf of the
3         companies?
4   A.    I plead the Fifth.
5   Q.    And is that on behalf of yourself individually?
6   A.    I plead the Fifth.
7               MR. JONAS:  That's all the questions I have,
8         Mr. Trustee.
9               MR. ADELSPERGER:  Before we move on, I have
10        one simple question.
11              ASSISTANT TRUSTEE ROBERTS:  Please.
12              MR. ADELSPERGER:  And, Mr. Miller, I'll
13        address it to you.  I do know what your
14        answer's going to be, but, Counsel, if you
15        know, given the fact that you stated the
16        inefficiencies going on here --
17              MR. THOMPSON:  Uh-huh.
18              MR. ADELSPERGER:  -- my question is quite
19        simply, Mr. Miller, or your counsel, if you
20        know, is there any other individual who can
21        appear at a meeting of creditors such as
22        this and answer questions regarding the
23        assets, operations, and finances of the
24        debtors?
25              MR. THOMPSON:  May I confer with my client?
```

Page 29

```
1               MR. ADELSPERGER:  Yes, you may.
2               MR. THOMPSON:  Thank you.
3               THE WITNESS:  I'm not sure to be honest with
4         you.
5               MR. ADELSPERGER:  Thank you.
6               THE WITNESS:  Yeah.
7               MR. KOS:  May I?
8               MR. ADELSPERGER:  Yes.
9                   EXAMINATION OF EARL D. MILLER
10   BY MR. KOS:
11   Q.    Mr. Miller, I'm going to make certain assumptions
12        before I start asking you questions.  I'm going
13        to first assume that you've been fully advised by
14        your counsel what the consequences of taking the
15        Fifth Amendment are.
16              ASSISTANT TRUSTEE ROBERTS:  Just a moment.
17        Can you identify yourself for the record?
18              MR. KOS:  Ed Kos.  Excuse me.  Ed Kos.  I'm
19        an attorney for Trustee Adelsperger.
20              ASSISTANT TRUSTEE ROBERTS:  Thank you.
21   Q.   I'm going to assume that you've been fully
22        advised of the consequences of taking the Fifth
23        Amendment.
24              MR. THOMPSON:  May I?
25   Q.    And further --
```

*Summit City Reporting, Inc. | 800.977.3376*
*www.summitcityreporting.com*

**EXHIBIT 4**

Page 30

1        MR. KOS:  I haven't asked the question yet.
2        I'm making certain assumptions on the record
3        so that he understands them, and the
4        question will be --
5   Q.   (By Mr. Kos) But you understand that the
6        testimony that you do not give, and when you
7        exercise that right to the Fifth Amendment, can
8        be used as an inference in a civil action against
9        you that can be then used with some corroborating
10       evidence to, in fact, resolve issues of fact in
11       the matters that might be brought against you.
12            I'm also going to assume that you understand
13       that the questions that I ask are going to lock
14       your testimony in forever.  You're going to be
15       making this waiver or this exercise of the Fifth
16       Amendment, and that you can waive it at a later
17       date, but it may not be to your benefit to do so.
18            And with that said, sir, my question to you:
19       You intended to, in fact, defraud the investors
20       of the 5 Star entities?  Did you intend to
21       defraud the investors of the 5 Star entities?
22            MR. THOMPSON:  Let me interject a couple of
23       comments.
24            MR. KOS:  You're not asked the question,
25       Mr. Thompson.  I asked --

Page 31

1   MR. THOMPSON:  You're making commentary that
2   is leading to my client, as were
3   questions -- my client is not an attorney.
4   He doesn't understand the scope of the Fifth
5   Amendment as it applies to him personally
6   versus a corporate entity.  I don't
7   represent the corporations.  To my
8   knowledge, he hasn't had anyone advising him
9   of the corporations' Fifth Amendment rights
10  or lack thereof.  Number one.
11      With respect to inferences, you know, by
12  all means in a civil case, that's why we
13  have this problem right now.  He clearly has
14  no assets to pay anything anyway, so let's
15  move forward with what's real.
16  ASSISTANT TRUSTEE ROBERTS:  Mr. Thompson,
17  we're in a bankruptcy proceeding and whether
18  Mr. Earl Miller has individual assets or not
19  is not relevant necessarily to the --
20  MR. THOMPSON:  He's been asked about them on
21  the record.
22  ASSISTANT TRUSTEE ROBERTS:  Right.  It's the
23  right of the United States Trustee, the
24  trustee, and creditors under Section 341 of
25  the bankruptcy code to ask questions about

Page 32

1        the affairs, the financial affairs, the
2        condition of the debtors, the information in
3        the schedules in a voluntarily filed
4        bankruptcy case, 11 cases, which are pending
5        before the United States bankruptcy code --
6        of the northern bankruptcy court of the
7        United States District Court -- of the
8        Northern District of Indiana.  And, you
9        are not allowed to answer on behalf of your
10       client.
11            MR. THOMPSON:  I'm not attempting to.
12            ASSISTANT TRUSTEE ROBERTS:  Mr. Kos is
13       permitted, as counsel for the trustee, to
14       ask questions.  He asked a question of
15       Mr. Miller.  I'm going to ask him to repeat
16       that question.  It is a question that
17       pertains to the affairs, the operations of
18       the debtors prepetition.
19            Mr. Kos, please repeat your question.
20   Q.   (By Mr. Kos) Yeah.  Mr. Miller, as an officer of
21       5 Star -- of the various 5 Star entities, was
22       your intention to defraud the investors that lent
23       money to the 5 Star entities?
24   A.   I plead the Fifth.
25   Q.   Mr. Miller, was it your intention to misuse the

Page 33

1   funds lent to the -- I should rephrase that.
2       Mr. Miller, was it your intention to misuse
3   the funds that were entrusted to you by the
4   investors of 5 Star entities?
5       MR. THOMPSON:  May my client confer with me
6       briefly?
7       MR. KOS:  No.
8       MR. THOMPSON:  You're telling my client that
9       he can't confer with counsel?
10      MR. KOS:  My question has been asked.
11      MR. ADELSPERGER:  The question's been asked.
12      MR. THOMPSON:  Well, I was going to ask that
13      before the trustee instructed him to reask
14      the question, the preceding question that
15      was asked.  And she told him to ask the
16      question, so we've not had an opportunity --
17      ASSISTANT TRUSTEE ROBERTS:  If you would
18      like to take a five-minute break to confer
19      with your client, you may take a five-minute
20      break, confer with your client, then come
21      back, and Mr. Kos will proceed with his
22      questions.
23      MR. THOMPSON:  Okay.  Thank you.
24          (Break in audio recording)
25      ASSISTANT TRUSTEE ROBERTS:  We're back on

Page 34

1  the record.  This is the 341 meeting for the
2  5 Star Chapter 11 cases.
3       Mr. Miller, you did indeed swear to the
4  oath earlier.  Just to remind you, your oath
5  is continuing.  You are under penalties of
6  perjury, and I'm now going to take questions
7  from individual creditors.
8       Please raise your hand if you would like
9  to ask a question and you have not
10 previously asked a question at the initial
11 341 meeting.  That's any individual
12 creditor.  Sir.
13 UNIDENTIFIED VOICE:  I'm representing an
14 individual creditor.  May I ask questions on
15 his behalf?
16 ASSISTANT TRUSTEE ROBERTS:  Yes, you may.
17 MR. ADELSPERGER:  Identify.
18 ASSISTANT TRUSTEE ROBERTS:  If you would, if
19 you would come up, you can state your name
20 for the record and identify the name of your
21 client and what his claim is against
22 whichever debtor it is.  Say whichever
23 debtor it is that he has a claim against,
24 and then proceed with your questions.
25 MR. FISHER:  My name is Matt Fisher.  I'm

Page 35

1       representing Mr. William Adamczyk, his
2       claims against a number of the 5 Star
3       entities that are included in the
4       bankruptcy.  We have a couple of questions
5       if that's all right.
6            EXAMINATION OF EARL D. MILLER
7  BY MR. FISHER:
8  Q.  First, Mr. Miller, what is your current domicile
9      address, where you currently reside?
10 A.  New address is P.O. Box 573, and it's in Woodland
11     Park, Colorado.
12 Q.  Okay.
13 A.  The ZIP code is 80866.
14 Q.  Okay.  And where do you currently reside?  Where
15     do you fall asleep?
16 A.  My home address?  Okay.  Yeah.  697 Northwestern
17     Place.  You want to write it down or --
18 Q.  I can trust the transcript.
19 A.  Okay.  Northwestern Place, and it's Woodland
20     Park, 80863.
21 Q.  Okay.
22 A.  Yeah.
23 Q.  And do you own that home?  Do you -- or is it a
24     home?  Is it an apartment?
25 A.  Yeah, it's a home.

Page 36

1  Q.  It's a home.  Do you own that home?
2  A.  No.
3  Q.  Do you rent that home?
4  A.  I'm going to be pleading the Fifth.
5  Q.  Okay.
6            ASSISTANT TRUSTEE ROBERTS:  Can you all
7            speak up, please?
8            THE WITNESS:  Sorry.
9            ASSISTANT TRUSTEE ROBERTS:  For the record.
10           Thank you.
11 Q.  (By Mr. Fisher) All right.  Second, are there any
12     investor funds that were directed toward 5 Star
13     entities that are not included in today's
14     bankruptcy proceeding?
15 A.  I plead the Fifth.
16 Q.  Okay.  Do you currently have an active source of
17     income that allows you to afford living in the
18     domicile that you previously listed?
19 A.  I plead the Fifth.
20 Q.  Where -- do you have personal bank accounts, and
21     where are those personal bank accounts located in
22     terms of their state or the bank?
23           MR. THOMPSON:  Is this within the scope of
24           the examination for the 5 Star companies?
25           MR. FISHER:  Our argument is that there's a

Page 37

1       possible intermixing of assets between
2       corporate and personal.
3            ASSISTANT TRUSTEE ROBERTS:  Okay.  Then I
4            would say, yes, it is.  Proceed.
5  A.  I plead the Fifth.
6            MR. FISHER:  Okay.  That's all.  Thank you.
7            ASSISTANT TRUSTEE ROBERTS:  Thank you.
8            Anyone else who would like to ask questions?
9            Come up.  Please state your name for the
10           record.
11           MR. SWARTZ:  Samuel Swartz.
12                EXAMINATION OF EARL D. MILLER
13 BY MR. SWARTZ:
14 Q.  In May of 2015 or June of 2015, May or June --
15           MR. THOMPSON:  Please state your claim as a
16           creditor.  Which company do you have a claim
17           against?
18           MR. SWARTZ:  Well, I'm committee.
19           UNIDENTIFIED MALE VOICE:  He's a member of
20           the committee.
21           MR. THOMPSON:  Okay.  That's fine.
22           (Indiscernible cross talk)
23 Q.  (By Mr. Swartz) In June of 2015, I put 125,000
24     into a promissory note in Commercial.  Then on
25     July of '15, you already locked everything up.

5 Star Investment Group
341 Meeting,  on 11/15/2016

Pages 38..41

Page 38

1    What did you do with all that money when you
2    closed up the entity that you hadn't put it into?
3  A.  I plead the Fifth.
4  Q.  Okay.  We'll get an answer someday.
5         ASSISTANT TRUSTEE ROBERTS:  Next person.
6         Anyone else?  Come forward.  State your name
7         for the record, ma'am.
8         MS. ANDREWS:  I'm Karen Andrews.  I'm an
9         investor as well as on the unsecured
10        creditors committee.
11            EXAMINATION OF EARL D. MILLER
12 BY MS. ANDREWS:
13 Q.  I would like to ask, Earl, at what point in time
14     did you, representing 5 Star, knowingly begin to
15     put more investment money into a mortgage than
16     the property was worth?
17 A.  I plead the Fifth.
18 Q.  And do you wish to use your personal investments
19     and personal finances to pay back people who have
20     invested and have lost money?
21 A.  I plead the Fifth.
22         ASSISTANT TRUSTEE ROBERTS:  Anyone else?
23         Please, sir.
24         MR. HEIGHT:  My name's Steve Height.
25

Page 39

1            EXAMINATION OF EARL D. MILLER
2  BY MR. HEIGHT:
3  Q.  I have invested in 5 Star Portland, whatever that
4      involves.  I don't think we've ever met.  We've
5      spoken on the phone, and I think it was September
6      of 2015.  Many of the questions I have, have
7      already been asked, and you're pleading the
8      Fifth, and I appreciate that.  But you made a
9      statement to me at that time that you were going
10     to do everything in your power to get my money
11     back.
12         May I ask you, what are you doing to get my
13     money back?
14 A.  I plead the Fifth.
15 Q.  Thank you.
16         MR. RILEY:  My name is Christopher Riley.
17         I'm an attorney for creditors James Miller
18         and Joe Miller.  And they have filed proofs
19         of claim against 5 Star Investment Group II,
20         LLC.
21            EXAMINATION OF EARL D. MILLER
22 BY MR. RILEY:
23 Q.  Mr. Miller, were you ever an officer of 5 Star
24     Investment Group II, LLC?
25 A.  I plead the Fifth.

Page 40

1  Q.  My clients obtained real estate mortgages for
2      money loaned on properties purchased in St.
3      Joseph County in South Bend.  Did 5 Star
4      Investment Group II, LLC, ever obtained more
5      mortgages on those properties in South Bend than
6      the properties were worth?
7  A.  I plead the Fifth.
8         ASSISTANT TRUSTEE ROBERTS:  Anyone else?
9         MR. BAKER:  I'm Stan Baker.
10            EXAMINATION OF EARL D. MILLER
11 BY MR. BAKER:
12 Q.  I just had a question here.  I've been invested
13     since 2012 in several different entities, and I'm
14     not sure where my money is at the present.  I was
15     in Oregon.  I did, the end of May, switch to TC
16     Commercial.  At that time I did receive a
17     promissory note stating the 304 (inaudible)
18     Middlebury, and then I got a private placement
19     memorandum from TC Commercial, which is a North
20     Carolina limited liability company.
21         Can you tell me the address for that North
22     Carolina limited liability company?
23 A.  I'm going to answer this one.  The TC Commercial
24     is the one that owned Twin City.  There's -- I
25     want to answer all the questions, but because of

Page 41

1  the nature of today, I'm pleading the Fifth.  So
2  just so you know, I want to answer questions; but
3  I'm pleading the Fifth today because of the
4  nature of where we're at.
5         But to answer your question there, had we
6  been allowed to execute -- your money went to
7  Twin City.  Had we been allowed to execute, you
8  would today have ownership in that property.
9  It's a great property.  We had a bunch of money
10 in escrow for rehab, but we were not allowed to
11 execute.  And so it's been -- unfortunately the
12 trustee has lost it.  So I apologize.
13 Q.  So TC Commercial --
14 A.  Yes.
15 Q.  -- is an entity of Twin City?
16 A.  Yeah.  Yes.  It has ownership in Twin City.  We
17 brought the notes.  We recognized we should have
18 it in subscription agreements and operating
19 agreements.  We had everything drawn up, ready to
20 switch over, and then we were not allowed to
21 execute unfortunately.  So when -- I really,
22 really care about you investors.  I really do.
23 Unfortunately, my hands are tied, so...
24 Q.  There -- I've got another question that I'd like
25 to state.  Mike Alfrey was who I was dealing with

**EXHIBIT 4**

Page 42

1  on this; and when I went from Portland to this TC
2  Commercial, TC Commercial I understand is not
3  in -- the way I look at it in a bankruptcy that I
4  see an entity behind, I own some property in --
5  out west, and I stated that I was going to
6  roll -- possibly sell that property.  And Mike
7  Alfrey did state at that time that he might
8  personally be interested in buying that property.
9  And at that time he told me that you might be
10 interested in putting up -- you were looking into
11 putting up a hurricane-resistant,
12 tornado-resistant, and I think he said
13 earthquake-resistant home as a show place or
14 model home or whatever.
15     I don't -- I never talked to you personally,
16 but that was brought up in our conversation.  So
17 I'm just, you know, I'm just trying to dig up a
18 little bit.  Where is our money?  Where is --
19 A.  I have to plead the Fifth.
20 Q.  All right.  Thank you.
21     MR. ADELSPERGER:  If I may, this may be an
22     appropriate time just so that the record is
23     straight for me to comment.  You may be
24     seated because I'm going to take a moment
25     here.

Page 43

1     With regard to TC and Twin Cities, and
2  this is the second time on the record that
3  my efforts have been questioned with regard
4  to this bankruptcy.  And it's the third time
5  that I am aware of that my efforts have been
6  questioned with regard to this bankruptcy
7  with regard to TC.
8     Specifically, some of you in this
9  audience, and maybe all of you, I don't
10 really care to know, but maybe you have
11 received an e-mail on October 24, 2016, from
12 a gentleman by the name of Bob Sutter that
13 said a number of things.  And I'm going to
14 take this opportunity to read through a
15 prepared statement that I have, and it was
16 prepared on the possibility that we would
17 stumble back into this particular issue.
18    Some of you who are here today may have
19 received an e-mail correspondence from Bob
20 Sutter regarding Twin City Townhomes.  I
21 would like to clear up some of the
22 misinformation that was provided in that
23 e-mail and also give you an update with
24 regard to Twin City Townhomes.
25    When the bankruptcy cases, 11 in all,

Page 44

1  were originally filed, the debtors were not
2  completely forthcoming regarding the
3  information about Twin City.  On the 5 Star
4  Commercial bankruptcy schedules, the debtors
5  did not list that 5 Star Commercial, LLC,
6  had an ownership in the Twin City Townhomes.
7  Because the schedules list a fairly large
8  receivable due from Twin City Townhomes and
9  because the proofs of claim that were filed
10 in the end of April and beginning of May
11 suggested that 5 Star Commercial may, in
12 fact, have an ownership interest in the Twin
13 City Apartments, my legal team and I began
14 investigating the matter.
15    Upon interviews conducted by myself and
16 my counsel, we learned that Mr. Miller
17 either individually, through one or more of
18 the debtors or a trust or on a nonfiling 5
19 Star entity, purchased an apartment complex
20 in Winston-Salem, North Carolina, known as
21 Twin City Townhomes sometime in the summer
22 of 2015.  We were not given any information
23 or documentation reflecting whether or not
24 the complex was owned outright by
25 Mr. Miller, by an entity owned by

Page 45

1  Mr. Miller, or by one of the 5 Star entities
2  in bankruptcy or not in bankruptcy.
3     We, my team and I, ordered title work and
4  learned that the complex had been purchased
5  in July of 2015 for $7.5 million, right
6  around the same time that the SEC began its
7  investigation of Mr. Miller and 5 Star.
8  Although the title work showed that the
9  owner was an Indiana LLC and that there was
10 a mortgage on the property for about
11 $7.1 million, the title work did not show
12 who owns the LLCs, whether the investor
13 money was used to purchase Twin Cities, or
14 whether any of the money of the debtor
15 entities was used to purchase Twin Cities.
16 Accordingly, I instructed my legal counsel
17 to serve several subpoenas to obtain
18 information of the owners of Twin City and
19 details of the purchase of Twin City.
20    Counsel served those subpoenas on 5 Star
21 Management Solution, LLC, care of Norman D.
22 Praet, an attorney in North Carolina, and TC
23 Commercial, LLC, in care of Norman Praet.
24 Mr. Praet did not immediately respond to
25 those subpoenas.

**EXHIBIT 4**

Page 46

1    On June 13th of 2016, Mr. Miller filed a
2  statement of confession in the SEC matter
3  stating that he was willing to cooperate,
4  but he failed to provide the requested
5  documents or provide any explanation
6  whatsoever of the structure of the ownership
7  of Twin City and the detail of sale.  We, my
8  team and I, continued to pursue avenues to
9  obtain information regarding the fund that
10  has been utilized to purchase Twin Cities.
11    My counsel contacted Kim Taylor, legal
12  counsel for the other apartment complexes
13  associated with this case; Kim Bruggeman,
14  the person supposedly managing the Twin City
15  Townhomes; and Mr. Praet.  In addition, my
16  counsel spoke to an individual who asked to
17  be named -- to be kept confidential and
18  learned that the complex was in bad repair,
19  the target of numerous zoning and hazardous
20  health violations, and subject to several
21  lawsuits.
22    In early August, we learned that the
23  mortgage was in default and that U.S. Bank
24  had commenced a lawsuit and was asking for
25  the appointment of a receiver.  My counsel

Page 47

1  contacted Mrs. Bruggeman about this lawsuit.
2  Mrs. Bruggeman represented that a Mr. Carl
3  Withers; a Mr. Babenco; and a Mr. Kuatt,
4  K-U-A-T-T, if I'm not pronouncing that
5  correct; and herself were going to make an
6  offer to purchase the apartment complex that
7  would pay off the bank and protect investor
8  money.
9    My counsel requested that Mrs. Bruggeman
10  provide my counsel with a list of the
11  investors and the financial information,
12  including rent rolls, balance sheet, income,
13  and expense statements.  In addition, my
14  counsel requested that Mrs. Bruggeman
15  provide documents reflecting the ownership
16  structure of Twin Cities, LLC.
17    To avoid the immediate appointment of a
18  receiver, I hired a lawyer in North Carolina
19  to appear in the action filed by the bank
20  and to buy some time to allow
21  Mrs. Bruggeman's group to make the offer.
22  The bank was asked for -- the bank was
23  asking for several documents from
24  Mrs. Bruggeman and agreed to stand down
25  until the documents were received.  The

Page 48

1  documents were not immediately provided.  An
2  offer was never made.  The bank was going to
3  push forward with the appointment of a
4  receiver.  Lawsuits were continued to be
5  filed, and the additional health and zoning
6  violations were pursued.
7    A receiver was appointed, and we made the
8  decision not to utilize this bankruptcy's
9  estate fund to fight an appointment of a
10  receiver.  On September 19th of 2016, we
11  finally received documents from Mr. Praet.
12  Among the documents was a trust instrument
13  created by Mr. Miller and a Mr. Marlin
14  Schwartz known as Southern Equity Group
15  Trust.  I'm sorry.  Southern Equity Group
16  Living Trust.  The governance documents of
17  the Twin City Winston-Salem, LLC, were also
18  received.  Those documents reflect that the
19  Southern Equity Group Trust owns 90 percent
20  of the Twin City Winston-Salem, LLC, and
21  that 5 Star Commercial only had a 5 percent
22  interest.
23    On September 15, 2016, we finally
24  received the investor list.  That list
25  disclosed close to $2 million in investments

Page 49

1  that were apparently earmarked for Twin
2  Cities.  We also received a closing
3  statement when Twin City Townhome was
4  purchased and learned that 1.4 million in
5  cash was contributed to purchase the
6  apartment complex in July of 2015.
7    You may have heard from certain
8  individuals involved in this case that the
9  apartment building was not successful
10  because the SEC froze the bank account.  We
11  have not been able to find any evidence that
12  there was any account or substantial cash
13  earmarked to pay any operating expenses of
14  Twin City.  What we have learned is that the
15  U.S. Bank was holding approximately $600,000
16  in a repair account.  In order to access
17  that account, Twin City had to actually make
18  repairs and ask for reimbursement from the
19  bank.  From day one, Twin City did not have
20  enough money to make repairs and receive
21  reimbursement from the bank.  It is unclear
22  why Twin Cities did not have operating
23  capital.
24    If you recall during our last meeting,
25  Ms. Caruso asked Mr. Miller if he raised

**EXHIBIT 4**

Page 50

1   $2 million for Twin Cities and $1.4 million
2   was paid at closing, then where did that
3   600,000 go?  Why did Twin Cities not have
4   any operating funds?  Because Twin Cities
5   could not perform the repairs and the
6   property became in disrepair, the vacancy
7   rate increased, rents became delinquent.
8   Twin City became in default of its
9   obligations to its vendors and U.S. Bank.
10      An independent receiver is now in place
11  managing Twin Cities.  Ms. Bruggeman,
12  Mr. Babenco, Mr. Withers, and Mr. Kuatt are
13  free to make an offer to the receiver to buy
14  that complex if they so choose.  The
15  receiver reports that the lender is
16  releasing moneys now to make rehab of the
17  apartments on an as-needed basis to fill
18  vacancies.  The receiver has rented eight
19  refurbished apartments and eight more are in
20  the works.  The receiver further reports
21  that Twin City of Winston-Salem was not
22  paying its vendors and approximately
23  $200,000 is owed to these vendors.  It is
24  also uncertain whether the bank will
25  continue to advance money for tenant

Page 51

1               improvement.  It is also uncertain whether
2               the bank will push forward with foreclosure
3               action to allow the receiver to continue to
4               manage these townhomes.
5                    That's my report with respect to this.
6               If you have specific questions with regard
7               to this issue, I would suggest that you
8               e-mail them to me so that I can get them to
9               my counsel who knows the answers or are
10              working on the answers.  Danger happens,
11              people, when you go outside of these
12              meetings to try to get your information.
13              That's my statement.
14              ASSISTANT TRUSTEE ROBERTS:  Thank you,
15              Trustee Adelsperger.  And I'm going to now
16              ask if anyone else in -- any other
17              individual creditors would like to step
18              forward to ask questions of Mr. Miller.
19              Okay.  So seeing none, I'm going to ask
20              Mr. Kos to continue with such questions as
21              he has.
22                    EXAMINATION OF EARL D. MILLER
23  BY MR. KOS:
24  Q.    Mr. Miller, we've just heard a little bit about
25        Twin Cities, so I'll start there.  With regard to

Page 52

1        Twin City, the ownership on the deed for that
2        property is Twin City of Winston-Salem, LLC, an
3        Indiana limited liability company.  Are you the
4        owner of that limited liability company?
5   A.   I plead the Fifth.
6   Q.   The Secretary of State -- would it surprise you
7        that the records of the Secretary of State show
8        that you are the 100 percent owner of the -- of
9        that LLC that owns the North Carolina property?
10  A.   I plead the Fifth.
11  Q.   Mr. Miller, Southern Equity Group Trust, from the
12       closing statement, doesn't show that it paid any
13       money at the closing.  Why does Southern Equity
14       Group Trust have a 95 percent interest in that
15       management company and the operation of the
16       property?
17  A.   I plead the Fifth.
18  Q.   Isn't it true, Mr. Miller, that the $1.9 million
19       that was raised for the purchase of Twin Cities
20       came from 5 Star investors?
21  A.   I plead the Fifth.
22  Q.   Isn't it true, Mr. Miller, that when you raised
23       the money from the 5 Star investors, you intended
24       to defraud them?
25  A.   That is not true, sir.  I wouldn't defraud

Page 53

1        investors intentionally.
2   Q.   Please explain.  I think you've just waived
3        your -- please give a full answer how you, how
4        you didn't intend to defraud the investors when
5        you set up all these multiple layers of ownership
6        and that the benefit for the property, ownership
7        of that property fell to you personally or to a
8        trust in which you and Marlin Schwartz were
9        owners?
10  A.   The investor money was raised in notes,
11       promissory notes.  It was as debt.  The same
12       thing -- the way houses were.  And our goal was
13       to switch it over and give them ownership.
14       Simple as that.  That's what our goal was, but we
15       weren't allowed to execute.
16  Q.   There was nothing in the SEC that had any action
17       against the Twin Cities -- they didn't even know
18       about it.
19  A.   It was mentioned in the first 341 conference and
20       I, and I -- what Adelsperger said was in the
21       first 341 conference I specifically mentioned I
22       will do whatever I need to do to switch over Twin
23       City and all the investors and get them
24       ownership.  And I explained what we were doing.
25       You can go back and listen to it.  But my

5 Star Investment Group
341 Meeting,  on 11/15/2016

Pages 54..57

Page 54

1    intention was not to defraud investors in Twin
2    City, and I'm being very straightforward here.
3    Q.   So is your testimony today that, in fact, the
4         $1.9 million that was raised for 5 Star -- from 5
5         Star investors, in fact, gives them the ownership
6         of Southern Equity Group Trust, gives them the
7         ownership of the property in Winston-Salem, North
8         Carolina, and all of the intervening levels of
9         management?
10   A.   I plead the Fifth on that, yeah.  It's not
11        specific.
12   Q.   Mr. Miller, have you had communications with Kim
13        Bruggeman after the time that the Chapter 11
14        bankruptcies were filed?
15   A.   I plead the Fifth.
16   Q.   Is Kim Bruggeman a partner of yours?
17   A.   I plead the Fifth.
18   Q.   Are you aware of Kim Bruggeman paid herself
19        considerable fees from the management and
20        operation of Twin Cities apartments?
21   A.   I plead the Fifth.
22   Q.   Are you aware, Mr. Miller, that the Twin Cities
23        obligations to U.S. Bank were paid through June
24        of 2016?
25   A.   I plead the Fifth.

Page 55

1    Q.   Are you aware that after June of 2016, Kim
2         Bruggeman failed to collect rents from the
3         tenants of this apartment complex?
4    A.   I plead the Fifth.
5    Q.   Do you have any communications with Kim Bruggeman
6         concerning the lawsuit that's been filed by U.S.
7         Bank?
8    A.   I plead the Fifth.
9    Q.   Have you had any communications with Carl Withers
10        concerning this property in North Carolina?
11   A.   I plead the Fifth.
12   Q.   Have you had any communications with Ed Babenco
13        concerning this property in North Carolina?
14   A.   I plead the Fifth.
15   Q.   Have you had any communications with Alan Kuatt
16        concerning this property in North Carolina?
17   A.   I plead the Fifth.
18   Q.   Mr. Praet, have you had communications with him?
19   A.   I plead the Fifth.
20   Q.   Have you had communications with Kim Taylor?
21   A.   I plead the Fifth.
22   Q.   Have you had any communications with Bob Sutter
23        concerning this property in North Carolina?
24   A.   I plead the Fifth.
25   Q.   Have you had any communications with any other

Page 56

1    person, not your lawyer, concerning this property
2    in North Carolina?
3    A.   I plead the Fifth.
4    Q.   Mr. Miller, isn't it true that you made
5         misrepresentations to the 5 Star investors
6         concerning their investments in this North
7         Carolina property?
8    A.   I plead the Fifth.
9    Q.   Did you represent to those investors that they
10        were, in fact, getting ownership of the North
11        Carolina property?
12   A.   I plead the Fifth.
13   Q.   Isn't it true, Mr. Miller, you didn't put any of
14        your own money into the investment in the North
15        Carolina property?
16   A.   I plead the Fifth.
17   Q.   Isn't it true, Mr. Miller, you have not put any
18        of your own money into any of the investments
19        being held by 5 Star investment?
20   A.   I plead the Fifth.
21   Q.   Isn't it true, Mr. Miller, that you also received
22        compensation that's not been disclosed?
23   A.   I plead the Fifth.
24   Q.   Mr. Miller, isn't it also true that you made
25        misrepresentations to the investors that invested

Page 57

1    in properties in Portland, Oregon?
2    A.   I plead the Fifth.
3    Q.   Mr. Miller, did you invest any of your personal
4         money in the properties in Portland, Oregon?
5    A.   I plead the Fifth.
6    Q.   Mr. Miller, did you invest any of your money into
7         the properties that are found here in northern
8         Indiana?
9    A.   I plead the Fifth.
10   Q.   Isn't it true, Mr. Miller, as early in 2015, you
11        and others in 5 Star were well aware that the
12        Indiana properties were at least a million
13        dollars under water?
14   A.   I plead the Fifth.
15   Q.   Isn't it true, Mr. Miller, in 2015 you, you gave
16        instructions to your employees in an attempt to
17        sell that portfolio of properties?
18   A.   I plead the Fifth.
19   Q.   Isn't it true, Mr. Miller, that in 2015 and
20        thereafter, when properties in northern Indiana
21        were sold, you had to bring funds to the closings
22        because the properties were underwater?
23   A.   I plead the Fifth.
24   Q.   Mr. Miller, isn't it true that you accepted funds
25        from investors in 2015 to pay investors who had

**EXHIBIT 4**

Page 58

1    been -- who had loaned money to 5 Star entities
2    before their investments?  I'll withdraw that.
3    I'll rephrase it for you.
4         Isn't it true, Mr. Miller, that you used
5    later investment money to pay the dividends to be
6    paid to earlier investors?
7  A. I plead the Fifth.
8  Q. Mr. Miller, isn't it true that you made
9    intercompany transfers to hide your efforts to
10   defraud the investors?
11 A. I plead the Fifth.
12 Q. Isn't it true, Mr. Miller, that you accepted
13   funds from Marlin Schwartz for ownership interest
14   in the 5 Star entities?
15 A. I plead the Fifth.
16 Q. Isn't it true, Mr. Miller, that Marlin Schwartz
17   is no longer an owner of 5 Star -- of any of the
18   5 Star entities?
19 A. I plead the Fifth.
20 Q. Isn't it true, Mr. Miller, that you passed or,
21   well, paid Mr. Schwartz money for his interest so
22   that he would not be an interest when these
23   bankruptcies were filed?
24 A. I plead the Fifth.
25 Q. Mr. Miller, is it true that you made donations on

Page 59

1    behalf of the 5 Star entities to Z Ministries for
2    which there was no consideration given by Z
3    Ministries?
4  A. I plead the Fifth.
5  Q. Is it true, Mr. Miller, that over a hundred
6    thousand dollars of investor money was
7    transferred from 5 Star entities to Z Ministries?
8  A. I plead the Fifth.
9  Q. Mr. Miller, is it true that you sold on land
10   contract a property in Indiana to Servants of the
11   Streets?
12 A. I plead the Fifth.
13 Q. Isn't it true, Mr. Miller, that you sold that
14   property for less than its true fair value?
15 A. I plead the Fifth.
16 Q. Isn't it true, Mr. Miller, that you made a
17   fraudulent transfer by reducing that purchase
18   price by giving them a $10,000 credit as a,
19   quote, charitable donation?
20 A. I don't know what you're talking about to be
21   honest with ya.
22 Q. Mr. Miller, did you sell the property to Servants
23   of the Streets for $25,000, of which 10,000 was
24   paid by a $10,000 donation by the 5 Star
25   entities, resulting in a net purchase price of

Page 60

1    $15,000?
2  A. I don't know.  I don't know what you're talking
3    about.
4  Q. You don't know anything about the transfer to
5    Servants of the Streets?
6  A. No.
7  Q. Do you know who would?
8  A. Matt would.
9  Q. Matt would?
10 A. Yeah.
11 Q. And how would Matt know?
12 A. I think he was the one that sold it to them.
13 Q. And did Mr. Zercher prepare the paperwork for
14   that transfer?
15 A. I have no idea.
16     MR. ADELSPERGER:  For the record, Matt
17     Gingerich?
18     THE WITNESS:  Yes.
19     MR. ADELSPERGER:  Thank you.
20 Q. (By Mr. Kos) Mr. Miller, have you made fraudulent
21   transfers of property or money to any other
22   person?
23 A. Not that I'm aware of, no.
24 Q. Mr. Miller, can you tell us about South Fork
25   Harvester and the property that it owns in

Page 61

1    Goshen, Indiana?
2  A. I plead the Fifth.
3  Q. It's going to take awhile.  I have a lot of
4    folders to go through.
5  A. Yeah.
6  Q. Mr. Miller, are you the owner of National Real
7    Estate Group, LLC?
8  A. I plead the Fifth.
9  Q. Mr. Miller, are you the owner of Mountain View
10   Holdings Trust?
11 A. I plead the Fifth.
12 Q. Mr. Miller, are you the owner of Multifamily
13   Holdings, LLC?
14 A. I plead the Fifth.
15 Q. Mr. Miller, are you the owner of A to Z Builders,
16   LLC?
17 A. I plead the Fifth.
18 Q. Are you the owner of Legacy Builders Trust?
19 A. I plead the Fifth.
20 Q. Artisan Builders, LLC?
21 A. I plead the Fifth.
22 Q. Mr. Miller, is it true that you created Mountain
23   View Holdings Trust to be the ultimate owner of
24   the various 5 Star entities?
25 A. I plead the Fifth.

EXHIBIT 4

5 Star Investment Group
341 Meeting,  on 11/15/2016                                             Pages 62..65

Page 62

1  Q.   Mr. Miller, is it true that you are an investor
2       in Green Resource Homes, Inc.?
3  A.   I plead the Fifth.
4  Q.   Mr. Miller, is it true that you have worked with
5       Julius Toth and Robert Foraker to defraud the
6       investors of 5 Star entities in your investments
7       in the Green Resource Homes, Inc.?
8  A.   No, that is not true.
9  Q.   Please explain.
10 A.   I haven't intentionally defrauded the investors.
11 Q.   Didn't you provide Toth and Foraker a large sum
12      of money for the purchase of real estate and for
13      the purchase of various inventory and various
14      supposedly eco-friendly products?
15 A.   I did, but it was not with the intent to defraud.
16 Q.   Oh, it just had that effect?  Did they defraud
17      you?
18 A.   Yes.
19 Q.   Are you aware that the trustee has filed a
20      lawsuit trying to recover those funds that have
21      been defrauded by Mr. Toth and Mr. Foraker?
22 A.   I was not.  I'm glad to hear that.
23 Q.   Are you willing to provide testimony to assist us
24      in the prosecution of that matter?
25 A.   Yes.

Page 63

1  Q.   Mr. Miller, is it true that 5 Star investor money
2       is -- was used to purchase Village Apartments of
3       Charleston, LLC?
4  A.   I plead the Fifth.
5  Q.   Mr. Miller, is it true that 5 Star investment
6       money has been used in Bedrock Management
7       Solutions, LLC?
8  A.   No.
9  Q.   All right.  What money did go into Bedrock
10      Management Solutions, LLC?
11 A.   None that I'm aware of.
12 Q.   What does Bedrock Management Solutions own?
13 A.   I don't think it owns anything.
14 Q.   What does it do?
15 A.   It manages Withers, Kuatt, and Babenco's
16      properties.
17 Q.   Do you have an ownership interest with those
18      gentlemen you just named personally?  Personally,
19      do you have an interest in Bedrock Management
20      Solutions?
21 A.   I did, but I signed it over to them because I
22      went my own way and they went their way.  So I
23      don't have -- that entity does not have any
24      assets.
25 Q.   And when did you sign that interest over to them?

Page 64

1  A.   I don't remember.
2  Q.   Do you have paperwork?
3  A.   No.
4  Q.   Do you have documents concerning that transfer?
5  A.   The server was taken.
6  Q.   When was the -- when did that transfer occur?
7  A.   I don't know.
8  Q.   Was it in 2015?
9  A.   I don't know.
10 Q.   Mr. Miller, did 5 Star investors' money go into
11      Colonial Place Apartments?
12 A.   I plead the Fifth.
13 Q.   Mr. Miller, did 5 Star investor money go into
14      Ashley Park Apartments?
15 A.   I plead the Fifth.
16 Q.   Mr. Miller, did 5 Star investor money go into
17      Timber Hollow Apartments?
18 A.   I plead the Fifth.
19 Q.   Mr. Miller, did 5 Star investor money go into
20      Avalon Trace Apartments?
21 A.   I plead the Fifth.
22 Q.   Mr. Miller, did 5 Star investor money go into
23      Parkfairfax Apartments?
24 A.   I plead the Fifth.
25 Q.   Mr. Miller, did 5 Star investment money go into

Page 65

1       Ace Property Group, LLC?
2  A.   I plead the Fifth.
3  Q.   Mr. Miller, did 5 Star investment go into
4       Springmont Holdings, LLC?
5  A.   I plead the Fifth.
6  Q.   Mr. Miller, did 5 Star investor money go into
7       Avalon Trace Management, LLC?
8  A.   I plead the Fifth.
9  Q.   Mr. Miller, did 5 Star investment money go into
10      Trent Holdings Group, LLC?
11 A.   I plead the Fifth.
12 Q.   Mr. Miller, did 5 Star investor money go into
13      Fairfax Holdings, LLC?
14 A.   I plead the Fifth.
15 Q.   Mr. Miller, did 5 Star investment go into Avalon
16      Trace Holdings, LLC?
17 A.   I plead the Fifth.
18 Q.   Mr. Miller, did 5 Star investor money go into
19      Utah Holdings Group, LLC?
20 A.   I plead the Fifth.
21 Q.   Mr. Miller, did 5 Star investment money go into
22      Albion Premier Investments, LLC?
23 A.   I plead the Fifth.
24 Q.   Mr. Miller, did 5 Star investment money go into
25      Albion Premier Manager, LLC?

**EXHIBIT 4**

Page 66

1   A.   I plead the Fifth.
2   Q.   Mr. Miller, what is 5 Star Investing?
3   A.   I plead the Fifth.
4   Q.   Mr. Miller, what is 5 Star Holdings, LLC?
5   A.   I plead the Fifth.
6   Q.   Mr. Miller, what is 5 Star Capital Fund, LLC?
7   A.   I plead the Fifth.
8   Q.   Mr. Miller, what is 5 Star Fund I, LLC?
9   A.   I plead the Fifth.
10  Q.   Mr. Miller, what is 5 Star Fund II, LLC?
11  A.   I plead the Fifth.
12  Q.   Mr. Miller, these last three entities that I just
13       talked about were all created in 2015.  Did 5
14       Star investment money -- was it used for
15       capitalization of those entities?
16  A.   I plead the Fifth.
17  Q.   Please explain, Mr. Miller, what was the purpose
18       of Mountain View Holdings?
19  A.   I plead the Fifth.
20  Q.   Mr. Miller, what is Blue Eagle Ventures, LLC?
21  A.   I plead the Fifth.
22  Q.   Mr. Miller, did any 5 Star investor money go into
23       Blue Eagle Ventures, LLC?
24  A.   I plead the Fifth.
25  Q.   Is that a Florida LLC, Mr. Miller?

Page 67

1   A.   I plead the Fifth.
2   Q.   Do you have any property in Bradenton, Florida?
3   A.   I plead the Fifth.
4   Q.   Does any of the 5 Star entities have property in
5        Florida?
6   A.   I plead the Fifth.
7   Q.   Does any of the 5 Star entities have property in
8        Texas?
9   A.   I plead the Fifth.
10  Q.   Does it have property -- does any of the 5 Star
11       entities have properties in North Carolina?
12  A.   I plead the Fifth.
13  Q.   Does any of the 5 Star entities have properties
14       in South Carolina?
15  A.   I plead the Fifth.
16  Q.   Does it have any property in any other state?
17  A.   I plead the Fifth.
18  Q.   Mr. Miller, does any 5 Star money -- any money
19       from 5 Star investors -- was it transferred to GD
20       as 5 Star Villa?
21  A.   I plead the Fifth.
22  Q.   Mr. Miller, has any 5 Star investor money been
23       transferred to FireStar Group, LLC?
24  A.   I plead the Fifth.
25  Q.   Mr. Miller, are any of the 5 Star investor funds

Page 68

1        transferred to GBS Fairway Management?
2   A.   I plead the Fifth.
3   Q.   Mr. Miller, has any 5 Star investor money been
4        transferred to Golden Asset Management?
5   A.   I plead the Fifth.
6   Q.   Mr. Miller, has any 5 Star investor money been
7        transferred to Sungate Apartments?
8   A.   I plead the Fifth.
9   Q.   Mr. Miller, has any 5 Star investor money been
10       transferred to Seven Heavens, LLC?
11  A.   Plead the Fifth.
12  Q.   Mr. Miller, did you have any conversations or
13       communications with Rudy Helmuth concerning the
14       sale of property in Middlebury, Indiana, that
15       occurred shortly after this bankruptcy was filed,
16       which was a commercial property that we talked
17       about at this previous --
18  A.   I plead the Fifth.
19  Q.   Who is Sarah Helmuth?
20  A.   I plead the Fifth.
21  Q.   Is Sarah Helmuth Rudy Helmuth's daughter?
22  A.   I plead the Fifth.
23  Q.   Is Sarah Helmuth a former employee of 5 Star?
24  A.   I plead the Fifth.
25  Q.   Is Sarah Helmuth the person that created the

Page 69

1        notes and investment packages for 5 Star
2        entities?
3   A.   I plead the Fifth.
4   Q.   Mr. Miller, did any 5 Star investment funds go to
5        North Stream Ministries?
6   A.   I plead the Fifth.
7   Q.   Mr. Miller, is it true that all funds that were
8        paid to Matt Gingerich came from 5 Star and from
9        the 5 Star entities?
10  A.   I plead the Fifth.
11  Q.   Mr. Miller, I've seen photographs of you with an
12       airplane of some sort.  Was that airplane
13       acquired with 5 Star money?
14  A.   I plead the Fifth.
15  Q.   Do you presently have in your possession any
16       property, any money, anything that was acquired
17       using 5 Star money?
18  A.   You know what?  That has to do with intent, so
19       I'm going to answer that question.  That was not
20       bought with 5 Star money.
21  Q.   What was not bought with 5 Star money?
22  A.   That airplane was not bought with 5 Star money.
23       It was not bought with investor funds of 5 Star.
24  Q.   And where did it come from?
25  A.   I bought it.

**EXHIBIT 4**

Page 70

1  Q.  Where did you get the money from?
2  A.  I had funds.
3  Q.  Compensation from 5 Star?
4  A.  Yes.
5  Q.  You didn't work for anything other than 5 Star?
6  A.  No.
7  Q.  Where is that airplane?
8  A.  I plead the Fifth.
9  Q.  Mr. Miller, what was your compensation package
10     for 5 Star?
11 A.  I plead the Fifth.
12 Q.  What was Mr. Gingerich's compensation when he
13     worked for 5 Star?
14 A.  I plead the Fifth.
15 Q.  Mr. Miller, did 5 Star investment money --
16     investors' money go toward the failed purchase of
17     a property in Ohio called the NASA building?
18 A.  I plead the Fifth.
19 Q.  Were your partners in that Mr. Foraker?
20 A.  I plead the Fifth.
21 Q.  Also was involved, I think, another Realtor
22     person by the name of Williams?
23 A.  I plead the Fifth.
24 Q.  Do you recall his involvement? And how much
25     money was transferred as part of that purchase?

Page 71

1  A.  I plead the Fifth.
2  Q.  Would it refresh your memory if it was over
3      $200,000?
4  A.  I plead the Fifth.
5  Q.  That was investor money, Mr. Gingerich?
6      Mr. Miller, excuse me. Getting tongue-tied.
7      Sorry.
8  A.  Plead the Fifth.
9  Q.  I apologize. Mr. Miller, do you also own an
10     entity called EP Miller & Associates?
11 A.  I plead the Fifth.
12 Q.  Mr. Miller, do you also have another entity
13     called EM Holdings, LLC?
14 A.  I plead the Fifth.
15 Q.  Mr. Miller, do you have any interest in an entity
16     called MLN Properties, LLC?
17 A.  I plead the Fifth.
18 Q.  Those entities I just mentioned, were any 5 Star
19     investor money transferred to those entities?
20 A.  I plead the Fifth.
21 Q.  Mr. Miller, did you have an ownership interest in
22     a Nevada corporation?
23 A.  I plead the Fifth.
24 Q.  That ownership in that corporation included Matt
25     Gingerich and Mr. Bontrager?

Page 72

1  A.  I plead the Fifth.
2  Q.  Mr. Miller, do you have any documents in your
3      possession concerning the transfer of
4      Mr. Gingerich's ownership interest in the 5 Star
5      entities to you?
6  A.  I plead the Fifth.
7  Q.  Do you know of anyone who has the documents
8      concerning that transaction?
9  A.  I plead the Fifth.
10 Q.  Did you acquire life insurance in your own name
11     using 5 Star investor money?
12 A.  I plead the Fifth.
13 Q.  Mr. Miller, was 5 Star investor money used to pay
14     the buyout from Mr. Bontrager?
15 A.  I plead the Fifth.
16 Q.  Did 5 Star entities invest in any business in
17     which Mr. Rudy Helmuth was a principal?
18 A.  I plead the Fifth.
19 Q.  Did 5 Star invest money -- was any 5 Star
20     investor money used to invest in businesses
21     co-owned by Marlin Schwartz?
22 A.  I plead the Fifth.
23 Q.  Mr. Miller, did you have any ownership interest
24     in R & M Holdings, LLC?
25 A.  I plead the Fifth.

Page 73

1  Q.  Any interest -- did any 5 Star investment money
2      go into Legacy Assets, LLC?
3  A.  I plead the Fifth.
4  Q.  Did any 5 Star money go into Creative Funding,
5      LLC?
6  A.  I plead the Fifth.
7  Q.  Did any 5 Star investor money go into Schwartz
8      Remodeling, LLC?
9  A.  I plead the Fifth.
10 Q.  Did any 5 Star investor money get transferred to
11     Premier Property Managers, LLC?
12 A.  I plead the Fifth.
13 Q.  Did any 5 Star investor money -- was any 5 Star
14     investor money transferred to Premier Transport
15     Group, LLC?
16 A.  I plead the Fifth.
17 Q.  Do you have any -- does 5 Star still have any
18     ownership interest in an entity that was
19     previously called 5 Star XYZ, LLC?
20 A.  I plead the Fifth.
21 Q.  Does 5 Star have any interest, ownership
22     interest -- any of the 5 Star entities have any
23     ownership interest in that entity which is now
24     called InfoLink, LLC?
25 A.  I plead the Fifth.

Page 74

1   Q.   Mr. Miller, did you authorize the employees of 5
2        Star to make the distributions to the investor?
3   A.   I plead the Fifth.
4   Q.   Mr. Miller, did you sign the checks that were
5        paid to the 5 Star investors?
6   A.   I plead the Fifth.
7   Q.   Mr. Miller, were you the signatory on all the
8        bank accounts for the 5 Star entities?
9   A.   I plead the Fifth.
10  Q.   Mr. Miller, did you transfer over $750,000 of 5
11       Star investor money to Global Impact Companies,
12       LLC?
13  A.   I plead the Fifth.
14            ASSISTANT TRUSTEE ROBERTS:  If I could just
15       interrupt.
16            MR. KOS:  Yeah.
17            ASSISTANT TRUSTEE ROBERTS:  Mr. Miller, that
18       information is disclosed on the schedules of
19       the various debtors.
20            THE WITNESS:  Then why is the question being
21       asked?
22            ASSISTANT TRUSTEE ROBERTS:  Mr. Kos is
23       asking questions about the finances of the
24       debtors.  And if you will recall, you've
25       answered questions about the Global Impact

Page 75

1        transfers previously.  So I would suggest
2        that you've waived the Fifth in this line of
3        questioning.
4            Mr. Kos, if you'd like to resume.
5   Q.   (By Mr. Kos)  Sure.  So you did transfer 5 Star
6        investor moneys to Global Impact?  And for what
7        did Global Impact do to warrant a $750,000
8        payday?
9   A.   Global really helped us out in restructuring.
10       Again, we're not allowed to execute.  So they
11       were able to help us, you know, do all that stuff
12       and restructure.  Again, as I stated many times
13       in even the other ones, Global helped us to --
14       we're going to go after Gingerich.  We're going
15       to sue Toth and Foraker.  We're going to sue
16       Randy.  We had all the lawsuits ready.  We
17       were -- we had appointments set up with investors
18       to give them their collateral, their real estate
19       back.  We had the documents drafted to give
20       ownership in both Twin City and Village because
21       there were some notes in Village as well.  So we
22       were going to give those investors their
23       ownership.  Global got paid not all of it at one
24       time.  They got paid on the front side a
25       retainer, and then they got paid from the cash

Page 76

1        flow that we got from the houses on a monthly
2        basis.
3   Q.   And do you have any work product or record that
4        shows what, in fact -- what they did?
5   A.   You have all of it.  They gave all of it to you.
6        Have you not spoken with them yet?  There's not
7        one phone call to Global yet with you guys?  Not
8        one phone call?
9   Q.   There's a subpoena --
10  A.   A subpoena?
11  Q.   -- that has not been answered.
12  A.   We don't know what they did.  You don't know
13       where they were.  I mean, usually a trustee will
14       reach out and get information from --
15  Q.   And we have.
16  A.   -- the previous team and get the information,
17       so...
18            MR. ADELSPERGER:  You need another
19       statement?  Because I can make one right
20       off.
21            THE WITNESS:  Well --
22            MR. ADELSPERGER:  If someone will not
23       respond to a subpoena, how can I trust a
24       phone call?  Now, are you going to take the
25       Fifth to that, or are you going to answer

Page 77

1   that question?  I'm serious.  If someone
2   will not answer a subpoena, how can I trust
3   a phone call?
4   MR. THOMPSON:  Mr. Trustee, when you say --
5   can you give it some context?  When you're
6   saying when someone will not trust -- are
7   you talking about a specific instance?
8   MR. ADELSPERGER:  Yeah.  Yeah.  The instance
9   that he just questioned me on.  If my
10  counsel -- I'll be very specific.  If my
11  counsel sends a subpoena to Global and its
12  owners and they fail to respond by even
13  saying, "No, we're not giving it to you,"
14  they just don't respond, how can you assume
15  that I can trust a phone call?
16  MR. THOMPSON:  Can I have a minute to confer
17  with my client?
18  MR. ADELSPERGER:  No.  I got a pending
19  question.
20  MR. THOMPSON:  Yeah.  So okay.  Then I'm
21  going to assert an objection.
22  MR. ADELSPERGER:  Sure.
23  MR. THOMPSON:  And the objection is:  You're
24  asking a question beyond -- that doesn't
25  even go to the scope of his personal

**EXHIBIT 4**

Page 78

1  knowledge.  There's no way he can know the
2  answer to that because you're asking him to
3  answer on behalf of Global.  I mean, he
4  didn't send the subpoena.  They didn't
5  respond to it.  You're not talking about
6  something that he didn't respond to.
7  MR. ADELSPERGER:  The objection is duly
8  noted.  Are you advising him not to answer
9  the question?
10  MR. THOMPSON:  I'm going to allow him to
11  answer as he sees fit.
12  MR. ADELSPERGER:  There you go.
13  A.  So when did you send a subpoena out?
14  EXAMINATION OF EARL D. MILLER
15  BY MR. ADELSPERGER:
16  Q.  I'm not going to answer your question with a
17  question.  How can I trust a phone call?
18  A.  All the documents from Global -- you got all of
19  those directly from -- you got them directly from
20  Cozen O'Connor, and they did a conference call
21  with you to help you understand it.
22  Q.  When did this occur?
23  A.  Right after you took over.
24  Q.  And who told you that it happened?
25  A.  I don't remember.

Page 79

1  Q.  But it happened?
2  A.  I believe it did, yeah.
3  Q.  Okay.  So it happened or you believe it happened?
4  A.  I was told from Cozen that -- I think it was
5  Cozen that told me that it happened.
6  Q.  Did they tell you who talked with whom?
7  A.  They didn't give me all the specifics.
8  Q.  When was the last time you spoke with anyone from
9  Cozen?
10  A.  About 30 days ago.
11  Q.  Who was it?
12  A.  And I don't remember who it was.  He didn't tell
13  me at that time.
14  Q.  It was a he?
15  A.  Yeah.  They didn't tell me at that time.  You
16  know, they did not tell me -- the last time I
17  spoke with them is not when we had this
18  conversation of what we're indicating here.
19  Q.  What was the purpose of the phone call?
20  A.  I plead the Fifth.
21  ASSISTANT TRUSTEE ROBERTS:  Can I --
22  MR. ADELSPERGER:  We're still on the same
23  topic.
24  ASSISTANT TRUSTEE ROBERTS:  It is on the
25  same topic.

Page 80

1  MR. ADELSPERGER:  Go ahead.
2  ASSISTANT TRUSTEE ROBERTS:  It's about, it's
3  about Global and Cozen.
4  EXAMINATION OF EARL D. MILLER
5  BY ASSISTANT TRUSTEE ROBERTS:
6  Q.  At the first meeting of creditors, Mr. Miller,
7  you testified that Global Impact took money that
8  had been paid to them by you using 5 Star funds
9  from the 5 Star companies.  And used that to pay
10  Cozen O'Connor some of their legal fees.  Can you
11  confirm that that is the case?
12  A.  I don't remember that.  So many questions.
13  Q.  Do you know whether or not, in fact, Global paid
14  money to Cozen O'Connor?
15  A.  I don't remember.  It's been a year ago.  Yeah.
16  Q.  Do you know what Global did with the $750,000
17  that was paid to them by the 5 Star entities?
18  A.  I don't.
19  EXAMINATION OF EARL D. MILLER
20  BY MR. ADELSPERGER:
21  Q.  Are you personally represented by any lawyer at
22  Cozen or the Cozen firm right now?
23  A.  I plead the Fifth.
24  Q.  Have you used any investor funds to hire Cozen or
25  any other lawyer to represent your personal

Page 81

1  interest?
2  A.  I plead the Fifth.
3  Q.  From the date that you began work with the 5 Star
4  entities until the day that you left the
5  employment of the 5 Star entities, was -- is it
6  fair to say that 5 Star was your sole source of
7  income?
8  A.  I plead the Fifth.
9  Q.  Michael Alfrey is a former employee of the 5 Star
10  entities; is that correct?
11  A.  I plead the Fifth.
12  Q.  Isn't it true that he departed employment of the
13  5 Star entities on July 24, 2015, because Adam
14  LaFavre from Global was representing your
15  personal interests and not the interest of 5 Star
16  or any of its entities?
17  A.  I plead the Fifth.
18  Q.  Isn't it true that during that time frame when
19  Global came in and took over operations of 5
20  Star, that you were nowhere to be found?
21  A.  I plead the Fifth.
22  Q.  Isn't it true that on that -- in that time frame,
23  not only were you nowhere to be found, but you
24  disconnected all forms of communications with 5
25  Star and its employees via communication by cell

Page 82

1     phone, home phone, e-mail, text, or any other
2     forms of communication?
3  A.  I plead the Fifth.
4  Q.  Isn't it true that you instructed Adam LaFavre
5     and Global to tell the employees on or about July
6     20 that they were in charge and they were calling
7     all the shots and you were no longer available
8     for comment?
9  A.  I plead the Fifth.
10         MR. ADELSPERGER:  Go ahead.
11         EXAMINATION OF EARL D. MILLER
12 BY MR. KOS:
13 Q.  Mr. Miller, when was the last time you spoke to
14     Adam LaFavre?
15 A.  I plead the Fifth.
16 Q.  Have you seen Mr. LaFavre since the bankruptcies
17     were filed?
18 A.  I plead the Fifth.
19 Q.  You visited Mr. LaFavre at his property in
20     Colorado, Buena Vista, Colorado?
21 A.  I plead the Fifth.
22 Q.  What did Mr. LaFavre do to earn the $750,000?
23 A.  I plead the Fifth.
24 Q.  What did Mr. Scott Bocklund do?
25 A.  I plead the Fifth.

Page 83

1  Q.  Who was Brandon Bellamy?
2  A.  I plead the Fifth.
3  Q.  Were any other transfers of property other than
4     money made to Global Impact Companies?
5  A.  I plead the Fifth.
6  Q.  Did 5 Star entities have any other bank accounts
7     other than those that were disclosed in the
8     bankruptcy schedules as having been at Interra
9     Credit Union and Wells Fargo bank?
10 A.  I plead the Fifth.
11 Q.  Mr. Miller, is it true that you used
12     instrumentalities of public communication --
13     telephone, e-mail, fax -- to defraud the
14     investors of 5 Star?
15 A.  No, that is not true.
16 Q.  Did you make inquiries with investors, for the
17     investors, other than telephone?
18 A.  I did.  I talked to investors on the phone.
19 Q.  Did you accept funds from them by wire transfer?
20 A.  I plead the Fifth.
21 Q.  Did you use the instrumentality of the United
22     States Postal Service in the furtherance of your
23     business enterprise of 5 Star entities --
24 A.  I plead the Fifth.
25 Q.  -- and defrauding of creditors?

Page 84

1     Mr. Miller, do you have any investment in
2     Grand Products, LLC?
3  A.  I plead the Fifth.
4  Q.  Did any 5 Star investment money go to Grand
5     Products, LLC?
6  A.  I plead the Fifth.
7  Q.  Did you have any part in the patenting of
8     something called the Torch Knife?
9  A.  I plead the Fifth.
10 Q.  Mr. Miller, you earlier said that Global had
11     helped prepare various lawsuits.  Can you provide
12     more detail concerning what lawsuits and who has
13     the pleadings concerning those lawsuits and what
14     were the grounds of those lawsuits?  Take the
15     time and the effort, as much as you can.
16 A.  The lawsuits were never sent out because we're
17     not allowed to execute.  So lawsuits were to Toth
18     and Foraker for being defrauded.  They were from
19     being defrauded from Portland.  This was all
20     after the discovery.  They discovered that.  And
21     from Gingerich as well.
22 Q.  Okay.  And what lawyer or law firms prepared
23     those?
24 A.  Cozen O'Connor.
25 Q.  Any particular lawyer at Cozen O'Connor?

Page 85

1  A.  I don't know for sure who did those.
2  Q.  Who introduced you to Cozen O'Connor?
3  A.  I plead the Fifth.
4  Q.  Did Cozen O'Connor have a prior relationship with
5     Global Impact Companies?
6  A.  I plead the Fifth.
7  Q.  Mr. Miller, did you transfer any of the 5 Star
8     investors' money to either of the Zupetzes?
9  A.  I plead the Fifth.
10 Q.  Did you transfer any 5 Star investor money to
11     Jason Chandler?
12 A.  I plead the Fifth.
13 Q.  Did you transfer any 5 Star investment money to
14     Allison and Andrew Pust, P-U-S-T?
15 A.  I plead the Fifth.
16 Q.  Was 5 Star investor money used to acquire 63700
17     County Road 31, Goshen, Indiana 46526?
18 A.  I plead the Fifth.
19 Q.  Mr. Miller, are you aware of any other assets,
20     whether they be personal property, real property,
21     intangible property, that belongs to 5 Star --
22     any of the 5 Star entities that's not listed on
23     the bankruptcy schedules?
24 A.  No.  I'm not aware of it.
25 Q.  Are all the intercompany loans accurately

5 Star Investment Group
341 Meeting,  on 11/15/2016                                        Pages 86..89

Page 86

1    reflected in the schedules that have been filed?
2  A.   I plead the Fifth.
3  Q.   Mr. Miller, did you prepare the prospectuses that
4       were provided to the 5 Star investors?
5  A.   I plead the Fifth.
6  Q.   Did you read and review the information that was
7       contained in all the prospectuses that were given
8       to the 5 Star investors?
9  A.   I plead the Fifth.
10 Q.   Was the information contained in those
11      prospectuses true and accurate to the best of
12      your knowledge?
13 A.   I plead the Fifth.
14 Q.   Mr. Miller, did 5 Star -- any of the 5 Star
15      entities receive cash from the various tenants or
16      persons that it dealt with?
17 A.   I plead the Fifth.
18 Q.   Has all the cash that was received by 5 Star been
19      adequately and properly accounted for?
20 A.   I plead the Fifth.
21 Q.   Mr. Miller, have you transferred any assets to
22      any family member?
23 A.   I plead the Fifth.
24 Q.   Transferred assets to any other person that we've
25      not described or identified so far today?

Page 87

1  A.   I plead the Fifth.
2  Q.   Mr. Miller, did any 5 Star investor money go into
3       JC Capital Fund Trust?
4  A.   I plead the Fifth.
5  Q.   Mr. Miller, did any 5 Star investor money go into
6       Bass Finders, LLC?
7  A.   I plead the Fifth.
8  Q.   Mr. Miller, did any 5 Star investor money go into
9       Born to Win Trust?
10 A.   I plead the Fifth.
11 Q.   Mr. Miller, do you have any knowledge of an
12      entity called Helmuth Investments, LLC?
13 A.   I plead the Fifth.
14 Q.   Did any 5 Star investor money go into Helmuth
15      Investments, LLC?
16 A.   I plead the Fifth.
17      ASSISTANT TRUSTEE ROBERTS:  Can you speak
18      up, please?
19 Q.   (By Mr. Kos) Earlier I asked about a Realtor.  I
20      couldn't remember his name.  William E.
21      Gallagher.  Regarding the NASA building.  Were
22      you aware that he had an ownership in the
23      building that was being sold?
24 A.   I plead the Fifth.
25      (Break in audio recording)

Page 88

1      ASSISTANT TRUSTEE ROBERTS:  All right.  We
2      are back on the record.  These are the
3      continued 341 meetings of the 5 Star
4      debtors.
5          Mr. Miller, again, you continue to be
6      under oath.  Mr. Kos has finished his
7      questions for right now.  Oh, you have one
8      more.
9      MR. KOS:  I'm sorry.  One more.
10     ASSISTANT TRUSTEE ROBERTS:  Go ahead.
11         EXAMINATION OF EARL D. MILLER
12 BY MR. KOS:
13 Q.   Mr. Miller, if you can tell us, do you know what
14      the maximum amount of money was invested in the
15      properties in Portland, Oregon?
16 A.   I plead the Fifth.
17     MR. KOS:  Okay.
18     ASSISTANT TRUSTEE ROBERTS:  Okay.  And you
19     had some questions?
20     MR. HORN:  Yes, ma'am.  I'm George Horn.
21     I'm counsel for Matt Gingerich.
22         EXAMINATION OF EARL D. MILLER
23 BY MR. HORN:
24 Q.   Mr. Miller, I have a few questions, if you would
25      please.  It is true -- is it not?  -- that on or

Page 89

1      about July 29th, 2014, you entered into a unit
2      purchase agreement with Mr. Gingerich whereby the
3      purchase was 50 percent interest in what we'll
4      refer to as the 5 Star entities?
5  A.   I plead the Fifth.
6  Q.   And prior to entering into that unit purchase
7       agreement with Mr. Gingerich, you had access to
8       the 5 Star financial (inaudible) position with
9       the companies, correct?
10 A.   I plead the Fifth.
11 Q.   And you entered into the agreement with
12      Mr. Gingerich, agreeing to pay him two and a half
13      million dollars for his 50 percent interest in
14      the company because you believed that was a fair
15      amount given your access to financials at that
16      time, correct?
17 A.   I plead the Fifth.
18     MR. ADELSPERGER:  Sir, speak up, please.
19     I'm sorry.
20 A.   Okay.  I plead the Fifth.
21 Q.   (By Mr. Horn) And, in fact, you had such
22      confidence in the financial stability of the 5
23      Star entities, you agreed to make payments to
24      Mr. Gingerich over a period of ten years,
25      correct?

EXHIBIT 4

Page 90

1   A.   I plead the Fifth.
2   Q.   Mr. Miller, when some of the apartment complexes
3        that 5 Star had invested in were sold,
4        acquisition fees were paid at the time those
5        sales went through, correct?
6   A.   I plead the Fifth.
7   Q.   And you received some of those acquisition fees
8        personally and kept them for your own, correct?
9   A.   I plead the Fifth.
10  Q.   Did any of those acquisition fees ultimately go
11       back to 5 Star?
12  A.   I plead the Fifth.
13  Q.   There came a point in time where you invested 5
14       Star money with a company called Green Resource
15       Homes, correct?
16  A.   I plead the Fifth.
17  Q.   And you did that without investor permission,
18       correct?
19  A.   I plead the Fifth.
20  Q.   You had an ownership interest in Green Resource
21       Homes along with Mr. Toth and Mr. Foraker,
22       correct, Mr. Miller?
23  A.   I plead the Fifth.
24  Q.   And Green Resource Homes at some point in about
25       2015 purchased a property located at 420 Main in

Page 91

1        Middlebury, Indiana, correct?
2   A.   I plead the Fifth.
3   Q.   And you had an ownership interest in Green
4        Resource Homes at the time that purchase was
5        made, correct?
6   A.   I plead the Fifth.
7   Q.   Green Resource Homes purchased that property for
8        $550,000, give or take, correct?
9   A.   I plead the Fifth.
10  Q.   And Green Resource Homes purchased that property
11       from a company known as RSR, am I correct?
12  A.   I plead the Fifth.
13  Q.   And the $550,000 paid by Green Resource Homes for
14       that property was $200,000 more than had been
15       previously paid for that property when it had
16       sold two times prior to Green Resource Homes
17       purchasing it, correct?
18  A.   I plead the Fifth.
19  Q.   And Green Resource Homes, in fact, was laundering
20       money through that building for purposes of
21       paying that inflated price of $550,000; is that
22       correct?
23  A.   I plead the Fifth.
24  Q.   The funds used -- let me back up for a second.
25       At some point after Green Resource Homes

Page 92

1        purchased that property, the property was sold to
2        H & H; is that correct?
3   A.   I plead the Fifth.
4   Q.   And that sale was made through your partners at
5        Green Resource Homes, Mr. Toth and Mr. Foraker,
6        to H & H, correct?
7   A.   I plead the Fifth.
8   Q.   And at the time they were involved in that sale
9        to H & H of the 420 Main Street property, they
10       had legal authority to act on behalf of Green
11       Resource Homes?
12  A.   I plead the Fifth.
13  Q.   Let me go back for a second.  When you entered
14       into the unit purchase agreement with
15       Mr. Gingerich, you entered into it voluntarily,
16       correct?
17  A.   I plead the Fifth.
18  Q.   And prior to entering into it, on at least a
19       monthly basis, you had access to the company
20       financials of 5 Star, the 5 Star entities,
21       correct?
22  A.   I plead the Fifth.
23  Q.   You also had access to the accountant,
24       Mr. Geiger, to review those financials at any
25       point in time should you so desire prior to the

Page 93

1        purchase of Mr. Gingerich's interest, correct?
2   A.   I plead the Fifth.
3   Q.   And as part of the payments you made to
4        Mr. Gingerich -- well, let me back up.
5            Under the uniform purchase -- excuse me --
6        unit purchase agreement, that was a personal
7        obligation which you had to Mr. Gingerich to pay
8        him that two and a half million dollars over ten
9        years, correct?
10  A.   I plead the Fifth.
11  Q.   And within the first year or so, you paid
12       Mr. Gingerich approximately 1.6 of the
13       $2.5 million you owed him, correct?
14  A.   I plead the Fifth.
15  Q.   And part of those funds came from your own
16       personal funds, correct?
17  A.   I plead the Fifth.
18  Q.   And part of those funds that were paid to
19       Mr. Gingerich came from money that Mr. Schwartz
20       paid you for an ownership interest in the 5 Star
21       entities?
22  A.   I plead the Fifth.
23  Q.   And part of those funds paid to Mr. Gingerich
24       included a distribution from 5 Star to you that
25       was recorded on the 2014 tax return of the

**EXHIBIT 4**

Page 94

1    entity, correct?
2  A.  I plead the Fifth.
3  Q.  You are currently in default of your agreement
4      with Mr. Gingerich under the unit purchase
5      agreement, correct?
6  A.  I plead the Fifth.
7  Q.  When the Sungate property was sold for two and a
8      half million dollars, was an acquisition fee
9      received?
10 A.  I plead the Fifth.
11 Q.  Did you personally keep the acquisition fee
12     receipt for the Sungate property?
13 A.  I plead the Fifth.
14 Q.  It is correct -- is it not?  -- that you declined
15     to pay the investors in the Sungate property the
16     amount they were due when the property was sold?
17 A.  I plead the Fifth.
18 Q.  There were other property sales where 5 Star was
19     entitled to receive an acquisition fee aside from
20     Sungate; is that correct?
21 A.  I plead the Fifth.
22 Q.  You have not made any efforts to recover money
23     from Global that was paid to them, have you,
24     Mr. Gingerich -- or see, I'm getting like Ed.
25     Have you, Mr. Miller?

Page 95

1  A.  I plead the Fifth.
2  Q.  Global did not complete all of the work they were
3      paid to do with that $750,000, correct?
4  A.  I plead the Fifth.
5  Q.  With regard to access to the financials of 5 Star
6      prior to the sale of Mr. Gingerich's interest to
7      you, you actually had monthly meetings with
8      Mr. Geiger to review the financials of the
9      company, correct?
10 A.  I plead the Fifth.
11 Q.  Mr. Miller, what documents did you review to
12     refresh your memory related to your testimony
13     here today?
14 A.  I plead the Fifth.
15 Q.  With regard to the company that owned the 420
16     Main Street property in Middlebury, before it was
17     purchased by Green Resource Homes, RSR, what do
18     you know about that company?
19 A.  I plead the Fifth.
20 Q.  Do you know who owned the company?
21 A.  I plead the Fifth.
22 Q.  Can you tell us why Green Resource Homes paid
23     $550,000 for the property when the two prior
24     sales never were above $350,000 for that
25     property?

Page 96

1  A.  I plead the Fifth.
2      MR. HORN:  That's all I have.  Thank you.
3      ASSISTANT TRUSTEE ROBERTS:  Trustee
4      Adelsperger.
5      EXAMINATION OF EARL D. MILLER
6  BY MR. ADELSPERGER:
7  Q.  Mr. Miller, just following up, a couple of
8      questions on that particular line of questions.
9          Isn't it true that Mr. Gingerich instructed
10     you to account for the payments that were made to
11     him for the purchase of that stock as
12     distributions to you from the company?
13 A.  I plead the Fifth.
14 Q.  Isn't it true that all of the funds that went to
15     Mr. Gingerich stemmed -- for the purchase of his
16     stock or the sale of his stock to you, were from
17     investor money?
18 A.  I plead the Fifth.
19 Q.  Isn't it true that the transfer of the Middlebury
20     property that was just discussed occurred after
21     the SEC put in place a freeze of distributing or
22     selling any properties owned by 5 Star or you?
23 A.  I plead the Fifth.
24     MR. ADELSPERGER:  I have no further
25     questions.  Does any of my counsel have any

Page 97

1      questions?  Unsecured creditors committee
2      have any questions?
3      MR. JONAS:  Nothing further.
4      ASSISTANT TRUSTEE ROBERTS:  Okay.  I do have
5      a couple of questions.
6      EXAMINATION OF EARL D. MILLER
7  BY ASSISTANT TRUSTEE ROBERTS:
8  Q.  You were just asked some questions regarding your
9      relationship with Global Impact.  Did you, did
10     you personally ever receive any money from Global
11     Impact?
12 A.  I plead the Fifth.
13 Q.  Did you personally receive any money from Global
14     Impact after the bankruptcy cases were filed?
15 A.  I plead the Fifth.
16 Q.  Did you personally receive any money from Adam
17     LaFavre?
18 A.  I plead the Fifth.
19 Q.  Did you personally receive any money from Adam
20     LaFavre after the bankruptcy cases were filed?
21 A.  I plead the Fifth.
22 Q.  Did you personally receive any money from Z
23     Ministries after the bankruptcy cases were filed?
24 A.  I plead the Fifth.
25 Q.  Did you personally receive any money from the

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016

Pages 98..100

Page 98

1        Zupetzes after the bankruptcy cases were filed?
2   A.   I plead the Fifth.
3   Q.   Did you personally receive any money from
4        Mr. Toth after the bankruptcy cases were filed?
5   A.   I plead the Fifth.
6   Q.   Did you personally receive any money from
7        Mr. Foraker after the bankruptcy cases were
8        filed?
9   A.   I plead the Fifth.
10           ASSISTANT TRUSTEE ROBERTS:  I have no
11       further questions today.  I reserve the
12       right to continue further questions.  We
13       will adjourn the meeting of creditors, and
14       we reserve the right at this time to conduct
15       one further potential meeting of creditors.
16       If, in fact, there is a decision to continue
17       and to hold a further meeting of creditors,
18       notice will go out.  You will all receive at
19       least 30 days' notice.  At this time, I'm
20       going to close the meeting for today.  And
21       we are off the record on November 15th,
22       2016.
23          (Break in audio recording)
24       MR. ADELSPERGER:  Hold on, hold on.  We're
25       going to make a technical correction.

Page 99

1   ASSISTANT TRUSTEE ROBERTS:  Yes.  Back on
2   the record for the continued 341 meeting of
3   the 5 Star debtors.  We're going to continue
4   the meeting and --
5   MR. ADELSPERGER:  No.  No.  We're requesting
6   that the meeting be adjourned and concluded.
7   Any further investigation of Mr. Miller or
8   anything else would have to come under Rule
9   2004 of the bankruptcy code and not, and
10  not --
11  UNIDENTIFIED FEMALE VOICE:  For the federal
12  rules.
13  MR. ADELSPERGER:  Oh, the federal rules.
14  Exactly.  But not through a 341 meeting.
15  ASSISTANT TRUSTEE ROBERTS:  All right.  That
16  being said, the 341 meeting is concluded.
17  MR. ADELSPERGER:  Adjourned and concluded.
18  Thank you.
19     (End of audio recording)
20
21
22
23
24
25

Page 100

1            C E R T I F I C A T E
2
3       I, Tonya J. Kaiser, a Notary Public, authorized to
4   take and certify transcriptions, do hereby certify that
5   the foregoing transcript was transcribed to the best of
6   my ability from an audio recording.
7
8       IN WITNESS WHEREOF, I have set my hand and seal this
9   2nd day of December, 2016.
10
11
12
13
14              TONYA J. KAISER
                NOTARY PUBLIC—OFFICIAL SEAL
                State of Indiana, County of Allen
                My Commission Expires 04/13/2018
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT 4**

---

**$**

---

**$1.4** 50:1

**$1.9** 52:18 54:4

**$10,000** 59:18,24

**$15,000** 60:1

**$2** 48:25 50:1

**$2.5** 93:13

**$200,000** 50:23 71:3 91:14

**$25,000** 59:23

**$350,000** 95:24

**$550,000** 91:8,13,21 95:23

**$600,000** 49:15

**$7.1** 45:11

**$7.5** 45:5

**$750,000** 74:10 75:7 80:16 82:22 95:3

---

**1**

---

**1** 20:10

**1.4** 49:4

**1.6** 93:12

**10,000** 59:23

**100** 52:8

**10:00** 4:4

**11** 4:24 5:2,20 6:25 17:10 20:10,13,15
21:14,16 24:19 32:4 34:2 43:25 54:13

**125,000** 37:23

**12:45** 8:25

**13th** 46:1

**14th** 14:18

**15** 4:3 21:1 37:25 48:23

**15th** 98:21

**16-30078** 4:8

**16-30079** 4:9

**16-30080** 4:10

**16-30081** 4:11

**16-30082** 4:13

---

**16-30083** 4:14

**16-30084** 4:15

**16-30085** 4:16

**16-30086** 4:18

**16-30087** 4:19

**16-30088** 4:20

**19th** 48:10

---

**2**

---

**20** 82:6

**2012** 40:13

**2014** 89:1 93:25

**2015** 9:8 11:3 12:19,20 14:1 37:14,23
39:6 44:22 45:5 49:6 57:10,15,19,25
64:8 66:13 81:13 90:25

**2016** 4:3 5:10,12 43:11 46:1 48:10,23
54:24 55:1 98:22

**21st** 5:12

**24** 43:11 81:13

**29** 3:7

**29th** 5:10 89:1

---

**3**

---

**30** 21:2 79:10 98:19

**304** 40:17

**31** 85:17

**341** 4:5 6:17 17:4,5,15 31:24 34:1,11
53:19,21 88:3

**343** 17:15

**35** 3:8

**37** 3:9

**38** 3:10

**39** 3:11,12

---

**4**

---

**40** 3:13

**420** 90:25 92:9 95:15

**46526** 85:17

---

**5**

---

**5** 4:6,8,9,10,11,13,14,15,16,18,19
11:21,24 12:5,6,8,11,14,16 13:3,7
14:3,24 22:25 23:4,9,13 24:11,15,22
25:1,13,17 26:2,5 27:12 30:20,21
32:21,23 33:4 34:2 35:2 36:12,24
38:14 39:3,19,23 40:3 44:3,5,11,18
45:1,7,20 48:21 52:20,23 54:4 56:5,19
57:11 58:1,14,17,18 59:1,7,24 61:24
62:6 63:1,5 64:10,13,16,19,22,25
65:3,6,9,12,15,18,21,24 66:2,4,6,8,10,
13,22 67:4,7,10,13,18,19,20,22,25
68:3,6,9,23 69:1,4,8,9,13,17,20,21,22,
23 70:3,5,10,13,15 71:18 72:4,11,13,
16,19 73:1,4,7,10,13,17,19,21,22
74:1,5,8,10 75:5 80:8,9,17 81:3,5,6,9,
13,15,19,24 83:6,14,23 84:4 85:7,10,
13,16,21,22 86:4,8,14,18 87:2,5,8,14
88:3 89:4,8,22 90:3,11,13 92:20
93:20,24 94:18 95:5 96:22

**50** 89:3,13

**51** 3:14

**573** 35:10

---

**6**

---

**600,000** 50:3

**63700** 85:16

**697** 35:16

---

**7**

---

**75** 14:20

**78** 3:15

---

**8**

---

**80** 3:16,17

**80863** 35:20

**80866** 35:13

**82** 3:18

**88** 3:19,20

---

**9**

---

**9** 3:6

---

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

**90** 48:19

**95** 52:14

**96** 3:21

**97** 3:22

---

**A**

**a.m.** 4:4

**absolute** 17:19 18:8,21,22,23

**absolutely** 16:7

**accept** 12:11,14,16 83:19

**accepted** 12:9 57:24 58:12

**access** 49:16 89:7,15 92:19,23 95:5

**Accordingly** 45:16

**account** 13:7 49:10,12,16,17 96:10

**accountant** 92:23

**accounted** 86:19

**accounts** 36:20,21 74:8 83:6

**accurate** 6:15 86:11

**accurately** 85:25

**Ace** 65:1

**acquire** 72:10 85:16

**acquired** 69:13,16

**acquisition** 90:4,7,10 94:8,11,19

**act** 92:10

**action** 30:8 47:19 51:3 53:16

**active** 36:16

**activity** 20:22,24

**Adam** 81:13 82:4,14 97:16,19

**Adamczyk** 35:1

**addition** 46:15 47:13

**additional** 7:3 48:5

**address** 8:6 28:13 35:9,10,16 40:21

**Adelsperger** 3:15,17,21 5:2 19:3,5,
   14,18 20:5,8 21:7,12,23 26:13,16
   28:9,12,18 29:1,5,8,19 33:11 34:17
   42:21 51:15 53:20 60:16,19 76:18,22
   77:8,18,22 78:7,12,15 79:22 80:1,20
   82:10 89:18 96:4,6,24 98:24

**adequately** 86:19

**adjourn** 98:13

**administer** 7:13

**administrative** 5:18

**advance** 50:25

**advise** 14:12 27:16

**advised** 29:13,22

**advising** 15:21 31:8 78:8

**affairs** 5:16 17:24 22:14 32:1,17

**affirm** 7:21

**afford** 36:17

**after** 7:6 12:4,8 27:18 54:13 55:1
   68:15 75:14 78:23 84:20 91:25 96:20
   97:14,20,23 98:1,4,7

**agent** 12:22

**agreed** 47:24 89:23

**agreeing** 89:12

**agreement** 89:2,7,11 92:14 93:6
   94:3,5

**agreements** 41:18,19

**ahead** 10:22 80:1 82:10 88:10

**airplane** 69:12,22 70:7

**Alan** 55:15

**Albion** 24:10 65:22,25

**Alfrey** 41:25 42:7 81:9

**Allison** 85:14

**allowed** 10:12,18 32:9 41:6,7,10,20
   53:15 75:10 84:17

**Amendment** 9:18,22,23 10:12,19
   15:23 18:24 28:1 29:15,23 30:7,16
   31:5,9

**amount** 88:14 89:15 94:16

**Andrew** 7:18 26:3,19 85:14

**Andrews** 3:10 38:8,12

**answer's** 28:14

**answers** 51:9,10

**apartment** 22:24 23:3 35:24 44:19
   46:12 47:6 49:6,9 55:3 90:2

**apartments** 23:13 24:2,6 44:13
   50:17,19 54:20 63:2 64:11,14,17,20,
   23 68:7

**apologize** 41:12 71:9

**apparently** 49:1

**applies** 31:5

**appointed** 5:2 22:10 48:7

**appointment** 46:25 47:17 48:3,9

**appointments** 75:17

**approximately** 49:15 50:22 93:12

**April** 44:10

**argument** 36:25

**Artisan** 14:20,23 61:20

**as-needed** 50:17

**Ashley** 22:23 64:14

**asleep** 35:15

**assert** 10:1,2,8 18:13 77:21

**asserted** 24:18

**Asset** 23:7 68:4

**assets** 17:21 28:23 31:14,18 37:1
   63:24 73:2 85:19 86:21,24

**assist** 62:23

**assistant** 3:16,22 4:2 5:5 7:17,19 8:1,
   5,10,20 9:20 10:20,24 11:6,10 13:12,
   16,19,22 14:11 17:1,3,8 18:11 19:12,
   17 21:11 22:2,7,18 27:6,13,23 28:11
   29:16,20 31:16,22 32:12 33:17,25
   34:16,18 36:6,9 37:3,7 38:5,22 40:8
   51:14 74:14,17,22 79:21,24 80:2,5
   87:17 88:1,10,18 96:3 97:4,7 98:10

**associated** 46:13

**Associates** 71:10

**assume** 29:13,21 30:12 77:14

**assumptions** 29:11 30:2

**assure** 20:23

**attempt** 57:16

**attempting** 32:11

**attention** 9:8

**attorney** 29:19 31:3 39:17 45:22

**attorney-client** 20:4

**attorneys** 26:10

5 Star Investment Group
341 Meeting,   on 11/15/2016

**audience** 7:8 43:9

**audio** 33:24 87:25 98:23

**August** 46:22

**authority** 92:10

**authorize** 74:1

**Avalon** 22:24 64:20 65:7,15

**avenues** 46:8

**avoid** 47:17

**aware** 9:22 26:12 43:5 54:18,22 55:1 57:11 60:23 62:19 63:11 85:19,24 87:22

**awhile** 61:3

---

**B**

**Babenco** 47:3 50:12 55:12

**Babenco's** 63:15

**back** 21:4,17 22:3 33:21,25 38:19 39:11,13 43:17 53:25 75:19 88:2 90:11 91:24 92:13 93:4

**bad** 46:18

**Baker** 3:13 40:9,11

**balance** 47:12

**bank** 36:20,21,22 46:23 47:7,19,22 48:2 49:10,15,19,21 50:9,24 51:2 54:23 55:7 74:8 83:6,9

**bankruptcies** 20:10 23:10,14 54:14 58:23 82:16

**bankruptcy** 4:6,23,24 5:1,16 17:5,12, 16,17,19,20 18:4,17 22:5,8,15 23:5,21 24:8 25:5 27:16 31:17,25 32:4,5,6 35:4 36:14 42:3 43:4,6,25 44:4 45:2 68:15 83:8 85:23 97:14,20,23 98:1,4,7

**bankruptcy's** 48:8

**basis** 9:24 50:17 76:2 92:19

**Bass** 87:6

**Bedrock** 63:6,9,12,19

**beg** 10:21

**began** 44:13 45:6 81:3

**begin** 38:14

**beginning** 44:10

**behalf** 6:23 11:20,24 28:2,5 32:9 34:15 59:1 78:3 92:10

**believe** 79:2,3

**believed** 89:14

**Bellamy** 83:1

**belongs** 85:21

**Bend** 6:4 12:4 40:3,5

**benefit** 30:17 53:6

**bit** 42:18 51:24

**blank** 6:7

**blanket** 9:24

**Blue** 66:20,23

**Bob** 43:12,19 55:22

**Bocklund** 82:24

**Bontrager** 71:25 72:14

**Born** 87:9

**bought** 69:20,21,22,23,25

**Box** 35:10

**Bradenton** 67:2

**Brandon** 83:1

**break** 8:25 33:18,20,24 87:25 98:23

**briefly** 18:20 33:6

**bring** 21:4 57:21

**brought** 12:22 20:21 27:17 30:11 41:17 42:16

**Bruggeman** 24:14 46:13 47:1,2,9,14, 24 50:11 54:13,16,18 55:2,5

**Bruggeman's** 47:21

**Buena** 82:20

**Builders** 14:21,23 61:15,18,20

**building** 49:9 70:17 87:21,23 91:20

**bunch** 41:9

**business** 12:6 17:17 25:2,17,21,24 26:2 72:16 83:23

**businesses** 72:20

**buy** 47:20 50:13

**buying** 42:8

**buyout** 72:14

---

**C**

**California** 25:15

**call** 8:24 76:7,8,24 77:3,15 78:17,20 79:19

**called** 14:20 70:17 71:10,13,16 73:19, 24 84:8 87:12 90:14

**calling** 82:6

**can't** 9:24 20:1 33:9

**cannot** 6:16 19:19

**capacity** 17:9

**capital** 4:19 49:23 66:6 87:3

**capitalization** 66:15

**care** 41:22 43:10 45:21,23

**Carl** 47:2 55:9

**Carolina** 40:20,22 44:20 45:22 47:18 52:9 54:8 55:10,13,16,23 56:2,7,11,15 67:11,14

**Caruso** 49:25

**case** 4:7,9,10,11,12,13,15,16,17,19, 20 9:7 16:9 22:10 23:14 24:23 25:14, 21 26:22 27:18 31:12 32:4 46:13 49:8 80:11

**cases** 4:6,21,24 5:16 23:5,10,18,22, 25 24:4,8,12 25:2,5,9 32:4 34:2 43:25 97:14,20,23 98:1,4,7

**cash** 12:14 49:5,12 75:25 86:15,18

**Cassidy** 25:18

**CD** 6:7

**Cedar** 24:6

**cell** 81:25

**certain** 29:11 30:2 49:7

**Chandler** 85:11

**changes** 12:8

**Chapter** 4:24 5:2 6:25 34:2 54:13

**charge** 19:11 82:6

**charged** 16:2

**charges** 16:6

**charitable** 59:19

**Charleston** 24:3 63:3

**Charlie** 25:10

**check** 12:17

**checks** 74:4

**choose** 50:14

**Christopher** 39:16

**Cities** 43:1 45:13,15 46:10 47:16 49:2,22 50:1,3,4,11 51:25 52:19 53:17 54:20,22

**City** 23:16 40:24 41:7,15,16 43:20,24 44:3,6,8,13,21 45:18,19 46:7,14 48:17,20 49:3,14,17,19 50:8,21 52:1,2 53:23 54:2 75:20

**civil** 16:11 18:24,25 30:8 31:12

**claim** 34:21,23 37:15,16 39:19 44:9

**claims** 35:2

**clarification** 24:18

**clarify** 27:9,15

**clear** 6:15 43:21

**client** 15:15,21 16:9,17,19 19:11 20:8 26:24 27:9 28:25 31:2,3 32:10 33:5,8, 19,20 34:21 77:17

**client's** 27:21

**clients** 40:1

**close** 48:25 98:20

**closed** 38:2

**closing** 49:2 50:2 52:12,13

**closings** 57:21

**co-owned** 72:21

**code** 4:6 17:6,16,20 18:8,17 22:8,16 31:25 32:5 35:13

**collateral** 75:18

**collect** 55:2

**collected** 10:15

**Colonial** 64:11

**Colony** 23:2

**Colorado** 35:11 82:20

**commence** 7:6,12 8:22 9:2

**commenced** 46:24

**comment** 18:21 42:23 82:8

**commentary** 31:1

**comments** 30:23

**commercial** 4:11 23:24 37:24 40:16, 19,23 41:13 42:2 44:4,5,11 45:23 48:21 68:16

**committed** 17:11

**committee** 7:5 8:22 9:6 16:1,11,21, 22 20:11 37:18,20 38:10 97:1

**communication** 81:25 82:2 83:12

**communications** 54:12 55:5,9,12, 15,18,20,22,25 68:13 81:24

**companies** 5:23 24:20 27:12 28:3 36:24 74:11 80:9 83:4 85:5 89:9

**company** 12:23 14:20 16:16 37:16 40:20,22 52:3,4,15 89:14 90:14 91:11 92:19 95:9,15,18,20 96:12

**compensation** 56:22 70:3,9,12

**complete** 95:2

**completely** 44:2

**complex** 22:24 24:10 44:19,24 45:4 46:18 47:6 49:6 50:14 55:3

**complexes** 23:3 46:12 90:2

**concerning** 55:6,10,13,16,23 56:1,6 64:4 68:13 72:3,8 84:12,13

**conclude** 6:16

**condition** 5:19 32:2

**conduct** 5:18 98:14

**conducted** 5:10 25:2 44:15

**confer** 28:25 33:5,9,18,20 77:16

**conference** 53:19,21 78:20

**conferring** 14:14

**confession** 46:2

**confidence** 89:22

**confidential** 46:17

**confirm** 80:11

**consent** 19:23

**consequences** 29:14,22

**considerable** 54:19

**consideration** 59:2

**consolidated** 4:25 5:3

**constitutional** 18:23

**contact** 8:6

**contacted** 46:11 47:1

**contained** 86:7,10

**context** 77:5

**continue** 5:14 6:17 12:6 18:18 22:20 50:25 51:3,20 88:5 98:12,16

**continued** 4:4 5:11,13,19 6:18,19 46:8 48:4 88:3

**continuing** 34:5

**contract** 59:10

**contracts** 14:23,24

**contributed** 49:5

**conversation** 42:16 79:18

**conversations** 27:3 68:12

**cooperate** 16:23 19:13 46:3

**copy** 6:7

**corporate** 31:6 37:2

**corporation** 71:22,24

**corporations** 31:7

**corporations'** 31:9

**correct** 8:8 11:3 47:5 81:10 89:9,16, 25 90:5,8,15,18,22 91:1,5,8,11,17,22 92:2,6,16,21 93:1,9,13,16 94:1,5,14, 20 95:3,9

**correction** 98:25

**correspondence** 43:19

**corroborating** 30:9

**counsel** 7:4,17 8:22 9:6 14:11,14 15:14 27:22 28:14,19 29:14 32:13 33:9 44:16 45:16,20 46:11,12,16,25 47:9,10,14 51:9 77:10,11 88:21 96:25

**counter-production** 26:11

**County** 40:3 85:17

**couple** 30:22 35:4 96:7 97:5

**court** 4:23,24 5:1 17:13,14 18:4 22:13 32:6,7

**Cozen** 78:20 79:4,5,9 80:3,10,14,22, 24 84:24,25 85:2,4

**created** 48:13 61:22 66:13 68:25

**Creative** 73:4

**credit** 59:18 83:9

**creditor** 34:12,14 37:16

**creditors** 4:5 5:9,11,14 6:20,22 7:1,5,
7 8:21 9:7 17:4 21:14,15 22:9,10
28:21 31:24 34:7 38:10 39:17 51:17
80:6 83:25 97:1 98:13,15,17

**criminal** 16:6,9 17:13 19:1 20:22,24

**cross** 21:22 37:22

**current** 35:8

---

**D**

**Danger** 51:10

**date** 6:18,19 14:17 20:20 30:17 81:3

**daughter** 68:21

**day** 49:19 81:4

**days** 79:10

**days'** 98:19

**deal** 18:2

**dealing** 41:25

**dealings** 25:14

**dealt** 86:16

**debt** 53:11

**debtor** 17:16 22:14 34:22,23 45:14

**debtors** 5:3,15,20,21,24,25 7:11
17:22,25 23:4 24:23 25:1,5,9,17,24
28:24 32:2,18 44:1,4,18 74:19,24 88:4

**debts** 6:1

**decision** 48:8 98:16

**declined** 94:14

**deed** 52:1

**default** 46:23 50:8 94:3

**defraud** 30:19,21 32:22 52:24,25 53:4
54:1 58:10 62:5,15,16 83:13

**defrauded** 62:10,21 84:18,19

**defrauding** 83:25

**delinquent** 50:7

**delve** 22:12

**departed** 81:12

**department** 5:7 9:11

**desire** 16:19 92:25

**detail** 46:7 84:12

**details** 45:19

**determination** 13:9

**didn't** 16:15 24:20 27:15 53:4,17
56:13 62:11 70:5 78:4,6 79:7,12,15

**differ** 10:21

**different** 21:16 27:19 40:13

**difficult** 16:13

**dig** 42:17

**digitally** 6:2

**direct** 9:8

**directed** 36:12

**direction** 14:5,6

**directly** 78:19

**disclosed** 18:3 48:25 56:22 74:18
83:7

**disconnected** 81:24

**discovered** 84:20

**discovery** 84:20

**discussed** 96:20

**discussion** 11:5

**disrepair** 50:6

**distributing** 96:21

**distribution** 93:24

**distributions** 74:2 96:12

**District** 4:22 5:6 32:7,8

**dividends** 58:5

**document** 15:5

**documentation** 44:23

**documents** 15:9 46:5 47:15,23,25
48:1,11,12,16,18 64:4 72:2,7 75:19
78:18 95:11

**dollars** 21:2 57:13 59:6 89:13 93:8
94:8

**domicile** 35:8 36:18

**don't** 31:6 39:4 42:15 43:9 59:20
60:2,4 63:13,23 64:1,7,9 76:12 77:14

78:25 79:12 80:12,15,18 85:1

**donation** 59:19,24

**donations** 58:25

**done** 8:23 19:4 25:17,21,24 26:2

**Doug** 19:18

**Douglas** 5:1

**drafted** 75:19

**drawn** 41:19

**due** 21:23 44:8 94:16

**duly** 78:7

**duties** 18:16

**duty** 17:19 18:6,8,21,22

---

**E**

**e-mail** 43:11,19,23 51:8 82:1 83:13

**Eagle** 66:20,23

**Earl** 3:5 7:16 8:4 9:3 29:9 31:18 35:6
37:12 38:11,13 39:1,21 40:10 51:22
78:14 80:4,19 82:11 88:11,22 96:5
97:6

**earlier** 34:4 58:6 84:10 87:19

**early** 46:22 57:10

**earmarked** 49:1,13

**earn** 82:22

**earthquake-resistant** 42:13

**eco-friendly** 62:14

**Ed** 29:18 55:12 94:24

**effect** 62:16

**effort** 84:15

**efforts** 43:3,5 58:9 94:22

**eight** 50:18,19

**Elkhart** 25:18

**EM** 71:13

**employee** 13:3 68:23 81:9

**employees** 57:16 74:1 81:25 82:5

**employment** 81:5,12

**end** 40:15 44:10

**enforcement** 19:9

5 Star Investment Group
341 Meeting,   on 11/15/2016

**entered** 89:1,11 92:13,15

**entering** 89:6 92:18

**enterprise** 83:23

**entities** 11:21,24 14:3,25 17:10 22:25 23:4 25:13,20 26:2 30:20,21 32:21,23 33:4 35:3 36:13 40:13 45:1,15 58:1, 14,18 59:1,7,25 61:24 62:6 66:12,15 67:4,7,11,13 69:2,9 71:18,19 72:5,16 73:22 74:8 80:17 81:4,5,10,13,16 83:6,23 85:22 86:15 89:4,23 92:20 93:21

**entitled** 20:11 94:19

**entity** 17:18 25:2 31:6 38:2 41:15 42:4 44:19,25 63:23 71:10,12,15 73:18,23 87:12 94:1

**entrusted** 33:3

**EP** 71:10

**Equity** 23:20 48:14,15,19 52:11,13 54:6

**escrow** 41:10

**estate** 40:1 48:9 61:7 62:12 75:18

**everyone** 18:15

**everything** 37:25 39:10 41:19

**evidence** 10:15 16:7 30:10 49:11

**evident** 16:10

**examination** 5:14 9:3 29:9 35:6 36:24 37:12 38:11 39:1,21 40:10 51:22 78:14 80:4,19 82:11 88:11,22 96:5 97:6

**excuse** 29:18 71:6 93:5

**execute** 41:6,7,11,21 53:15 75:10 84:17

**exercise** 30:7,15

**expense** 6:10 47:13

**expenses** 49:13

**explain** 53:2 62:9 66:17

**explained** 53:24

**explanation** 46:5

**extensively** 10:7

**extent** 10:4 15:23

**F**

**fact** 28:15 30:10,19 44:12 54:3,5 56:10 76:4 80:13 89:21 91:19 98:16

**fail** 77:12

**failed** 46:4 55:2 70:16

**fair** 59:14 81:6 89:14

**Fairfax** 23:2 65:13

**fairly** 44:7

**Fairway** 68:1

**fall** 35:15

**family** 86:22

**Fargo** 83:9

**fax** 83:13

**February** 5:10

**fee** 94:8,11,19

**fees** 54:19 80:10 90:4,7,10

**fell** 53:7

**FEMALE** 8:13

**Fifth** 9:17,21,23 10:12,19 11:4,16,19, 22,25 12:3,7,10,13,15,18,24 13:2,5,8, 11 14:2,4,7,8,22 15:1,23 18:13,24 20:15 21:8 23:1,6,11,15,19,23 24:1,5, 9,13,16 25:4,8,12,16,19,23 26:1,4,7 28:1,4,6 29:15,22 30:7,15 31:4,9 32:24 36:4,15,19 37:5 38:3,17,21 39:8,14,25 40:7 41:1,3 42:19 52:5,10, 17,21 54:10,15,17,21,25 55:4,8,11,14, 17,19,21,24 56:3,8,12,16,20,23 57:2, 5,9,14,18,23 58:7,11,15,19,24 59:4,8, 12,15 61:2,8,11,14,17,19,21,25 62:3 63:4 64:12,15,18,21,24 65:2,5,8,11, 14,17,20,23 66:1,3,5,7,9,11,16,19,21, 24 67:1,3,6,9,12,15,17,21,24 68:2,5,8, 11,18,20,22,24 69:3,6,10,14 70:8,11, 14,18,20,23 71:1,4,8,11,14,17,20,23 72:1,6,9,12,15,17,21,25 73:3,6,9,12, 16,20,25 74:3,6,9,13 75:2 76:25 79:20 80:23 81:2,8,11,17,21 82:3,9,15,18, 21,23,25 83:2,5,10,20,24 84:3,6,9 85:3,6,9,12,15,18 86:2,5,9,13,17,20, 23 87:1,4,7,10,13,16,24 88:16 89:5, 10,17,20 90:1,6,9,12,16,19,23 91:2,6, 9,12,18,23 92:3,7,12,17,22 93:2,10, 14,17,22 94:2,6,10,13,17,21 95:1,4, 10,14,19,21 96:1,13,18,23 97:12,15,

18,21,24 98:2,5,9

**fight** 48:9

**filed** 4:21 5:25 20:9 22:13 32:3 39:18 44:1,9 46:1 47:19 48:5 54:14 55:6 58:23 62:19 68:15 82:17 86:1 97:14, 20,23 98:1,4,8

**filing** 27:16

**filings** 18:3

**fill** 50:17

**finally** 48:11,23

**finances** 28:23 38:19 74:23

**financial** 5:16 17:24 32:1 47:11 89:8, 22

**financials** 89:15 92:20,24 95:5,8

**find** 49:11

**Finders** 87:6

**finding** 21:9

**fine** 10:23 20:7 37:21

**finished** 88:6

**Firestar** 67:23

**firm** 80:22

**firms** 84:22

**first** 14:15 15:24 29:13 35:8 53:19,21 80:6 93:11

**Fisher** 3:8 34:25 35:7 36:11,25 37:6

**fit** 78:11

**five-minute** 33:18,19

**Florida** 66:25 67:2,5

**flow** 76:1

**folders** 61:4

**following** 96:7

**Foraker** 62:5,11,21 70:19 75:15 84:18 90:21 92:5 98:7

**forced** 21:10

**foreclosure** 51:2

**forever** 30:14

**Fork** 60:24

**forms** 81:24 82:2

**forth** 22:3

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

Index: forthcoming..improvement

**forthcoming** 44:2

**forward** 16:8,23 22:19 31:15 38:6 48:3 51:2,18

**found** 57:7 81:20,23

**frame** 81:18,22

**fraudulent** 59:17 60:20

**free** 50:13

**freeze** 96:21

**Fritz** 25:18

**front** 21:8 75:24

**froze** 49:10

**full** 8:2 53:3

**fully** 29:13,21

**fund** 4:20 46:9 48:9 66:6,8,10 87:3

**Funding** 73:4

**funds** 13:1,4,6 14:1 33:1,3 36:12 50:4 57:21,24 58:13 62:20 67:25 69:4,7,23 70:2 80:8,24 83:19 91:24 93:15,16,18, 23 96:14

**furtherance** 83:22

**G**

**Gallagher** 87:21

**gave** 25:25 57:15 76:5

**GBS** 68:1

**GD** 67:19

**Geiger** 92:24 95:8

**gentleman** 43:12

**gentlemen** 63:18

**George** 88:20

**Gingerich** 60:17 69:8 71:5,25 75:14 84:21 88:21 89:2,7,12,24 92:15 93:4, 7,12,19,23 94:4,24 96:9,15

**Gingerich's** 70:12 72:4 93:1 95:6

**give** 7:22 20:8 30:6 43:23 53:3,13 75:18,19,22 77:5 79:7 91:8

**giving** 59:18 77:13

**glad** 62:22

**Global** 12:22 14:3 74:11,25 75:6,7,9, 13,23 76:7 77:11 78:3,18 80:3,7,13,16

81:14,19 82:5 83:4 84:10 85:5 94:23 95:2 97:9,10,13

**goal** 53:12,14

**Golden** 23:7 68:4

**good** 4:2 9:5 18:2

**Goshen** 61:1 85:17

**governance** 48:16

**Grand** 84:2,4

**grant** 16:24

**great** 41:9

**Green** 62:2,7 90:14,20,24 91:3,7,10, 13,16,19,25 92:5,10 95:17,22

**grounds** 84:14

**group** 4:7,10,12,14,17,18 5:24 11:8 23:20 39:19,24 40:4 47:21 48:14,15, 19 52:11,14 54:6 61:7 65:1,10,19 67:23 73:15

**guys** 76:7

**H**

**hadn't** 38:2

**half** 89:12 93:8 94:8

**hand** 7:20 15:2 34:8

**hands** 41:23

**happened** 21:3 78:24 79:1,3,5

**happily** 16:23

**Harvester** 60:25

**hasn't** 31:8

**haven't** 15:19 30:1 62:10

**hazardous** 46:19

**health** 46:20 48:5

**hear** 62:22

**heard** 49:7 51:24

**hearing** 17:14

**Heavens** 68:10

**Height** 3:11 38:24 39:2

**held** 4:5 5:11 11:5 56:19

**Helmuth** 68:13,19,21,23,25 72:17 87:12,14

**Helmuth's** 68:21

**helped** 75:9,13 84:11

**hide** 58:9

**hire** 80:24

**hired** 47:18

**hold** 8:16 98:17,24

**holding** 49:15

**Holdings** 4:8,13,16 23:8 61:10,13,23 65:4,10,13,16,19 66:4,18 71:13 72:24

**Hollow** 22:23 23:12 64:17

**home** 35:16,23,24,25 36:1,3 42:13,14 82:1

**Homes** 62:2,7 90:15,21,24 91:4,7,10, 13,16,19,25 92:5,11 95:17,22

**honest** 29:3 59:21

**Horn** 3:20 88:20,23 89:21 96:2

**hour** 9:2

**houses** 53:12 76:1

**Houston** 24:11

**hundred** 59:5

**hurricane-resistant** 42:11

**I**

**I.D.** 8:11

**idea** 60:15

**identified** 86:25

**identify** 6:13 7:14 29:17 34:17,20

**identity** 12:2 23:9,17

**II** 4:17 39:19,24 40:4 66:10

**III** 4:14

**imaginary** 20:21

**immediately** 45:24 48:1

**immunity** 16:24

**Impact** 74:11,25 75:6,7 80:7 83:4 85:5 97:9,11,14

**imposed** 16:12

**impossible** 16:13

**improvement** 51:1

5 Star Investment Group
341 Meeting,   on 11/15/2016

Index: inaudible..Justice

**inaudible** 8:19 27:21 40:17 89:8

**included** 35:3 36:13 71:24 93:24

**including** 47:12

**income** 36:17 47:12 81:7

**increased** 50:7

**incredible** 16:14

**independent** 50:10

**Indiana** 4:15,22 5:6 9:11,16 11:1 25:11 32:8 45:9 52:3 57:8,12,20 59:10 61:1 68:14 85:17 91:1

**indicated** 11:1 12:21

**indicating** 79:18

**indiscernible** 21:22 37:22

**individual** 5:22 7:7 9:23 28:20 31:18 34:7,11,14 46:16 51:17

**individually** 28:5 44:17

**individuals** 49:8

**inefficiencies** 28:16

**inefficiency** 27:20

**inefficient** 21:18

**inference** 30:8

**inferences** 31:11

**inflated** 91:21

**Infolink** 73:24

**information** 8:6 10:6 17:20,22 18:1 22:12 32:2 44:3,22 45:18 46:9 47:11 51:12 74:18 76:14,16 86:6,10

**initial** 5:9 6:23 34:10

**initiated** 27:18

**inquiries** 83:16

**inquiry** 5:19

**instance** 77:7,8

**instruct** 15:15

**instructed** 33:13 45:16 82:4 96:9

**instructing** 18:14,15

**instructions** 57:16

**instrument** 48:12

**instrumentalities** 83:12

**instrumentality** 83:21

**insurance** 72:10

**intangible** 85:21

**intend** 10:1 30:20 53:4

**intended** 30:19 52:23

**intent** 62:15 69:18

**intention** 14:8,16 15:14,19 32:22,25 33:2 54:1

**intentionally** 53:1 62:10

**intercompany** 58:9 85:25

**interest** 6:21 7:1 14:20 25:3 44:12 48:22 52:14 58:13,21,22 63:17,19,25 71:15,21 72:4,23 73:1,18,21,22,23 81:1,15 89:3,13 90:20 91:3 93:1,20 95:6

**interested** 42:8,10

**interests** 81:15

**interject** 30:22

**intermixing** 37:1

**Interra** 83:8

**interrupt** 9:21 17:2 74:15

**interruption** 8:14

**intervening** 54:8

**interviews** 44:15

**introduced** 85:2

**inventory** 62:13

**invest** 57:3,6 72:16,19,20

**invested** 22:25 38:20 39:3 40:12 56:25 88:14 90:3,13

**investigated** 20:23

**investigating** 20:24 44:14

**investigation** 45:7

**Investing** 66:2

**investment** 4:7,9,12,14,17,18 38:15 39:19,24 40:4 56:14,19 58:5 63:5 64:25 65:3,9,15,21,24 66:14 69:1,4 70:15 73:1 84:1,4 85:13

**investments** 38:18 48:25 56:6,18 58:2 62:6 65:22 87:12,15

**investor** 21:2 36:12 38:9 45:12 47:7 48:24 53:10 59:6 62:1 63:1 64:13,16, 19,22 65:6,12,18 66:22 67:22,25 68:3, 6,9 69:23 71:5,19 72:11,13,20 73:7, 10,13,14 74:2,11 75:6 80:24 85:10,16 87:2,5,8,14 90:17 96:17

**investors** 12:9,11,14,16,25 13:6,9 14:1 16:16,20 20:17 22:23,24 23:2,3, 7,9,12,13,16,17,20,21,24,25 24:2,3,6, 7,10,11 30:19,21 32:22 33:4 41:22 47:11 52:20,23 53:1,4,23 54:1,5 56:5, 9,25 57:25 58:6,10 62:6,10 67:19 74:5 75:17,22 83:14,16,17,18 86:4,8 94:15

**investors'** 64:10 70:16 85:8

**invocation** 28:1

**involved** 23:10 25:13,20 49:8 70:21 92:8

**involvement** 70:24

**involves** 39:4

**ironic** 26:25

**issue** 43:17 51:7

**issues** 19:2 30:10

**IV** 4:18

---

**J**

**Jaffe** 5:4

**James** 39:17

**Jason** 85:11

**JC** 87:3

**Joe** 39:18

**Jonas** 3:6 7:5 8:22 9:2,4,5 10:9,24,25 11:14 13:25 14:13,17 15:5,8,14 18:1, 18 22:19,20,21,22 24:22 25:1 26:18, 21,25 27:14,24,25 28:7 97:3

**Joseph** 40:3

**judge** 19:21

**judicial** 5:17

**Julius** 62:5

**July** 12:19 14:1 37:25 45:5 49:6 81:13 82:5 89:1

**June** 37:14,23 46:1 54:23 55:1

**Justice** 5:7

## K

**K-u-a-t-t** 47:4

**Karen** 38:8

**Kim** 24:14 25:14 46:11,13 54:12,16,18 55:1,5,20

**kind** 21:18

**Knife** 84:8

**knowingly** 38:14

**knowledge** 31:8 78:1 86:12 87:11

**Kos** 3:7,14,18,19 29:7,10,18 30:1,5,24 32:12,19,20 33:7,10,21 51:20,23 60:20 74:16,22 75:4,5 82:12 87:19 88:6,9,12,17

**Kos's** 26:18

**Kuatt** 47:3 50:12 55:15 63:15

## L

**lack** 16:14 31:10

**Lafavre** 81:14 82:4,14,16,19,22 97:17,20

**land** 59:9

**large** 21:1 44:7 62:11

**last** 49:24 66:12 79:8,16 82:13

**later** 6:18 7:4 9:2 30:16 58:5

**laundering** 91:19

**law** 84:22

**lawsuit** 46:24 47:1 55:6 62:20

**lawsuits** 46:21 48:4 75:16 84:11,12, 13,14,16,17

**lawyer** 25:6,10,14,18,21 26:5,6 47:18 56:1 80:21,25 84:22,25

**lawyers** 25:24

**layers** 53:5

**leading** 27:4 31:2

**learned** 44:16 45:4 46:18,22 49:4,14

**left** 81:4

**Legacy** 61:18 73:2

**legal** 44:13 45:16 46:11 80:10 92:10

**lender** 50:15

**lent** 32:22 33:1

**levels** 54:8

**liabilities** 17:21

**liability** 5:22 16:4,6,12 40:20,22 52:3, 4

**life** 72:10

**limited** 5:22 40:20,22 52:3,4

**list** 25:25 44:5,7 47:10 48:24

**listed** 36:18 85:22

**listen** 6:5 53:25

**living** 36:17 48:16

**LLC** 4:7,8,10,11,12,13,14,16,17,18,20 23:8 24:3,15 39:20,24 40:4 44:5 45:9, 21,23 47:16 48:17,20 52:2,9 61:7,13, 16,20 63:3,7,10 65:1,4,7,10,13,16,19, 22,25 66:4,6,8,10,20,23,25 67:23 68:10 71:13,16 72:24 73:2,5,8,11,15, 19,24 74:12 84:2,5 87:6,12,15

**LLCS** 45:12

**loaned** 40:2 58:1

**loans** 85:25

**located** 36:21 90:25

**lock** 30:13

**locked** 37:25

**longer** 58:17 82:7

**looked** 15:3,5

**lost** 38:20 41:12

**lot** 27:5 61:3

**Louder** 13:18

**loudly** 6:14 13:20

**lunch** 8:25

## M

**made** 6:10 10:14 13:9,25 14:3,5 39:8 48:2,7 56:4,24 58:8,25 59:16 60:20 83:4 91:5 92:4 93:3 94:22 96:10

**Madison** 24:7

**Main** 90:25 92:9 95:16

**make** 6:7 12:8 15:12 18:25 21:9 26:8

29:11 47:5,21 49:17,20 50:13,16 74:2 76:19 83:16 89:23 98:25

**making** 30:2,15 31:1

**MALE** 37:19

**manage** 51:4

**management** 23:8 24:15,22 45:21 52:15 54:9,19 63:6,10,12,19 65:7 68:1,4

**manager** 17:10 65:25

**Managers** 73:11

**manages** 63:15

**managing** 46:14 50:11

**Marlin** 25:3 48:13 53:8 58:13,16 72:21

**Matt** 34:25 60:8,9,11,16 69:8 71:24 88:21

**matter** 44:14 46:2 62:24

**matters** 30:11

**maximum** 15:23 88:14

**means** 31:12

**meet** 9:14

**meeting** 4:4 5:9,11,13 6:2,6,8,10,11, 16,20,22 7:2 9:1,10 11:1,14,18,20,24 12:1,4,8 17:4 22:8 27:4 28:21 34:1,11 49:24 80:6 98:13,15,17,20

**meetings** 7:10 10:7 20:13 21:14 51:12 88:3 95:7

**member** 37:19 86:22

**memorandum** 40:19

**memory** 71:2 95:12

**mentioned** 53:19,21 71:18

**met** 39:4

**Michael** 81:9

**Michigan** 25:7

**microphone** 8:16

**Middlebury** 40:18 68:14 91:1 95:16 96:19

**Mike** 41:25 42:6

**Miller** 3:5 7:14,16,19 8:4,5,14 9:3,5 10:25 11:14,17 17:8 18:2,12 22:22 27:11,25 28:12,19 29:9,11 31:18

**EXHIBIT 4**

32:15,20,25 33:2 34:3 35:6,8 37:12
38:11 39:1,17,18,21,23 40:10 44:16,
25 45:1,7 46:1 48:13 49:25 51:18,22,
24 52:11,18,22 54:12,22 56:4,13,17,
21,24 57:3,6,10,15,19,24 58:4,8,12,
16,20,25 59:5,9,13,16,22 60:20,24
61:6,9,12,15,22 62:1,4 63:1,5 64:10,
13,16,19,22,25 65:3,6,9,12,15,18,21,
24 66:2,4,6,8,10,12,17,20,22,25
67:18,22,25 68:3,6,9,12 69:4,7,11
70:9,15 71:6,9,10,12,15,21 72:2,13,23
74:1,4,7,10,17 78:14 80:4,6,19 82:11,
13 83:11 84:1,10 85:7,19 86:3,14,21
87:2,5,8,11 88:5,11,13,22,24 90:2,22
94:25 95:11 96:5,7 97:6

**Miller's** 18:16

**million** 21:2 45:5,11 48:25 49:4 50:1
52:18 54:4 57:12 89:13 93:8,13 94:8

**Ministries** 59:1,3,7 69:5 97:23

**minute** 77:16

**Mishawaka** 12:5

**misinformation** 43:22

**misrepresentations** 56:5,25

**misuse** 32:25 33:2

**MLN** 71:16

**model** 42:14

**moment** 15:20 29:16 42:24

**money** 12:9,11,14,16 13:10 16:20
21:2 32:23 38:1,15,20 39:10,13 40:2,
14 41:6,9 42:18 45:13,14 47:8 49:20
50:25 52:13,23 53:10 56:14,18 57:4,6
58:1,5,21 59:6 60:21 62:12 63:1,6,9
64:10,13,16,19,22,25 65:6,9,12,18,21,
24 66:14,22 67:18,22 68:3,6,9 69:13,
16,17,20,21,22 70:1,15,16,25 71:5,19
72:11,13,19,20 73:1,4,7,10,13,14
74:11 80:7,14 83:4 84:4 85:8,10,13,16
87:2,5,8,14 88:14 90:14 91:20 93:19
94:22 96:17 97:10,13,16,19,22,25
98:3,6

**moneys** 50:16 75:6

**monthly** 76:1 92:19 95:7

**mood** 20:6

**morning** 4:2 9:5

**mortgage** 38:15 45:10 46:23

**mortgages** 40:1,5

**mountain** 21:24 61:9,22 66:18

**move** 12:19 28:9 31:15

**Multifamily** 61:12

**multiple** 53:5

---

## N

**name** 5:4 8:2 9:5 26:18 34:19,20,25
37:9 38:6 39:16 43:12 70:22 72:10
87:20

**name's** 38:24

**named** 25:6,10,14,18,21 46:17 63:18

**names** 11:17

**Nappanee** 25:11

**NASA** 70:17 87:21

**National** 61:6

**nature** 41:1,4

**necessarily** 31:19

**needed** 9:1

**net** 59:25

**Nevada** 71:22

**nice** 8:15

**none** 51:19 63:11

**nonfiling** 44:18

**Norman** 25:22 45:21,23

**North** 40:19,21 44:20 45:22 47:18
52:9 54:7 55:10,13,16,23 56:2,6,10,14
67:11 69:5

**northern** 4:22 5:6 32:6,8 57:7,20

**Northwestern** 35:16,19

**note** 26:8,18 37:24 40:17

**noted** 18:4 78:8

**notes** 26:9 41:17 53:10,11 69:1 75:21

**notice** 6:19 98:18,19

**November** 4:3 98:21

**number** 4:7,9,10,11,12,13,15,16,17,
19,20 6:25 31:10 35:2 43:13

**numerous** 46:19

---

## O

**O'connor** 78:20 80:10,14 84:24,25
85:2,4

**oath** 5:15 7:13 34:4 88:6

**objection** 77:21,23 78:7

**objections** 15:13

**obligation** 93:7

**obligations** 50:9 54:23

**obtain** 45:17 46:9

**obtained** 40:1,4

**obvious** 19:14

**occur** 64:6 78:22

**occurred** 68:15 96:20

**October** 43:11

**offer** 47:6,21 48:2 50:13

**office** 5:7 6:4,5 8:7

**officer** 32:20 39:23

**offices** 12:5

**official** 9:6

**officials** 9:10,15 11:2

**Ohio** 70:17

**once** 8:1 16:23

**one** 6:23 7:9 9:25 19:19 24:23 26:24
27:7 28:10 31:10 40:23,24 44:17 45:1
49:19 60:12 75:23 76:7,8,19 88:7,9
98:15

**operate** 12:6

**operating** 41:18 49:13,22 50:4

**operation** 52:15 54:20

**operations** 5:21,24 28:23 32:17
81:19

**opportunity** 6:12 7:9 15:20 33:16
43:14

**option** 15:20

**oral** 5:19

**order** 4:23 5:1 9:21 49:16

**ordered** 45:3

**Oregon** 40:15 57:1,4 88:15

**originally** 44:1

**outright** 44:24

**oversight** 17:12

**owed** 50:23 93:13

**owned** 40:24 44:24,25 95:15,20 96:22

**owner** 17:9 24:19,21 45:9 52:4,8
58:17 61:6,9,12,15,18,23

**owners** 24:14 45:18 53:9 77:12

**ownership** 41:8,16 44:6,12 46:6
47:15 52:1 53:5,6,13,24 54:5,7 56:10
58:13 63:17 71:21,24 72:4,23 73:18,
21,23 75:20,23 87:22 90:20 91:3
93:20

**owns** 45:12 48:19 52:9 60:25 63:13

**P**

**P-u-s-t** 85:14

**p.m.** 9:1

**P.O.** 35:10

**package** 70:9

**packages** 69:1

**paid** 50:2 52:12 54:18,23 58:6,21
59:24 69:8 74:5 75:23,24,25 80:8,13,
17 90:4 91:13,15 93:11,18,20,23
94:23 95:3,22

**painfully** 19:14

**paper** 15:2 19:20

**paperwork** 60:13 64:2

**Park** 22:23 35:11,20 64:14

**Parkfairfax** 64:23

**part** 19:8 70:25 84:7 93:3,15,18,23

**parties** 6:21 7:1

**partner** 54:16

**partners** 26:22 70:19 92:4

**passed** 58:20

**patenting** 84:7

**pay** 31:14 38:19 47:7 49:13 57:25
58:5 72:13 80:9 89:12 93:7 94:15

**payday** 75:8

**paying** 50:22 91:21

**payments** 89:23 93:3 96:10

**penalties** 18:6 34:5

**penalty** 7:21

**pending** 23:14 24:4 32:4 77:18

**people** 16:10 38:19 51:11

**percent** 14:20 48:19,21 52:8,14 89:3,
13

**perform** 50:5

**period** 9:9 12:19 89:24

**perjury** 7:21 18:6 34:6

**permission** 90:17

**permitted** 32:13

**person** 38:5 46:14 56:1 60:22 68:25
70:22 86:24

**personal** 12:17 16:4 36:20,21 37:2
38:18,19 57:3 77:25 80:25 81:15
85:20 93:6,16

**personally** 31:5 42:8,15 53:7 63:18
80:21 90:8 94:11 97:10,13,16,19,22,
25 98:3,6

**persons** 11:18,23 12:1 86:16

**pertains** 32:17

**petition** 17:23

**phone** 39:5 76:7,8,24 77:3,15 78:17
79:19 82:1 83:18

**photograph** 19:24

**photographs** 69:11

**picture** 8:11 19:20 26:13

**piece** 15:2 20:25

**pieces** 19:19

**place** 11:15 23:3 35:17,19 42:13
50:10 64:11 96:21

**placement** 40:18

**plainly** 6:14

**plead** 11:4,16,19,22,25 12:3,7,10,13,
15,18,24 13:2,5,8,11 14:2,4,7,8,22
15:1 23:1,6,11,15,19,23 24:1,5,9,13,
16 25:4,8,12,16,19,23 26:1,4,7 28:4,6
32:24 36:15,19 37:5 38:3,17,21 39:14,
25 40:7 42:19 52:5,10,17,21 54:10,15,
17,21,25 55:4,8,11,14,17,19,21,24
56:3,8,12,16,20,23 57:2,5,9,14,18,23

**pleading** 36:4 39:7 41:1,3

**pleadings** 84:13

**point** 10:13 12:21 24:17 38:13 90:13,
24 91:25 92:25

**portfolio** 57:17

**Portland** 4:8 39:3 42:1 57:1,4 84:19
88:15

**position** 20:6 89:8

**possession** 69:15 72:3

**possibility** 43:16

**possibly** 42:6

**Postal** 83:22

**potential** 98:15

**potentially** 19:11

**power** 19:9,10 39:10

**Praet** 25:22 45:22,23,24 46:15 48:11
55:18

**preceding** 33:14

**Premier** 65:22,25 73:11,14

**prepare** 60:13 84:11 86:3

**prepared** 43:15,16 84:22

**prepetition** 32:18

**prepetitioned** 17:10

**present** 11:18,20,23 40:14

**presented** 15:19

**presently** 69:15

58:7,11,15,19,24 59:4,8,12,15 61:2,8,
11,14,17,19,21,25 62:3 63:4 64:12,15,
18,21,24 65:2,5,8,11,14,17,20,23
66:1,3,5,7,9,11,16,19,21,24 67:1,3,6,
9,12,15,17,21,24 68:2,5,8,11,18,20,
22,24 69:3,6,10,14 70:8,11,14,18,20,
23 71:1,4,8,11,14,17,20,23 72:1,6,9,
12,15,18,22,25 73:3,6,9,12,16,20,25
74:3,6,9,13 79:20 80:23 81:2,8,11,17,
21 82:3,9,15,18,21,23,25 83:2,5,10,
20,24 84:3,6,9 85:3,6,9,12,15,18 86:2,
5,9,13,17,20,23 87:1,4,7,10,13,16,24
88:16 89:5,10,17,20 90:1,6,9,12,16,
19,23 91:2,6,9,12,18,23 92:3,7,12,17,
22 93:2,10,14,17,22 94:2,6,10,13,17,
21 95:1,4,10,14,19,21 96:1,13,18,21
97:12,15,18,21,24 98:2,5,9

5 Star Investment Group
341 Meeting,   on 11/15/2016

Index: preserve..recorded

**preserve** 15:22

**presumes** 24:21

**pretty** 16:10

**previous** 68:17 76:16

**previously** 8:7 15:17 34:10 36:18 73:19 75:1 91:15

**price** 59:18,25 91:21

**primarily** 13:4

**principal** 17:17 72:17

**prior** 6:22 7:10 10:7 85:4 89:6 91:16 92:18,25 95:6,23

**private** 40:18

**privilege** 10:1,9,19 20:4

**probably** 16:10 20:2

**problem** 31:13

**problems** 27:21

**proceed** 10:22 22:19 27:14 33:21 34:24 37:4

**proceeding** 5:17,18 17:13 18:25 19:1 31:17 36:14

**proceedings** 27:20

**process** 21:18,19

**produced** 16:7

**product** 15:4 76:3

**production** 15:8

**products** 62:14 84:2,5

**promissory** 37:24 40:17 53:11

**pronouncing** 47:4

**proofs** 39:18 44:9

**proper** 20:3

**properly** 86:19

**properties** 40:2,5,6 57:1,4,7,12,17, 20,22 63:16 67:11,13 71:16 88:15 96:22

**property** 6:1 38:16 41:8,9 42:4,6,8 45:10 50:6 52:2,9,16 53:6,7 54:7 55:10,13,16,23 56:1,7,11,15 59:10,14, 22 60:21,25 65:1 67:2,4,7,10,16 68:14,16 69:16 70:17 73:11 82:19 83:3 85:20,21 90:25 91:7,10,14,15 92:1,9 94:7,12,15,16,18 95:16,23,25

96:21

**prosecution** 62:24

**prospect** 16:5 21:14

**prospectuses** 86:3,7,11

**protect** 47:7

**protection** 20:9 27:17

**protections** 20:3

**provide** 17:20 46:4,5 47:10,15 62:11, 23 84:11

**provided** 8:7 43:22 48:1 86:4

**public** 20:16 83:12

**publicly** 18:4 22:13

**purchase** 45:13,15,19 46:10 47:6 49:5 52:19 59:17,25 62:12,13 63:2 70:16,25 89:2,3,6 91:4 92:14 93:1,5,6 94:4 96:11,15

**purchased** 40:2 44:19 45:4 49:4 90:25 91:7,10 92:1 95:17

**purchasing** 91:17

**purpose** 5:13 22:9 27:19 66:17 79:19

**purposes** 91:20

**pursuant** 4:5 17:5,14

**pursue** 46:8

**pursued** 48:6

**push** 48:3 51:2

**Pust** 85:14

**put** 37:23 38:2,15 56:13,17 96:21

**putting** 42:10,11

**puzzle** 20:25 21:1

### Q

**question** 9:24 10:2,17,22 14:9,10,14 15:16 18:13 24:20 27:7 28:10,18 30:1, 4,18,24 32:14,16,19 33:10,14,16 34:9, 10 40:12 41:5,24 69:19 74:20 77:1,19, 24 78:9,16,17

**question's** 33:11

**questioned** 43:3,6 77:9

**questioning** 7:6 75:3

**questions** 5:20 6:12,23 7:3,9,10

8:23,24 9:18 10:5 16:4 18:19 20:19 21:5,10,19 22:4,20 28:7,22 29:12 30:13 31:3,25 32:14 33:22 34:6,14,24 35:4 37:8 39:6 40:25 41:2 51:6,18,20 74:23,25 80:12 88:7,19,24 96:8,25 97:1,2,5,8 98:11,12

**quote** 59:19

### R

**raise** 7:20 11:7 34:8

**raised** 10:5 49:25 52:19,22 53:10 54:4

**raising** 13:4

**Randy** 75:16

**rate** 50:7

**reach** 76:14

**read** 15:10 19:19 43:14 86:6

**ready** 41:19 75:16

**real** 31:15 40:1 61:6 62:12 75:18 85:20

**Realtor** 70:21 87:19

**reask** 33:13

**reasking** 21:19

**reason** 6:17 9:14 16:8,18

**reassert** 10:12,19

**recall** 9:9 11:17 12:23,25 13:3 14:21 49:24 70:24 74:24

**receipt** 94:12

**receivable** 44:8

**receive** 40:16 49:20 86:15 94:19 97:10,13,16,19,22,25 98:3,6,18

**received** 43:11,19 47:25 48:11,18,24 49:2 56:21 86:18 90:7 94:9

**receiver** 46:25 47:18 48:4,7,10 50:10, 13,15,18,20 51:3

**recognized** 41:17

**record** 7:15 8:3 10:11 11:5 13:23 21:20 26:9 27:8 29:17 30:2 31:21 34:1,20 36:9 37:10 38:7 42:22 43:2 60:16 76:3 88:2 98:21

**recorded** 6:2 93:25

**EXHIBIT 4**

**recording** 6:3,6,8,15 33:24 87:25 98:23

**records** 13:25 52:7

**recover** 16:13,20 62:20 94:22

**reducing** 59:17

**refer** 89:4

**referring** 26:12

**reflect** 48:18

**reflected** 86:1

**reflecting** 44:23 47:15

**refresh** 71:2 95:12

**refurbished** 50:19

**regard** 43:1,3,6,7,24 51:6,25 95:5,15

**regarding** 5:15,21,23 22:13 28:22 43:20 44:2 46:9 87:21 97:8

**regardless** 14:9 15:16

**rehab** 41:10 50:16

**reimbursement** 49:18,21

**reinstate** 10:18

**related** 95:12

**relationship** 85:4 97:9

**releasing** 50:16

**relevant** 31:19

**remember** 64:1 78:25 79:12 80:12,15 87:20

**remind** 34:4

**reminder** 10:4

**Remodeling** 73:8

**rent** 36:3 47:12

**rented** 50:18

**rents** 50:7 55:2

**repair** 46:18 49:16

**repairs** 49:18,20 50:5

**repeat** 32:15,19

**rephrase** 33:1 58:3

**report** 51:5

**reports** 50:15,20

**represent** 27:10,12 31:7 56:9 80:25

**representative** 17:18

**represented** 47:2 80:21

**representing** 34:13 35:1 38:14 81:14

**requested** 46:4 47:9,14

**reserve** 7:2 98:11,14

**reside** 35:9,14

**resolve** 30:10

**Resource** 62:2,7 90:14,20,24 91:4,7, 10,13,16,19,25 92:5,11 95:17,22

**resources** 16:14

**respect** 17:21 18:16 21:23 31:11 51:5

**respond** 15:15 18:6,9,20 45:24 76:23 77:12,14 78:5,6

**responsible** 13:4

**restructure** 75:12

**restructuring** 75:9

**resulting** 59:25

**resume** 9:1 75:4

**retainer** 75:25

**retaining** 27:21

**return** 12:4 14:1 93:25

**returned** 13:1,6,10

**review** 86:6 92:24 95:8,11

**revoke** 10:14

**rights** 15:23 31:9

**Riley** 3:12 39:16,22

**Road** 85:17

**Robert** 62:5

**Roberts** 3:16,22 4:2 5:4 7:17,19 8:1, 5,10,20 9:20 10:20,24 11:6,10 13:12, 16,19,22 14:11 17:1,8 18:11 19:12,17 21:11 22:2,7,18 27:6,13,23 28:11 29:16,20 31:16,22 32:12 33:17,25 34:16,18 36:6,9 37:3,7 38:5,22 40:8 51:14 74:14,17,22 79:21,24 80:2,5 87:17 88:1,10,18 96:3 97:4,7 98:10

**rock** 8:17

**roll** 42:6

**rolls** 47:12

**RSR** 91:11 95:17

**Rudy** 68:13,21 72:17

**S**

**sale** 46:7 68:14 92:4,8 95:6 96:16

**sales** 90:5 94:18 95:24

**Samuel** 37:11

**Sarah** 68:19,21,23,25

**schedules** 5:25 17:23 32:3 44:4,7 74:18 83:8 85:23 86:1

**Schwartz** 25:3 48:14 53:8 58:13,16, 21 72:21 73:7 93:19

**scope** 31:4 36:23 77:25

**Scott** 82:24

**seated** 42:24

**SEC** 19:8 20:20,21 45:6 46:2 49:10 53:16 96:21

**second** 15:25 36:11 43:2 91:24 92:13

**Secretary** 52:6,7

**Section** 4:5 17:4,5,15 31:24

**securities** 9:10,15 11:2

**seeking** 27:17

**sees** 78:11

**self-serving** 20:18

**sell** 42:6 57:17 59:22

**selling** 96:22

**send** 6:6 78:4,13

**sends** 77:11

**September** 5:12 12:20 14:19 39:5 48:10,23

**serious** 77:1

**Servants** 59:10,22 60:5

**serve** 45:17

**served** 45:20

**server** 64:5

**Service** 83:22

**set** 53:5 75:17

**Seven** 68:10

**shared** 26:9

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016                                                     Index: sheet..table

**sheet** 47:12

**sheltered** 18:7

**Sherman** 25:6

**shortly** 68:15

**shots** 82:7

**show** 16:8 42:13 45:11 52:7,12

**showed** 45:8

**shows** 76:4

**side** 75:24

**sign** 63:25 74:4

**signatory** 74:7

**signed** 20:10 63:21

**simple** 28:10 53:14

**simply** 28:19

**single** 18:13

**sir** 12:23 14:17 20:5 24:23 27:1 30:18 34:12 38:23 52:25 89:18

**sit** 20:14

**situation** 16:17 18:7

**small** 11:8

**snowball** 21:24

**sold** 57:21 59:9,13 60:12 87:23 90:3 91:16 92:1 94:7,16

**sole** 17:9 24:19 81:6

**Solely** 27:11

**Solution** 45:21

**Solutions** 24:15,22 63:7,10,12,20

**someday** 38:4

**sort** 69:12

**source** 36:16 81:6

**South** 6:4 12:4 40:3,5 60:24 67:14

**Southern** 23:20 48:14,15,19 52:11,13 54:6

**speak** 6:14 8:15 13:12 36:7 87:17 89:18

**speaking** 17:2

**specific** 19:23 51:6 54:11 77:7,10

**specifically** 22:9 43:8 53:21

**specifics** 79:7

**spoke** 46:16 79:8,17 82:13

**spoken** 39:5 76:6

**spring** 9:8 11:2

**Springmont** 65:4

**St** 40:2

**stability** 89:22

**Stan** 40:9

**stand** 47:24

**star** 4:7,8,9,10,12,13,14,15,16,18,19 8:17 11:21,24 12:5,6,8,11,14,16 13:3, 7 14:3,24 22:25 23:4,9,13 24:12,15,22 25:1,13,17 26:2,5 27:12 30:20,21 32:21,23 33:4 34:2 35:2 36:12,24 38:14 39:3,19,23 40:3 44:3,5,11,19 45:1,7,20 48:21 52:20,23 54:4,5 56:5, 19 57:11 58:1,14,17,18 59:1,7,24 61:24 62:6 63:1,5 64:10,13,16,19,22, 25 65:3,6,9,12,15,18,21,24 66:2,4,6,8, 10,14,22 67:4,7,10,13,18,19,20,22,25 68:3,6,9,23 69:1,4,8,9,13,17,20,21,22, 23 70:3,5,10,13,15 71:8 72:4,11,13, 16,19 73:1,4,7,10,13,17,19,21,22 74:2,5,8,11 75:5 80:8,9,17 81:3,5,6,9, 13,15,20,25 83:6,14,23 84:4 85:7,10, 13,16,21,22 86:4,8,14,18 87:2,5,8,14 88:3 89:4,8,23 90:3,11,14 92:20 93:20,24 94:18 95:5 96:22

**start** 29:12 51:25

**started** 21:24

**state** 8:2 9:11,15 10:10 11:2 34:19 36:22 37:9,15 38:6 41:25 42:7 52:6,7 67:16

**stated** 28:15 42:5 75:12

**statement** 17:24 27:1 39:9 43:15 46:2 49:3 51:13 52:12 76:19

**statements** 47:13

**States** 4:23 5:5,8 6:24 7:3 17:3,12,15 20:12 22:11,16 31:23 32:5,7 83:22

**stating** 40:17 46:3

**stemmed** 96:15

**step** 15:22 51:17

**Steve** 38:24

**stock** 96:11,16

**straight** 42:23

**straightforward** 54:2

**Stream** 69:5

**Street** 92:9 95:16

**Streets** 59:11,23 60:5

**structure** 46:6 47:16

**stuff** 75:11

**stumble** 43:17

**subject** 46:20

**subjects** 15:17

**submit** 15:11

**subpoena** 15:7 76:9,10,23 77:2,11 78:4,13

**subpoenas** 45:17,20,25

**subscription** 41:18

**substantial** 49:12

**substantively** 4:25

**successful** 49:9

**sue** 75:15

**suggest** 51:7 75:1

**suggested** 44:11

**sum** 62:11

**summer** 44:21

**Sungate** 68:7 94:7,12,15,20

**supersede** 18:22

**supposedly** 46:14 62:14

**surprise** 52:6

**Susan** 5:4

**Sutter** 43:12,20 55:22

**Swartz** 3:9 37:11,13,18,23

**swear** 7:21 34:3

**switch** 40:15 41:20 53:13,22

**sworn** 18:5

**system** 8:15 22:15

---

**T**

**table** 19:2

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016

Index: taking..unsecured

**taking** 9:17 19:24 29:14,22

**talk** 20:15 21:22 37:22

**talked** 42:15 66:13 68:16 79:6 83:18

**talking** 21:13 59:20 60:2 77:7 78:5

**target** 46:19

**tax** 93:25

**Taylor** 25:15 46:11 55:20

**TC** 23:24 40:15,19,23 41:13 42:1,2 43:1,7 45:22

**team** 44:13 45:3 46:8 76:16

**technical** 98:25

**telephone** 83:13,17

**telling** 33:8

**ten** 89:24 93:8

**tenant** 50:25

**tenants** 55:3 86:15

**Tennessee** 24:7

**terms** 20:4 22:4 36:22

**testified** 14:19 15:17 80:7

**testimony** 7:22 12:23 14:21 30:6,14 54:3 62:23 95:12

**Texas** 24:11 67:8

**text** 82:1

**thereof** 31:10

**thing** 13:15 53:12

**things** 19:16 43:13

**third** 16:1 43:4

**Thompson** 7:18 10:10,23 15:4,7,11, 18 17:7 18:10,20 19:4,7,13 20:1,7 21:6,13 22:1,6,17 24:17,24 26:3,5,8, 15,19,20,24 27:2,7,11,15 28:17,25 29:2,24 30:22,25 31:1,16,20 32:11 33:5,8,12,23 36:23 37:15,21 77:4,16, 20,23 78:10

**thousand** 59:6

**three** 66:12

**tied** 41:23

**Timber** 22:23 23:12 64:17

**time** 6:4 9:9 10:13,17 13:19 15:25 16:1 21:17 38:13 39:9 40:16 42:7,9,22

43:2,4 45:6 47:20 54:13 75:24 79:8, 13,15,16 81:18,22 82:13 84:15 89:16 90:4,13 91:4 92:8,25 98:14,19

**times** 20:15 21:16 75:12 91:16

**title** 45:3,8,11

**today** 4:3 6:16 7:22 9:18 11:9,11 14:9 15:10 28:1 41:1,3,8 43:18 54:3 86:25 95:13 98:11,20

**today's** 7:2 36:13

**told** 33:15 42:9 78:24 79:4,5

**tongue-tied** 71:6

**topic** 79:23,25

**Torch** 84:8

**tornado-resistant** 42:12

**Toth** 62:5,11,21 75:15 84:17 90:21 92:5 98:4

**Townhome** 49:3

**townhomes** 43:20,24 44:6,8,21 46:15 51:4

**Trace** 22:24 64:20 65:7,16

**transaction** 72:8

**transcript** 6:9 35:18

**transfer** 59:17 60:4,14 64:4,6 72:3 74:10 75:5 83:19 85:7,10,13 96:19

**transferred** 59:7 67:19,23 68:1,4,7, 10 70:25 71:19 73:10,14 86:21,24

**transfers** 12:12 58:9 60:21 75:1 83:3

**transparency** 27:3

**transparent** 26:23

**Transport** 73:14

**Trent** 65:10

**tribunal** 21:9 24:12

**true** 52:18,22,25 56:4,13,17,21,24 57:10,15,19,24 58:4,8,12,16,20,25 59:5,9,13,14,16 61:22 62:1,4,8 63:1,5 69:7 81:12,18,22 82:4 83:11,15 86:11 88:25 96:9,14,19

**trust** 23:21 35:18 44:18 48:12,15,16, 19 52:11,14 53:8 54:6 61:10,18,23 76:23 77:2,6,15 78:17 87:3,9

**trustee** 3:16,22 4:2 5:2,5,8 6:24,25 7:17,19 8:1,5,8,10,20 9:20 10:20,24

11:6,10 13:12,16,19,22 14:11 17:1,3,8 18:11 19:12,17,18 20:12 21:11 22:2,7, 11,18 27:6,13,23 28:8,11 29:16,19,20 31:16,22,23,24 32:12,13 33:13,17,25 34:16,18 36:6,9 37:3,7 38:5,22 40:8 41:12 51:14,15 62:19 74:14,17,22 76:13 77:4 79:21,24 80:2,5 87:17 88:1,10,18 96:3 97:4,7 98:10

**truth** 7:23,24

**turn** 19:22

**turnaround** 12:22

**twice** 16:22

**Twin** 23:16 40:24 41:7,15,16 43:1,20, 24 44:3,6,8,12,21 45:13,15,18,19 46:7,10,14 47:16 48:17,20 49:1,3,14, 17,19,22 50:1,3,4,8,11,21 51:25 52:1, 2,19 53:17,22 54:1,20,22 75:20

**two** 6:3 10:7 19:15 26:10 89:12 91:16 93:8 94:7 95:23

**type** 16:5

---

## U

**U.S.** 8:8 46:23 49:15 50:9 54:23 55:6

**Uh-huh** 21:6 28:17

**ultimate** 61:23

**ultimately** 21:8 90:10

**uncertain** 50:24 51:1

**unclear** 49:21

**understand** 10:15 17:7 18:12 22:1,6, 17 26:20 30:5,12 31:4 42:2 78:21

**understanding** 9:14

**understands** 30:3

**underwater** 57:22

**unfortunately** 41:11,21,23

**UNIDENTIFIED** 8:13 11:8,12 34:13 37:19

**uniform** 93:5

**Union** 83:9

**unit** 89:1,6 92:14 93:6 94:4

**United** 4:22 5:5,8 6:24 7:3 17:3,12,15 20:12 22:11,16 31:23 32:5,7 83:21

**unsecured** 9:7 38:9 97:1

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016

**update** 43:23

**Utah** 23:8 65:19

**utilize** 48:8

**utilized** 46:10

---

**V**

**vacancies** 50:18

**vacancy** 50:6

**vendors** 50:9,22,23

**Ventures** 66:20,23

**versus** 31:6

**View** 61:9,23 66:18

**VII** 4:12

**Villa** 67:20

**Village** 24:2 63:2 75:20,21

**violations** 46:20 48:6

**visited** 82:19

**Vista** 82:20

**VOICE** 8:13 11:8,12 34:13 37:19

**voluntarily** 17:11 32:3 92:15

---

**W**

**waive** 30:16

**waived** 10:8 53:2 75:2

**waiver** 10:14,16 30:15

**warrant** 75:7

**water** 57:13

**Wells** 83:9

**west** 42:5

**whatsoever** 46:6

**whichever** 34:22

**William** 7:5 35:1 87:20

**Williams** 70:22

**Win** 87:9

**Winston-salem** 23:17 44:20 48:17, 20 50:21 52:2 54:7

**wire** 12:11 83:19

**withdraw** 58:2

**Withers** 47:3 50:12 55:9 63:15

**Woodland** 35:10,19

**work** 15:4 20:3 45:3,8,11 70:5 76:3 81:3 95:2

**worked** 25:6,9 62:4 70:13

**working** 51:10

**works** 22:5,15 50:20

**worth** 38:16 40:6

**wouldn't** 52:25

**writable** 6:7

**write** 35:17

**writing** 15:12

**written** 15:10

---

**X**

**XYZ** 73:19

---

**Y**

**ya** 59:21

**year** 80:15 93:11

**years** 6:3 89:24 93:9

---

**Z**

**Zercher** 25:10 60:13

**zero** 16:7

**ZIP** 35:13

**zoning** 46:19 48:5

**Zupetzes** 85:8 98:1

**EXHIBIT 4**