UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| 5 STAR INVESTMENT GROUP, LLC, | ) | CASE NO.    16-30078-hcd |
| 5 STAR PORTLAND HOLDINGS, LLC, | ) | |
| 5 STAR INVESTMENT GROUP V, LLC, | ) | SUBSTANTIVELY CONSOLIDATED |
| 5 STAR COMMERICAL, LLC, | ) | CHAPTER 11s |
| 5 STAR INVESTMENT GROUP VII, LLC, | ) | |
| 5 STAR HOLDINGS, LLC, | ) | |
| 5 STAR INVESTMENT GROUP III, LLC, | ) | |
| 5 STAR INDIANA HOLDINGS, LLC, | ) | |
| 5 STAR INVESTMENTGROUP II, LLC, | ) | |
| 5 STAR INVESTMENT GROUP IV, LLC, | ) | |
| and 5 STAR CAPITAL FUND, LLC1 | ) | |
| Debtors. | ) | |

# DISCLOSURE STATEMENT FOR TRUSTEE'S PLAN OF LIQUIDATION (AS IMMATERIALLY MODIFIED)

Douglas R. Adelsperger, the chapter 11 trustee in this case ("Trustee"), submits the

following Disclosure Statement (the "Disclosure Statement") in connection with the Trustee's

Plan of Liquidation (as Immaterially Modified)[2] (the "Plan") filed concurrently herewith:

## I. INTRODUCTION

This Disclosure Statement is intended to provide the information required by § 1125 of
the Bankruptcy Code and needed by creditors and parties in interest to evaluate the Trustee's
proposed Plan and to make informed decisions about whether to vote to accept the Plan.

---

[1] The filing companies were  5 Star Investment Group, LLC, 5 Star Portland Holdings, LLC, 5
Star Investment Group V, LLC, 5 Star Commercial, LLC, 5 Star Investment Group VII, LLC, 5 Star
Holdings, LLC, 5 Star Investment Group III, LLC, 5 Star Indiana Holdings, LLC, 5 Star Investment
Group II, LLC, 5 Star Investment Group IV, LLC and 5 Star Capital Fund, LLC (collectively, the
"Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the
"Bankruptcy Code").

[2] The Plan filed concurrently herewith contains immaterial modifications pursuant to 11 U.S.C. §
1127(a), correcting typographical errors and clarifying a few provisions of the plan filed on January 11,
2018 as Docket No. 1116. This Disclosure Statement is revised from the Disclosure Statement filed on
January 11, 2018 to conform to those changes and to include updated financial information since the
filing of the Disclosure Statement on January 11, 2018.

Although this Disclosure Statement includes a summary of the Plan, it is important to read both documents, because the Plan is the controlling legal document. All of the information in this Disclosure Statement is qualified by the Plan itself.  Also, terms which are capitalized in this Disclosure Statement should be understood to have the meaning forth in the Plan.

The information herein is generally organized according to the following broad categories:

- Article II - **Outline** of the proposed Plan;

- Articles III and IV - **Summary of the History of the Debtor Companies** and the **Known Assets on the Petition Date**;

- Articles V and VI - **Description of Key Events during the Bankruptcy** and of the **Assets Currently Available for Distribution**;

- Articles VII and VIII – **Legal Considerations Relating to the Plan, the Confirmation Process and the Effect of a Confirmed Plan**.

Both the Plan and this Disclosure Statement were filed by the Trustee, who was appointed as the Chapter 11 Trustee in each of the Bankruptcy Cases on February 29, 2016, following an emergency motion filed by the United States Trustee ("UST"). Generally speaking, § 1104 of the Bankruptcy Code provides that a Trustee may be appointed when it is in the interests of creditors, and for "cause," such as fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor before or after the bankruptcy filing.

The Plan and this Disclosure Statement pertain to claims against *all* of the eleven (11) related companies that filed bankruptcy petitions on January 25, 2016 ("Petition Date")[3]. Although the cases were commenced as individual proceedings by separate companies, after a review of the books of the companies and the manner in which they were operated as one business with comingled assets and liabilities, the Trustee filed a motion for "substantive consolidation" of all the bankruptcy cases on May 18, 2016.  Substantive consolidation was approved by the Bankruptcy Court on June 24, 2016.

The Plan is identified as a "Plan of Liquidation" because it contemplates a sale (or settlement or other liquidation) of all assets, and the distribution of proceeds to all creditors in accordance with the priorities set forth in the Bankruptcy Code as set forth in the Plan. Unlike the situation in some Chapter 11 cases, the Plan does not contemplate the continued operation or reorganization of the Debtor companies, although liquidation of some assets will necessarily occur over an extended time.  Also, unlike many Chapter 11 cases, there are no secured loan claims held by banks or financial institutions.  Instead, the overwhelming majority of claims (in

---

[3] The Plan and Disclosure Statement do not, however, address claims against any affiliated companies that did not file bankruptcy petitions (the "Non-Debtor Companies"), which are not subject to the jurisdiction of the Bankruptcy Court.

both number and amount) are held by individual Investors. The only alleged secured debts involve real estate tax liens and alleged mortgages held by some of the Investors.

After payment of secured real estate taxes and expenses of administration, the Plan proposes that an Initial distribution of $5 million will be made to Allowed Claims of all Investors (regardless of whether or not they claim to have valid mortgages) and other unsecured creditors, with remaining cash held for payment of the Trustee's and the Trustee's professional fees and expenses associated with continued liquidation of assets and prosecution of lawsuits against insiders and others.   The Plan provides for Subsequent Distributions on a *pro rata* basis, as additional proceeds of liquidations become available, when in the Trustee's judgment there are sufficient funds available.

Creditors whose claims and interests are "impaired" under the Plan – essentially all creditors other than Estate professionals and real estate priority tax claims[4] -- may vote to accept or reject the Plan. Thereafter, the Court will schedule a date and time for a hearing at which the tabulation of votes will be presented to the Bankruptcy Court, which will address any objections to the Plan and determine whether the Plan should be confirmed.  A separate notice with respect to that hearing will be issued to you by the Court.

**Your vote is important,** and may be cast by filling out and mailing the enclosed Ballot to counsel for the Trustee within the time set by this Court, addressed as follows:

> Deborah J. Caruso
> John C. Hoard
> Rubin & Levin, P.C.
> 135 N. Pennsylvania St., Suite 1400
> Indianapolis, IN 46204

As a Creditor or Equity Interest Holder, your acceptance of the Plan is important and appreciated.

**No representations regarding this Plan, including those regarding value of property and estimated Distributions to creditors, are authorized except those contained in this Disclosure Statement.   Likewise, any estimates in this Disclosure Statement regarding the value of property, the amount of claims, or amount of anticipated Distributions to Creditors are premised upon the best information currently available to the Trustee and his counsel regarding assets presently available and the estimated Allowed Claims.  The actual values and amount of Distributions may be higher or lower than any such estimate, depending on the actual sales prices of property and the total amount of Allowed Claims and Administrative Expense Claims, and the ultimate recovery, if any, from the prosecution and collection of Causes of Action.**

---

[4] The claims of professionals and priority tax claims, which are not classified as impaired under the Plan, are conclusively presumed under law to have accepted the Plan and cannot vote on the Plan.

## II. SUMMARY OF PLAN

As noted, the Plan proposes to liquidate the remaining assets of the Debtors and to make distributions of all such proceeds and the cash on hand to all creditors and parties in interest.

The treatment of individual claims, including the timing and amount of potential payment, depends on the legal attributes of the claims and the priorities established by the Bankruptcy Code. Under the Trustee's Plan, there are four broad categories of claims and interests, with correspondingly different treatment under the Plan. They are:

A.    Administrative Expense and Priority Tax Claims[5];

B.    Class 1, Secured Real Estate Tax Claims for unpaid real estate taxes;

C.    Class 2, Unsecured Claims; and

D.    Class 3, Equity Interests.

Each of these categories, and the corresponding proposed treatment in the Plan, is described in more detail as follows:

### A.    Administrative Expense and Priority Tax Claims (Unimpaired)

Under the Plan, Administrative Expense Claims consist of claims for compensation of professionals (including the Trustee, his attorneys, and attorneys for the Official Creditors' Committee) whose employment was approved by the Court pursuant to section 330 of the Bankruptcy Code, which are claims entitled to priority treatment under sections 507(a)(2) and 503(b) of the Bankruptcy Code.

Priority Tax Claims, if any, will consist of any tax claims entitled to priority treatment pursuant to section 507(a)(8) of the Bankruptcy Code.

The Plan provides that both Administrative Expense Claims and Priority Tax Claims will be paid in full on *the later of* (a) 15 days after the Effective Date of the Plan, or (b) 7 days following the date such Administrative Expense Claim or Priority Tax Claim first becomes an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim.

### B.    Class 1 Secured Real Estate Tax Claims  (Impaired)

---

[5] As permitted by section 1123(a)(1) of the Bankruptcy Code, the Plan does not establish a separate "class" for these claims.

The Debtors owe real estate taxes to a small number of county taxing authorities – believed to be limited to the Elkhart County Treasurer and the St. Joseph County Treasurer – which are secured by liens on real estate owned by the Debtors.

Consistent with the priorities established by the Bankruptcy Code for such secured claims (which must be paid before proceeds of any sale of the relevant real estate may be distributed to junior creditors holding unsecured claims), the Plan proposes to pay Secured Real Estate Tax Claims within 30 days after the Effective Date or within 30 days after sale of the relevant real estate, *whichever is later*.

### C.    Class 2 Unsecured Claims (Impaired)

The overwhelming majority of claims in this case, both in number and dollar amount, are Unsecured Claims held by Investors. These claims consist of the amounts owing at the time the bankruptcy petitions were filed, without regard to prior payments received by creditors so long as they were consistent with the relevant agreements.

It is difficult at this time to estimate the probable amount of these claims that will be "Allowed" by the Bankruptcy Court after consideration of any objections for claims that are not owing, are duplicates, are improperly computed, and for similar reasons.  What is known is that Investor claims totaling approximately $29 million have been filed, about $20 million of which were described as "unsecured" claims on the relevant Proofs of Claim, with the remainder of approximately $9 million described as "secured" claims in the Proofs of Claim.

For the reasons discussed in detail in Article VII (A) below, the Plan treats *all* Investor claims in the same manner, *regardless of whether they were filed as ostensible "secured" claims or "unsecured" claims,* by proposing *pro rata* distributions of available cash to the Investor holding each Allowed Claim. Specifically, 60 days after the Effective Date of the Plan, or the first business day immediately thereafter if such day is a weekend or holiday, the Trustee will make an Initial Distribution of Five Million Dollars ($5,000,000.00) to Creditors holding Allowed Claims in Class 2 on a *pro rata* basis.  In other words, all Class 2 Claims shall receive the same treatment, consisting of a Distribution in accordance with the proportion that each holder's Allowed Claim bears to the aggregate amount of all Allowed Claims and Disputed Claims in Class 2.

Following such Initial Distribution, the Trustee shall make a determination on a quarterly basis beginning in the second quarter following Confirmation regarding whether Subsequent Distribution(s) can be made, taking into account the amount of Cash and Property of the Estate available for distribution to Creditors holding Allowed Unsecured Claims.  If the Trustee determines that Subsequent Distribution(s) can be made, he shall make Subsequent Distribution(s) consisting of Cash or other Property of the Estate, less reserves for payment of disputed claims, Litigation Expenses and Allowed Administrative Expense Claims of the Trustee and the Trustee's professionals as approved by the Court.

Under the Plan, the exact timing of any Subsequent Distributions shall be within the discretion of the Trustee, based on the funds on hand and the Trustee's estimates regarding the

prospects and timing of further recoveries from Causes of Action and liquidation of remaining Property of the Estate. The Trustee shall provide quarterly notice to Creditors holding Allowed Unsecured Claims regarding whether it appears Subsequent Distributions will be made at that time.

### D.    Class 3 Equity Interests (Impaired).

Class 3 is comprised of persons holding equity (ownership) interests in the debtor companies, believed to be limited to one person, Earl Miller.

Although the Trustee does not anticipate making any Distributions to Equity Interests, the Plan provides a mechanism for Distributions to Equity Interests, which would occur *if and only if* all other creditors, including Holders of Administrative Expense Claims and Claims in Classes 1 and 2, have been paid in full.  In such unlikely event, any remaining Cash or Property of the Estate would be distributed to the Holder of the Equity Interests as provided by the Bankruptcy Code, and subject to any orders entered by the Bankruptcy Court.

### E.    Releases, Injunctions, and Other Provisions

The Plan also contains customary provisions for release and exculpation of the Trustee and estate professionals and an injunction against the commencement or continuation of any act or action to collect, recover, or offset from the Estate or Property of the Estate, any Claim or Equity Interest treated in the Plan or any actions to interfere with or impede the implementation and Consummation of the Plan, except as otherwise expressly permitted by the Plan, the Confirmation Order or by Final Order enforcing the terms of the Plan, with exceptions for police and regulatory powers and actions by governmental entities.   The Court shall have jurisdiction to determine and award damages for any violation of such injunction, including compensatory damages, attorney's fees and expenses, and exemplary damages for any willful violation of the injunction contemplated herein.

## III.   SUMMARY OF EVENTS PRECEDING THE BANKRUPTCY FILINGS

### A.    Company Origins

The businesses that eventually became the Debtors in this bankruptcy case began with the formation in 2007 of 5 Star Investment Group by Matthew Gingerich ("Gingerich") and his then partner, Norman Bontrager ("Bontrager").

Initially, the business model that Gingerich and Bontrager conceived for 5 Star Investment Group involved obtaining funds from investors to purchase and rehabilitate distressed single-family homes (the "Single-Family Business") in the South Bend, Indiana area, then re-selling the properties and paying investors.  Bontrager found homes to purchase and rehabilitate, and Gingerich maintained 5 Star Investment Group's books and records.

To attract investors, Gingerich and Bontrager arranged for 5 Star Investment Group to issue short-term, interest-only, notes to investors, with interest rates far exceeding the prevailing rates for bank deposits, certificates of deposits and other fixed-return investments at the time. The notes were to be secured by mortgages on the homes 5 Star Investment Group purchased. Five Star Investment Group would then lease the homes to buyers who did not qualify for conventional financing and work with the buyers to improve their credit to ultimately finance and purchase the homes. Five Star Investment Group would charge a substantial fee to the prospective buyer for the option to purchase the home, which would be applied to the home's pre-determined sale price. However, the prospective home buyer's rent would not be applied to the purchase price of the home. Whenever it sold a home to a buyer, 5 Star Investment Group would repay the investors from the sale proceeds and would retain any surplus.

Limitations imposed by state and federal securities laws posed problems for the business, however, as more investors were needed to fund acquisitions. In an attempt to comply with (or circumvent) such laws, Gingerich and Bontrager responded by creating a multitude of new affiliated entities[6] (the "5 Star Entities" or the "Entities") that would issue promissory notes under a certain dollar amount to a limited number of new investors. However, in many circumstances, the investors' funds were then loaned by that company to a different 5 Star Entity, which would use the funds to make new real estate investments and to cover the Entity's operating costs.

Many of the 5 Star Entities which issued notes to investors had few if any assets other than notes receivable from other Entities.[7] In addition, the 5 Star Entities never registered the promissory notes it issued to its investors with the appropriate state and federal agencies. The Trustee's investigation indicates there was little to no meaningful distinction between companies, with many of them operating as each other's managers; funds and assets freely flowed back and forth between them, usually through undocumented inter-company loans.

### B.    Earl Miller and Gingerich Become Partners

In December 2008, Gingerich and Bontrager contacted Earl Miller ("Miller") to assist with raising funds for 5 Star Investment Group. Like Gingerich, Miller was of Amish descent, with extensive ties and contacts with the local Amish community, which he had left in his teens. Miller had no experience in financial services or investment management, but had worked in the

---

[6] In 2009, Gingerich, Bontrager, and Miller created 5 Star Investment Group II, LLC. In 2010, Gingerich and Miller created 5 Star Investment Group III, LLC, 5 Star Investment Group IV, LLC, 5 Star Investment Group I, LLC, and 5 Star Investment Group V, LLC. In 2011, 5 Star Investment Group VI, LLC and 5 Star Investment Group VII, LLC were created. In 2012, 5 Star Investment Group VIII, LLC and 5 Star Commercial, LLC were created. In 2013, 5 Star Investment Group IX, LLC and 5 Star Investment Group XI, LLC were created. In 2014, 5 Star Holdings, LLC, 5 Star Investing, LLC, 5 Star Indiana Holdings, LLC, 5 Star Portland Holdings, LLC, 5 Star Management Solutions, LLC were created. In 2015, National Real Estate Group LLC, A-Z Builders LLC, Multi Family Holdings LLC, 5 Star Fund I LLC, 5 Star Fund II LLC, and 5 Star Capital Fund LLC were created.

[7] The 5 Star Entities with no assets other than amounts receivable from other Entities did not file for bankruptcy. Moreover, while the 5 Star Entities' booked loans to other Entities as "notes receivable", it is likely that the intercompany loans were never formally documented.

real estate industry.  In late 2009, Miller purchased Bontrager's interest in the 5 Star Entities, after which Gingerich and Miller became equal partners, with Gingerich largely responsible for business operations and Miller performing marketing to investors, most of whom were Amish.

As before, the investments were promoted through promises of "double digit annual returns," with Miller encouraging Amish investors to transfer 401K and IRA accounts to the 5 Star Entities.  Because of his Amish connection, Miller was very successful at gaining the trust of – and recruiting investors from – the local Amish community.   He advertised his investment services in local Amish newspapers, touted his Amish heritage, and arranged community meetings with local Amish families where he made oral presentations and also gave prospective investors written marketing materials related to his companies, including a Private Placement Memorandum.  It appears that the marketing efforts also included unsolicited telemarketing calls to existing investors in which "finder's fees" were offered for signing up new investors. It was soon apparent that Miller's television, billboard and newspaper advertisements, combined with direct calls and solicitations, were extremely effective.  From 2009 through 2012, the 5 Star Entities, with Miller's help, raised approximately $12.1 million dollars.

C.    **Expansion of Business Activities**

Beginning in 2013, the 5 Star Entities expanded their business to include purchasing apartment complexes (the "Multi-Family Business") and expanded the Single-Family Business to include rehabilitation and sale of single family homes in Portland, Oregon.  In general, Gingerich developed and oversaw the Single-Family Business, and Miller did the same for the Multi-Family Business.  The 5 Star Entities raised approximately $13.6 million from investors in 2013 alone.

With regard to the Single-Family Business, one of the most substantial investments by the 5 Star Entities involved real estate development contracts for single-family homes entered into between the Debtors and Metro Homes Northwest, LLC ("Metro Homes") in 2014 and 2015, in which the Debtors loaned substantial sums to Metro Homes which were secured by deeds-in-trust for the properties being developed by Metro Homes in the Portland area (the "Portland Business").  In addition to loans made to Metro Homes, 5 Star also loaned lesser sums to West Coast Development, LLC ("West Coast") in Portland, and to NE 42nd LLC ("NE 42nd"), an Oregon limited liability company that was developing a commercial real estate project.

The Multi-Family Business involved offering investments in ten (10) multi-family apartment complexes ("Apartment Complex(es)"), primarily in North Carolina and Texas, described in more detail in Exhibit "2" hereto.  In most instances, the investors' funds were invested directly into a variety of limited liability companies, each of which purchased a particular Apartment Complex and the investors became members of the limited liability company.  The Apartment Complexes were managed by management companies that were associated with Earl Miller.  Two of the Apartment Complexes -- The Village Apartments of Charleston and Twin City Apartments in North Carolina -- were funded by investments made directly to the 5 Star entities, which in turn invested the funds (as minority owners) in entities which owned the Apartment Complexes. The majority owner of those entities was Southern Equity Group Trust, a trust established by Miller and Marlin Swartz.

8

D.    **The General Investment Process**

The investment process from one investor's perspective is described in detail in a Complaint that was eventually filed, on January 14, 2016, by one investor (Adamczyk) with the District Court for the Northern District of Illinois, entitled *Adamczyk v. Miller,* Case No. 1:16-cv-00516 (the "Adamczyk Action").

As described in that lawsuit, it appears the common investment scenario would start with advertisements and community meetings, after which investors would visit the companies' offices and sign up to invest. Most were allegedly told their money would only be invested in real estate, backed by first mortgages, and that Miller would receive no salary. *See* Complaint, ¶¶ 47-55, Adamczyk Action. Evidence suggests that some or all of these representations were often untrue. Investors would then be mailed a packet of documents, with instructions to sign, notarize and return them, as well as instructions to wire money to the company. They would typically receive a "Private Placement Memorandum" or "Disclosure Statement" relating to their investment, and a "Promissory Note" (the "Note") which provided for their signature as "Investor," and an affirmation by them that they had received the Private Placement Memorandum or Disclosure Statement and were either "accredited" investors by virtue of a net worth in excess of $1 million or income in excess of $200,000 per year, or that they were "sophisticated non-accredited" investors. Although the form of the Notes changed over time, it appears that none of the Notes made reference to collateral for the investments, but virtually all of them included the phrase "[y]our investment may be pooled with one or more investors to purchase the property." Furthermore, it appears that in some cases, Miller may have given preferred treatment to at least some investors. For example, the Trustee has reviewed e-mail correspondence which indicates that in one instance, a mortgage document was falsified in 2015 at an investor's request to make it appear that the mortgage had been given in 2011.

A majority of investors opted to receive a lower rate of interest in return for a promised mortgage on a parcel of real estate that would purportedly secure the investment. In most instances, however, numerous mortgages would be given to different investors for a single parcel of property, often for amounts totaling in excess of the property value. When the mortgages were recorded, the order of recording (and hence the legal priority for any such mortgage under state law) was essentially arbitrary. On occasion, a single mortgage or deed of trust would be issued to multiple Investors as "grantees," whose investments were "pooled" in connection with the transaction.

Based on the Trustee's review of claims filed in the bankruptcy cases, a total of approximately 148 investors received roughly 201 separate mortgages on 79 properties. Obviously many of the mortgages were not "first" mortgages. Based on the filed claims, only about 12 properties have only one mortgage. Approximately 19 properties have 2 mortgages, 27 properties are encumbered by three mortgages, and 16 properties have between 4 and 6 mortgages. There are no mortgages at all for five properties. Although most mortgage investors (roughly 109) each received one mortgage on one property, a number of investors received multiple mortgages, usually on different properties.[8]

---

[8] Based on the claims, 26 investors hold two mortgages on two separate properties, 8  investors

Furthermore, investors would commonly loan funds to one company, such as non-Debtor 5 Star Investment Group I, LLC, which would then transfer the funds to other companies. The Note would often be given by one company, and the purported Mortgage given by another; oftentimes, the Mortgage itself would not specify the name of the company which provided the Note which was allegedly being secured. Some investors would receive monthly payments of interest, although the payments would not necessarily be made by the same entity which owned the real estate. Income would be generated through rents received from tenants whose leases would include options for purchase. It is believed that in some instances, funds were invested in speculative ventures such as purported "green products," despite representations to investors that the funds would be used to purchase real estate. [9]

Evidence indicates that after interest payments were made to some investors for a period of time, many investors would often be asked – sometimes on many occasions – to release existing notes and roll principal investments over into new properties, held by different entities, in exchange for new promissory notes. The investment of the Plaintiff in the Adamczyk Action, for example, allegedly became associated with 10 different promissory notes. Adamczyk Action Complaint, ¶ 14, pg.3. The usual course of business would be for the investor to receive a phone call prior to expiration of a note, informing him a property had been sold off and asking if he wanted to roll over the principal into a new investment. The investor would agree, and the company would send him a satisfaction to be signed regarding the old note and a new note, often accompanied by another "placement memorandum" purporting to describe the investment offering. *Id.*, ¶ 58, pg.11. It does not appear that any effort was made to insure that the legal priority of any mortgage allegedly securing the new note would be consistent with the priority of any previous mortgage and note given to an Investor.

### E.    Miller's Buy-Out of Gingerich and Dispute with Metro Homes

In May 2014, Gingerich approached Miller about purchasing Gingerich's half-interest in the 5 Star Entities. After negotiations, on July 29, 2014, Miller and Gingerich entered into a "Unit Purchase Agreement" (the "UPA") in which Miller agreed to purchase Gingerich's interest in the 5 Star Entities for $2.5 million. After July 2014, it appears Miller exercised exclusive control over all of the companies, and that there were no other officers, managers or boards of directors, and Miller was the only authorized party for the Debtors' bank accounts.

Although the UPA required Miller to personally make payments to Gingerich over the course of ten years, the Trustee believes that Miller improperly used 5 Star Entities' funds to pay Gingerich, and that both he and Gingerich used funds from the businesses (including investor funds) for their personal benefit in other ways. These alleged improper transfers are the subject of a settlement reached with Gingerich and pending litigation against Miller, as discussed in

---

hold three mortgages on three separate properties, and one investor holds four mortgages on four separate properties. One investor holds 5 mortgages on 5 separate property and 3 investors hold two mortgages each with respect to one single property.

[9] The facts described in this paragraph were generally described by Earl Miller after the bankruptcy filing in the Debtors' consolidated Meeting of Creditors under 11 U.S.C. § 341 on February 29, 2016.

Sections V(C) and V(D) below.

Around the same time Miller was using company funds to buy out Gingerich, a dispute arose with Metro Homes with regard to the Portland Business, which resulted in the filing of a lawsuit by Metro Homes in August, 2016 in an Oregon district court, Case No. 3:15-cv-01680-PK (the "Metro Homes Litigation"). The Debtors in turn filed counterclaims against Metro Homes. A receiver was appointed by the Oregon district court to sell the properties owned by Metro Homes, creating a fund for payment of claims, including those asserted by the Debtors.

### F.    The Venture Investments

After Miller bought out Gingerich's interest in the 5 Star Entities, Gingerich remained as a consultant for two months to train the Entities' new bookkeeper, Gilbert Michel. Michel, however, was unable to reconcile the 5 Star Entities' accounting records. Miller fired Michel in late 2014 or early 2015 and briefly attempted to maintain the 5 Star Entities' book himself before hiring two individuals with little or no bookkeeping experience.

Between February and July 2015, Miller made a series of loans and other investments (the "Venture Investments") through the Debtors 5 Star Capital Fund, LLC ("5 Star Capital") and 5 Star Commercial to several entities controlled by Julius Toth ("Toth") and Robert Foraker ("Foraker"). Toth and Foraker's companies purported to specialize in "green" and "energy saving" products. Despite transferring nearly $2.2 million to Toth and Foraker's companies, Miller performed virtually no due diligence on the Venture Investments. Further, to date, Miller's Venture Investments through 5 Star Capital and 5 Star Commercial to Toth and Foraker's companies have yielded no returns. Gingerich has indicated that he too invested in Toth and Foraker's companies.

### G.    Global Impact Audit, the SEC Lawsuit, and Bankruptcy Filing

In July 2015, Miller hired Global Impact Companies LLC ("Global Impact") to conduct an internal audit of the 5 Star Entities. Soon thereafter, Global Impact ceased the 5 Star Entities' fund raising activities and quickly determined that the Venture Investment had little substance and would not provide any income or cash flow to the 5 Star Entities. Global Impact also found that the Single-Family Business was not and could never be profitable because it generated very little revenue and consumed large amounts of cash. Global Impact came to a similar conclusion regarding the Portland Business as well. While Global Impact did find that the Multi-Family Business was profitable, it concluded that the business would not generate any income for the 5 Star Entities unless the apartments were sold five to seven years in the future. Global Impact ultimately concluded that, because the 5 Star Entities' day to day operations could not generate income until two to seven years in the future, it was never possible for the Entities to exist as a going concern from their inception. Global Impact was paid approximately $800,000 in the course of two months, which the Trustee contends was far in excess of the value of any services it provided, under two contacts which required up-front payments totaling $300,000 and monthly payments of at least $70,000. *See* "Causes of Action" described in Section V(D) below.

In October 2015, Miller also learned that he and the 5 Star Entities were under investigation by the United States Securities and Exchange Commission (the "SEC").  In November, the Federal Bureau of Investigation (the "FBI") raided the 5 Star Entities' offices. On November 5, 2015, the SEC filed a lawsuit against Miller, 5 Star Commercial and 5 Star Capital Fund, LLC ("5 Star Capital Fund") for violations of the Exchange Act, 15 U.S.C. § 78a et seq., and the Securities Act, 15 U.S.C. § 77a et seq. which is pending as Case No. 15-cv-00519 in the United States District Court for the Northern District of Indiana (the "SEC Action"). In November 2016, the SEC amended its complaint to include Gingerich as a relief defendant.

Under pressure from the SEC Action, the Adamczyk Action, and the Metro Homes Litigation, on January 25, 2016, Miller filed petitions for relief for the Debtors under Chapter 11 of the Bankruptcy Code in the Northern District of Indiana.  On February 29, 2016, the Trustee was appointed as the Chapter 11 trustee for the Debtors.  On June 24, 2016, the Debtors' bankruptcy cases were consolidated under Case Number 16-30078-hcd.

In broad terms, from 5 Star Investments Group's inception in 2007 by Gingerich and Bontrager until the bankruptcy filing nine years later when Miller was the sole owner, the 5 Star Entities raised approximately $54.5 million from investors and returned to them only about $17.5 million.

The Trustee's objective is to efficiently assess and liquidate the remaining assets – including causes of action against the insiders – and to equitably distribute the proceeds to investors, who hold the overwhelming majority of claims in both number and amount.

## IV.  THE DEBTORS' ASSETS AS OF THE PETITION DATE

Thus far, a number of the Debtors' significant assets, including the claims against Metro Homes, have been liquidated by the Trustee as discussed in Article V(B) below.  As of the Petition Date, however, none of the assets had been liquidated, and most were owned by four of the Debtor companies –  5 Star Investment Group, LLC ("Group"), 5 Star Investment Group V, LLC ("5 Star V"), 5 Star Commercial, LLC ("Commercial") and 5 Star Capital Fund, LLC ("Capital").

According to the bankruptcy schedules prepared by the Debtors with the assistance of Global Impact, the basic assets held by the companies on the Petition Date (excluding inter-company loans which are no longer relevant because of substantive consolidation of the cases) were as follows:

| | |
|---|---|
| Group | Claims against Metro Homes arising from Notes with estimated value as of the Petition Date of $4-5 million secured by real estate in Portland, Oregon;<br><br>14 residential properties subject to numerous mortgages given to investors<br><br>A minority interest in an LLC which owns an apartment building.  The schedules list the value of the LLC interest at $55,303.50, although such value may be difficult to realize due to the fact that Group owns a minority interest. |
| 5 Star V | 41 residential properties with an estimated value of $2,165,100, subject to numerous investor mortgages estimated at $2.8 million. It appears that only 7 of the 41 properties may have equity, estimated at $255,417; |
| Commercial | An unencumbered property with an estimated value of $298,500;<br><br>Minority interests in 6 LLCs which own apartment buildings all over the country.  The schedules list the value of the LLC interests at $1,345,000, although it was assumed on the Petition Date that value may be difficult to realize due to the fact they are minority interests;<br><br>Receivables from loans made by Commercial to apartment building entities that are different from the entities in which Commercial owns an interest.  The loans were scheduled at a combined value of $1,763,595;<br><br>Receivables from loans made by Commercial to a related entity, estimated at $250,000 |
| Capital | Claims in the "face amount" of about $1.7 million arising from unpaid investments in "green" start-up companies and/or receivables, although many such investments were believed to be uncollectible. |

Two other Debtors – 5 Star Investment Group II and 5 Star Investment Group III – owned mortgaged real estate (10 and 8 properties, respectively) with respect to which it appears clear there is no potential equity.  Apart from those mentioned above, all of the other Debtor companies had no tangible assets, with the exception of inter-company loans made to other Debtors (which are made irrelevant by substantive consolidation) and non-Debtors (which will be described in more detail below).

## V.  EVENTS DURING BANKRUPTCY

### A.    Appointment of Trustee and Substantive Consolidation

At the time the bankruptcy petitions were filed, the Debtor companies were operating without any property insurance or general liability insurance, and were being sued in state court by several investors, and in federal courts in the SEC Action and the Adamczyk Action. Miller testified at the first meeting of creditors that insurance was permitted to lapse a month or two before the filing because it came down to a decision between paying for the bankruptcy or paying premiums, because rental income was insufficient to do both.

Because of these facts and other concerns of creditors, soon after the filing, on February 9, 2016, the United States Trustee ("UST") filed an *Emergency Motion for an Order Directing the Appointment of a Trustee or, in the Alternative, Conversion to Chapter 7, and Request for an Expedited Hearing on the Motion* (the "UST Motion"). Following a February 16, 2016 hearing on the UST Motion, the Court entered an Agreed Order granting the UST Motion.

Thereafter, the Trustee was appointed as the Chapter 11 Trustee in each of the Bankruptcy Cases on February 29, 2016, and on March 23, 2016 the Bankruptcy Court entered an Order consolidating the Debtors' bankruptcy cases for purposes of administration only. Approximately one month later, on April 21, 2016, United States Trustee Nancy J. Gargula also filed her *Notice appointing a Committee of Unsecured Creditors* (the "Committee"). The Bankruptcy Court subsequently approved employment of Hammerschmidt, Amaral & Jonas as Counsel for Official Committee of Unsecured Creditors.

Subsequently, on May 18, 2016, the Trustee filed a motion for *substantive* consolidation of all the bankruptcy cases pursuant to Bankruptcy Rule 1015 and 11 U.S.C. § 105(a), seeking authority to combine all assets and liabilities of the various entities as if they were a single entity, on the grounds that formal corporate distinctions had never been observed when the companies were operating, it would be cumbersome if not impossible to sort out numerous inter-company transfers and loans, and because consolidation of assets and liabilities would facilitate equitable treatment of claims by insuring similar treatment of similar claims.  Absent consolidation, arbitrary differences in the companies' balance sheets could result in very different treatment of substantially similar claims.  As stated in the Trustee's motion:

> Without substantive consolidation, a small number of investors would receive arbitrarily large distributions while many other similarly-situated creditors would receive little or nothing – the difference being due almost entirely to happenstance and the manner in which Miller moved funds between companies.  Furthermore, absent consolidation, much of the value that might be realized for creditors would be lost due to substantially higher administrative costs and inability to insure and maintain assets of some companies.

On June 24, 2016, the Bankruptcy Court; approved an *Agreed Order Granting Trustee's Motion for Substantive Consolidation* (the "Consolidation Order") (Docket No. 340),

consolidating all assets and liabilities of the bankruptcy estates into one bankruptcy estate, effective as of January 25, 2016, while preserving all powers, rights, claims and interests of the Trustee and the Bankruptcy Estates, including all Chapter 5 and Chapter 7 powers and rights under the Bankruptcy Code. Consolidation Order, ¶¶ 3-6. In order to administer the Debtors' properties and in anticipation of liquidation sales of the real estate assets, the Trustee sought and obtained court approval to employ Hazelton Properties, LLC as the Bankruptcy Estates' Property Managers and Tiffany Group Real Estate Advisors, LLC as the Bankruptcy Estates' Broker; and employment of Recommind Inc. as the estate's Data Management Company.

Following entry of the Consolidation Order, the Trustee has been engaged in the process of liquidating estate assets, and settling or litigating claims held by the consolidated bankruptcy estate, with the assistance of professionals retained by the Trustee with approval by the Bankruptcy Court. Efforts to date are described below.

### B.    Settlement with Metro Homes

The most significant liquidation action to date has been settlement and recovery of over $5 million with regard to the estate's claims against Metro Homes. This settlement was approved by the Bankruptcy Court on August 15, 2016 and by the Oregon District Court on August 26, 2016.

As noted above, the Debtors had previously made loans to developer Metro Homes which were secured by deeds-in-trust on Portland real estate.  During litigation between the Debtors and Metro Homes in an Oregon district court, Case No. 3:15-cv-01680, a receiver was appointed to sell the real estate, resulting in a sale and collection of proceeds by the receiver of approximately $5.2 million as of June of 2016.  On July 5, 2016, the Trustee filed a motion in this bankruptcy case, seeking approval of a settlement with Metro Homes, which was ultimately approved.

The settlement negotiated by the Trustee provided for payments to this bankruptcy estate of:  (1) an initial amount of $5 million; plus (2) 25% of additional net proceeds from sales of Metro Homes property until Metro Homes has received a total of $650,000; plus (3) 100% of net sales proceeds recovered by the Metro Homes receiver from sale of its properties after $650,000 has been paid to Metro Homes.

As a consequence of the settlement, the estate has received $5,115,238.43 generated by the sale of the Portland real estate.

### C.    Real Estate Sales, Additional Settlements, and Other Liquidation Efforts to Date

- Thus far, in addition to the $5 million settlement of the estate's claims against Metro

Homes, the Trustee and his professionals have engaged in prosecution and settlement of additional estate claims, and have sold a number of properties owned by the Debtors in sales and settlements either approved by the Bankruptcy Court or awaiting such approval, which have generated gross proceeds in excess of $2.5 million.  These include: Sales of real estate and personal property as summarized in Exhibit "1" hereto;

- Receipt of proceeds of $279,470.39 from sale of properties by West Coast Development, LLC that secured loans made to that company by 5 Star;

- Settlement approved by the Bankruptcy Court on April 25, 2017 of the estate's claims against NE 42nd LLC, by the proposed payment by that company of $212,593.87 on or before January 20, 2018, withdrawal of that company's claim of $225,000 in the 5 Star bankruptcy, and mutual releases;

- Mediation and settlement of the estate's claims against Gingerich, as approved by the Bankruptcy Court on November 16, 2017, pursuant to an agreement[10] under which the Trustee has received $150,000 and Gingerich agreed to make additional contingent payments that may generate between $50,000 and $100,000 in additional payments to the estate, conditioned on the amount Gingerich may be repaid from money he loaned to Grand Products, LLC, and how quickly he makes payment to the estate.

- Recovery and sale for $129,000 of property at 23401 Amber Valley Drive in South Bend, Indiana which had been transferred by Earl Miller for no consideration prior to the bankruptcy, in a transaction that was not disclosed in 5 Star's bankruptcy statement of financial affairs;

- Settlement for $110,000 of estate claims against law firm Cozen O'Conner for pre-petition and post-petition payments for services alleged to be avoidable under bankruptcy law, as approved by the Bankruptcy Court on January 10, 2018;

- Settlement and sale of the estate's Multi-Family investment interest in Trent Holdings, LLC, owner of Avalon Trace Apartments and Timber Hollow Apartments in Greensboro, North Carolina for $275,000, payable in two years with interest only payments in the interim;

- Settlement of preference and other claims against Marlin H. Schwartz under settlement agreement approved by the Bankruptcy Court on July 18, 2017 by Mr. Schwartz's

---

[10] Specific details of the settlement, which was based in large part on the Trustee's assessment of the estate's ability to collect from Gingerich, are set forth in the Settlement Agreement which accompanies Document #892 filed with the Bankruptcy Court on July 27, 2017, as modified by stipulations filed as Document #982 on September 15, 2017 and Document #1061 on November 9, 2017.

payment of $125,000 and an additional $39,800 to be paid by June 29, 2018;

- Settlement of Adversary case 16-03049 for recovery of fraudulent transfers filed against defendants Servants of the Street Ministries, Inc. and Mario L. Villela, pursuant to which those parties paid the estate $9,000 additional consideration for real estate that was sold by 5-Star under a 2013 land contract.

- Sale of the estate's Multi-Family investment interest in GVS Sungate Villas, LLC for $49,607.41;

- Prosecution of additional Causes of Action as described in section V (D) below.

### D.    Bankruptcy "Avoidance" Lawsuits and other Causes of Action

Thus far, the Trustee has also commenced 6 lawsuits on behalf of the estate asserting various causes of action ("Causes of Action" under the Plan), including suits demanding return of property which was transferred by the Debtors before the bankruptcy which may be recoverable under bankruptcy law, and various other relief. Under applicable law, including 11 U.S.C. § 548 of the Bankruptcy Code, a bankruptcy estate may recover the value of property which was transferred to persons or companies within a time period up to four years before the bankruptcy filing if the Debtor "transferor" was insolvent when the transfers were made and did not receive reasonably equivalent value in return for the transfers, or if the transfers were made with actual fraudulent intent. A number of such suits have already been filed against various parties, including Miller.

Following settlement of Adversary Case No. 16-03049 against defendants Servants of the Street Ministries, Inc. and Mario L. Villela discussed above, the five lawsuits which remain pending at this time are:

- Adversary case 17-03032 against Global Impact Companies, LLC; Cozen O'Connor;[11] Bocklund, LLC; and Adam LaFavre seeking recovery of alleged fraudulent transfers and preferential payments totaling in excess of $800,000;

- Adversary case 17-03036 against Earl Miller seeking recovery of nearly $1.6 million for distributions paid to Miller by insolvent 5 Star companies – most of which was used to buy out Gingerich's ownership interest – and over $2.2 million for alleged pre-petition breach of fiduciary duties, including investments in highly speculative business ventures, and $20 million for alleged breach of

---

[11] As noted previously, a $110,000 settlement has been reached with respect to the claims asserted in this litigation against law firm Cozen O'Conner, which was approved by the Bankruptcy Court on January 10, 2018.

fiduciary duties owed to the bankruptcy estate.

- Adversary case 16-03031 for recovery of fraudulent transfers and turnover against Defendants 3D Holographics Medical Imaging, Inc., 7 Heavens, LLC d/b/a Ecowasher, Associated Countries in Technology International Incubator, Inc., Eco II Ecowash, LLC, Green Resource Homes, Inc., H&H Real Estate Holdings, LLC, Julius Toth, Pedal Wheelchair, LLC, Robert A. Foraker, as Trustee of the Green Resource Homes Financial Trust for the Benefit of Julius Toth, Robert A. Foraker on July 13, 2016;

- Adversary case 17-03025 for recovery of fraudulent transfers and declaratory judgment against Southern Equity Group Trust and TC Commercial, LLC, seeking recovery of an 85.25% interest in a South Carolina limited liability company which owns Village Apartments of Charleston in Moncks Corner, South Carolina;

- Adversary Case 17-03038 for recovery of alleged fraudulent transfers in excess of $317,000 from Z-Ministries, Inc., and in excess of $5,600 made to Joseph J. Zupetz.

It is anticipated that additional Causes of Action may be filed as the Trustee and his professionals continue to investigate and review the Debtors' financial affairs and transactions which occurred prior to the Petition Date.

## VI. CURRENT ASSETS
### AND POTENTIAL DISTRIBUTIONS TO CREDITORS

As of January 31, 2018, the funds on hand were $6,713,445.12, following sales of properties, collection of rents, and payment of administrative expenses such as taxes and professional's fees in the bankruptcy case, as shown by the Trustee's *Operating Report* filed with the Bankruptcy Court on February 15, 2018.

To date, the Trustee has closed on sales of sixty-one (61 residential properties for gross proceeds of $2,112,000, and on a $410,000 sale of the Debtor's one commercial property at 3131 Grape Road in Mishawaka, IN, resulting in total gross proceeds for all of the sales of $2,522,000. In addition, as of the writing of this Disclosure Statement, the Trustee also has 1 additional sale of a residential property that has been approved by the Bankruptcy Court, which is expected to result in recovery of an additional $61,845 in gross proceeds, which would bring the total gross proceeds to $2,173,845. Details of all of the closed sales are contained in the Reports of Sale filed with the Bankruptcy Court, as summarized in Exhibit "1" hereto. As of the date of this Disclosure Statement, there are 16 additional residential properties held by the estate which have

not yet been sold, which are listed for sales prices totaling approximately $690,000.

The funds currently held by the Trustee are net of approximately $1.6 million in statutory charges, commissions, fees and expenses of estate administration previously approved by the Bankruptcy Court and paid by the Trustee. These include statutory fees and reimbursable expenses of the Trustee of $321,536.03; fees and reimbursable expenses of counsel for the Trustee of $987,398.59; fees and reimbursable expenses of the estate's accountants of $83,955.55, and fees and reimbursable expenses of the Committee of creditors of $109,817.10. Other administrative expenses paid by the Trustee to date include real estate sales commissions of $157,438.40, required bond costs for the Trustee of $35,937.00, and statutory fees payable to the United States Trustee of $25,676.40.

A.      **Claim Objections and Adjustments**

As noted, creditor claims totaling $29 million in amount have been filed in the bankruptcy cases.  The Trustee believes, however, that in this case as in most bankruptcy proceedings, that number will be significantly reduced when claims are adjusted to account for duplicate claims, claims that are not owing, claims that have not been accurately computed, and other grounds for objection. Actual initial Distributions to individual Creditors will not be determined until after Confirmation and after resolution of any disputed Claim amounts. Under the Plan, all disputes regarding claim amounts will be resolved by the Bankruptcy Court if the parties are unable to reach agreement. Furthermore, Allowed Administrative Expenses Claims may be higher or lower than the estimated amounts.

At this point, the filed claims have not been reviewed in sufficient detail to permit the Trustee to accurately estimate the amount of potential reductions in claim amounts,  nor has the Trustee yet compared the filed Proofs of Claim to the amounts shown on the Debtors' bankruptcy Schedules.  The Trustee anticipates that objections will be made where investors have not filed timely Proofs of Claim or where the Proof of Claim:

- Does not contain adequate documentation (except where the creditor was listed on the Debtors' Schedules as having an undisputed, non-contingent claim for the same or a higher amount, in which event the Trustee would not object to the amount listed on the Schedules);

- Includes interest charges for more than six months before the Petition Date, in light of evidence which indicates that interest was paid to investors up until six months before the bankruptcy filing;

- Includes late charges or attorney's fees;

- Is for a debt the Trustee believes is collectible from a non-filing apartment entity

19

which is liable for the same debt.

Generally speaking, the Trustee does not anticipate objecting to claims under $1,000.

The Trustee anticipates that the process of filing objections to claims will start soon, and will continue during the process of obtaining court approval of a disclosure statement, voting on the Plan, and confirmation of the Plan, so that as many potential objections as possible have been resolved before the Effective Date of the Plan and the Initial Distribution under the Plan.

### B.    Initial Distribution

Under the Plan, an Initial Distribution of $5 million would be made to unsecured creditors on the Distribution Date (approximately 60 days after the Effective Date of the Plan), based on conservative estimates of amounts needed for continuing expenses, reserves for disputed claims, and anticipated professional and other administrative claims.[12] Any Creditor with an Allowed Unsecured Claim whose claim is not objected to, or if objected to but ultimately allowed by a Final Order of the Court, would receive a *Pro Rata* share of Initial Distribution.

As noted, in addition to the $5 million Initial Distribution, the Trustee anticipates that as funds are recovered from sales of additional properties and prosecution and collection of Causes of Action, there may be supplemental Distributions to Creditors with Allowed Claims. Not surprisingly, it is difficult to accurately predict the additional amounts that may be recovered from further sales of property and prosecution of pending or future lawsuits. As noted earlier, there are numerous additional properties to be sold, and currently five pending lawsuits being prosecuted by counsel for the Trustee.

## VII.  MATTERS WHICH AFFECT CONFIRMATION OF THE PLAN

### A.    The Trustee Anticipates the Plan will be Accepted by the Required Classes of Creditors

Under the Bankruptcy Code, the Plan may be confirmed if proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code, and (1) all Impaired Classes of creditors vote to accept the Plan; or alternatively, if requested by the Trustee under 11 U.S.C. § 1129(b)[13], if (2) all Impaired Classes of claims do not accept the Plan but at least one class of

---

[12] Based on the funds on hand as of February 13, 2018, there would be approximately $1.7 million remaining after the Initial Distribution as reserves for payment of disputed claims and new administrative claims, with any remaining balance to be paid in Subsequent Distributions.

[13] In the Plan, the Trustee has requested that the Court confirm the Plan, if necessary, under 11

claims that is impaired votes to accept the Plan and certain other conditions specified in the Code have been met.  All of the Classes 1-3 are impaired under the Trustee's Plan, and hence the Trustee will solicit acceptances of the Plan from the members of all such classes.

For purposes of counting class votes, the Bankruptcy Code states that a Class of claims is said to have accepted the Plan if, of the ballots cast by creditors within that Class, creditors holding at least two-thirds (2/3) in amount and more than half (1/2) in number of the allowed claims vote in favor of the Plan.  Only creditors who *actually cast ballots* are counted for these purposes, so if you are satisfied with the Plan's treatment of your claim, your vote in favor of the Plan is important. *Holders of Claims or Equity Interests who fail to vote are not counted as either accepting or rejecting the Plan.*

Apart from the small number of Real Estate Secured Tax Creditors (to be paid promptly after the Effective Date), most of the creditor claims in the case are held by Investors, all which would be treated in the same fashion as unsecured claims under the Plan, by *pro rata* payment with respect to each holder's Allowed claim.  The Trustee believes this is the most fair and equitable approach with respect to Investor claims, and will be broadly accepted by holders of Class 2 claims, notwithstanding the fact that some Investors have received mortgages or deeds of trust purportedly securing their investments and have filed ostensible "secured" proofs of claim.

### B.    Reasons for Treatment of All Investor Claims as Unsecured Claims of Equal Priority

1.    "Equality is Equity" Among Similarly-Situated Investors

As a general rule, when property is sold in a bankruptcy, claims which are secured by liens on such property must ordinarily be paid first from the proceeds of sale before any payment is made to holders of "unsecured" claims.  With some exceptions, this is the approach required by the Bankruptcy Code, except where the affected creditors voluntarily agree to different treatment.  In the 5-Star cases, the issue is relevant for some properties, because some Investors have filed claims which purport to be secured by mortgages on those parcels.  The potential issue does not arise, however, for sales of assets with respect to which no liens have been asserted, such as parcels for which no Investor mortgages were filed, and settlements from pending lawsuits, including the over $5 million settlement of the Metro Homes litigation.

For a variety of reasons, however, the Trustee's Plan proposes to treat all Investors *equally* with respect to liquidation of *all* assets – regardless of whether some claims purport to be secured by mortgages -- an approach which the Trustee believes will be accepted by affected creditors, is the most fair and equitable approach under the unique circumstances of the case, and will avoid what would otherwise be a massive and wasteful dissipation of estate assets by

---

U.S.C. § 1129(b).

attorney's fees and expenses associated with litigation over the validity and priority of each alleged mortgage.

In choosing to place all Investors in a single unsecured Class, despite the existence of alleged mortgages on some properties, the Trustee believes it would be fundamentally unfair if the bankruptcy distributions received by individual Investors were to be radically different, depending on the particular happenstance in which their investments were utilized by the Debtors in what was essentially a large *Ponzi* scheme. As noted earlier, Investors would commonly loan funds to one company, such as non-Debtor 5 Star Investment Group I, LLC, which would then transfer the funds to another entity. Oftentimes, the 5 Star company which signed the Note would be different from the entity which owned the real estate. Thereafter, Investors would often be asked – sometimes on many occasions – to release existing notes and to "roll over" principal investments into new properties, held by different entities, in exchange for new promissory notes. The Trustee is aware of at least one instance – and there could be more – in which a mortgage was falsified in 2015 by a debtor at the request of a creditor to make it appear the mortgage had been given in 2011. Even attempting to sort out the relevant facts for all the properties would be a time-consuming and expensive process. Litigation relating to these and similar issues also would likely delay any distributions – potentially further reducing property values – while significantly increasing priority claims for costs of administration of the estate.

Most, if not all, Investors were told their money would only be invested in real estate, backed by first mortgages. In reality, however, only about 37% of the alleged 201 mortgages were actually "first" mortgages – something which often simply depended on which mortgage was recorded first by the Debtor company – and very often the funds invested were not used to acquire the particular property, or even by the company which owned the property. In virtually all instances the value of the mortgaged property was less than the amount of all mortgages on the property, and in most instances value was less than even the amount of the "first" mortgage. Based on sales to date and estimates of value, less than 12% of the alleged mortgage claims would be paid in full. Of the alleged mortgage claims $5,732,613.78, over $4 million in claims would receive *no* distribution.

Because of its efficiency and fairness, a pro rata distribution of assets to all investors is the approach typically proposed by court-appointed receivers in *Ponzi* scheme cases prosecuted by the SEC. Addressing the proposal in one such case involving facts similar to those here, the Seventh Circuit has observed that courts "have routinely endorsed pro rata distribution plans as an equitable way to distribute assets," particularly where funds are commingled and investors are similarly situated. *SEC v. Wealth Mgmt.,* 628 F.3d 323, 333-334 (7th Cir. 2010) (approving receiver's plan which treated all investors the same, even though only some had elected to "redeem" their investments). *See also, e.g., United States SEC v. Hyatt,* 2016 U.S. Dist. LEXIS 63347, 3-4 (N.D. Ill. May 13, 2016); *SEC v. Sunwest Mgt,* 2009 U.S. Dist. LEXIS 93181 (D.

Oregon 2009; S*EC. v. Capital Consultants,* LLC, 397 F.3d 733 (9th Cir. 2005); *SEC v. Credit Bancorp., Ltd.,* 290 F.3d 80 (2nd Cir. 2002).

In such cases, because assets have been commingled and corporate formalities disregarded, tracing principles need not (and cannot) be meaningfully applied to determine a distribution plan. *Commodity Futures Trading Comm'n v. Eustace ,*CIV.A. 05-2973, 2008 WL 471574 (E.D. Pa. Feb. 19, 2008) (citing *Cunningham v. Brown,* 265 U.S. 1, 13, (1924); *United States v. 13328 & 13324 State Highway 75 N.,* 89 F.3d 551, 553 (9th Cir. 1996) ("tracing fictions" should not be utilized under circumstances involving multiple victims and commingled funds). Generally, the receivership court, sitting in equity, will favor plans that distribute assets to the investor victims, on an equal *pro rata* basis, on the theory that each was a victim of the scheme.  As stated by the Sixth Circuit in *Quilling v. Trade Partners, Inc.,* 572 F.3d 293, 298 (6th Cir. 2009), "'equality is equity' as among 'equally innocent victims.'" In *Quilling,* the court approved a receiver's plan for pro rata distribution to persons who purchased interests in life insurance policies on terminally ill individuals, "regardless of whether the holder of the Allowed Claim is designated as an assignee of an interest or as an irrevocable beneficiary of a particular insurance policy or as having a collateral security interest or otherwise." *Id.* at 297. In similar situations, "pooling the receivership assets and distributing then on a pro rate basis is well supported. . . ." *Id.*  at 301, citing *SEC v. Basic Energy & Affiliated Res.,* 273 F.3d 657 (6th Cir. 2001); *S.E.C. v. Credit Bancorp, Ltd.,* 290 F.3d 80, 88 (2d Cir. 2002).

As stated by the Illinois District Court in the 2016 *Hyatt* case:

"[A] receiver devising a distribution plan is not required to apportion assets in conformity with misrepresentations and arbitrary allocations that were made by the defrauder, 'otherwise, the whim of the defrauder would . . . control the process that is supposed to unwind the fraud.'" (quoting *In re Bernard L. Madoff Inv. Sec. LLC,* 654 F.3d 229, 238 n.7 (2d Cir. 2011)). Calculating distributions based on the investor contracts would be particularly unfair in this case, as it would result in some investors receiving more money than others simply because the fraudulent contract they signed entitled them to a greater return on their investment. *S.E.C. v. Byers,* 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009) (finding that alternatives to pro rata distribution would "create unfair results by rewarding certain investors over others based on arbitrary factors," such as investment risk).

*Hyatt,* 2016 U.S. Dist. LEXIS 63347, 32-33 (N.D. Ill. 2016), quoting *Commodity Futures Trading Comm'n v. Walsh,*  712 F.3d 735, 749 (2d Cir. 2013).  The Court has broad authority to craft remedies for violations of the federal securities laws. *SEC v. Byers,* 637 F. Supp. 2d 166, 174 (S.D.N.Y. July 23, 2009), citing *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,* 467 F.3d 73, 81 (2d Cir. 2006); *SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir. 1997). Courts have held that within that broad authority lies the power to approve a plan of distribution proposed by a federal receiver. *See SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 82-83

(2d Cir. 2002) (affirming approval of distribution plan as "within the equitable discretion of the District Court"); *SEC v. Wang,* 944 F.2d 80, 88 (2d Cir. 1991); *see also SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 332 (5th Cir. 2001) ("Because we find that the district court did not abuse its discretion when it approved the Receiver's plan, we AFFIRM."). The Court has the authority to approve any plan provided it is "fair and reasonable." *Wang,* 944 F.2d at 81 (distribution plan should be "reviewed under [the District Court'] general equitable powers to ensure that it is fair and reasonable"); see also *SEC v. Enter. Trust Co.,* No. 08 Civ. 1260, 2008 U.S. Dist. LEXIS 79731, at *10 (N.D. 111. Oct. 7, 2008) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

It has also been noted that alternatives to pro rata distribution that have been proposed would often create unfair results by rewarding certain investors over others based on arbitrary factors. Cf. *Credit Bancorp,* 290 F.3d at 89 (noting that, in Ponzi schemes, "whether at any given moment a particular customer's assets are traceable is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first'") (*quoting United States v. Durham,* 86 F.3d 70, 72 (5th Cir. 1996)). Tracing analysis -- proposed by a number of objectors -- in particular has been almost universally rejected by courts as inequitable. *See, e.g., United States v. 13328 & 13324 State Highway 75 N.,* 89 F.3d 551, 553 (9th Cir. 1996) (holding that tracing would "frustrate equity"); *Durham,* 86 F.3d at 73 (holding that "following the tracing principle would be inequitable"); *SEC v. Elliott,* 953 F.2d 1560, 1569 (11th Cir. 1992) (rejecting tracing as inequitable).

Although the cited cases involve receiverships rather than bankruptcy liquidations, the Seventh Circuit has observed that "[t]he goal in both securities-fraud receiverships and liquidation bankruptcy is identical – the fair distribution of the liquidated assets." *Wealth Mgmt,* 628 F.3d at 333.  Where, as here, an SEC enforcement proceeding and bankruptcy law overlap, a party in interest in the bankruptcy case could even seek withdrawal of reference from the Bankruptcy Court under 28 U.S.C. § 157(d), which provides that the district court "shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding require consideration of both title 11 and other laws of the United States. . . ." It is noteworthy, in this context, that the Complaint in the SEC Action filed in this case sought trial by jury over its claims for relief which included disgorgement by the Debtor of funds allegedly obtained by fraud.

2.    Forensic Accountant Report Supports Findings Debtors Committed Fraud and Conducted Ponzi Scheme On Investors

The facts known about the Debtors' operation of the 5 Star Entities in the present case shows the same commingling of assets and *Ponzi* scheme attributes which have prompted courts to seek equitable solutions in the cases discussed above.

24

As part of his investigative due diligence, the Trustee hired BGBC, LLP ("BGBC"), forensic accountants to review the Debtors' books and records to determine whether the operations were conducted as a Ponzi scheme.  Efforts were initially hampered by the Debtors' lack of relevant records. However, the Trustee was able to obtain records from banks, spreadsheets from the SEC and other supporting documentation for use by the accountants.

Following its review, BGBC and its principal accountant, Howard I. Gross, CPA, ABV, CFF, CFP issued a Report which concluded in pertinent part:

> [T]he analysis of the cash transactions of the Debtor entities reflects not only a dependency on the other Debtor and non-Debtor entities but also *material inappropriate transfers of investor funds among Debtor and non-Debtor entities*. The analysis shows the Debtor entities *were highly reliant upon each other and were not managed or accounted for as separate, stand-alone, independent entities*.  In addition, the cash transactions *analyzed reflect a pattern of using new investor funds to satisfy current investor obligations of principal and interest*.

The Report details the examinations of transactions during the time period from July 1, 2014 to the Petition Date (January 25, 2016) and found that during this time, withdrawals exceeded deposits by approximately $1,591,000.  This deficit was funded by deposits from Debtor and non-Debtor entities which initiated over 500 individual deposits into other Debtor entities and "reflects the continual co-mingling of investor and other funds among and between Debtor and Debtor entities.  It is highly unusual for entities that are autonomous from other entities, related or not, to have this volume of transactions transferring funds, either in number or dollar amount."

Further, the Report also details how many accounts were underfunded and monies from other Debtor and non-Debtor accounts were made to fund checks in order to avoid return for non-sufficient funds.  No apparent accounting or financial purpose to the many transfers could be found other than the inappropriate goal of maintaining the appearance of separate, independent entities to both investors and other 3rd party entities.  However, the Debtor was, in fact, transferring funds from other Debtor and/or non-Debtor entities that had cash available on the specific days funds were needed to satisfy either investor or other 3rd party obligations.

Finally, the Report also exposes the operations of the Debtor whereby Commercial and Investment were used to conduct most of the financial activities for the Debtor and non-Debtor entities.  In fact, during the examination period, $8,000,000 in purchases were detailed, but "Investment accounted for at least $7,459,000" or 93% of these transactions.  As well, the sales from properties were deposited into Investment.  The deposits into Investment to fund these purchases emanated from Debtor entities (over $6,100,000) as well as non-Debtor entities ($2,400,000).  Commercial likewise receive approximately $3,100,000 and $1,800,000 from other Debtor and non-Debtor entities respectively.

25

In all, over 70 bank accounts and related transactions for Debtor and non-Debtor entities were reviewed by the Trustee's experts and charted for tracking the flow of funds between accounts during the time period covered by the Report. The analysis shows that once the funds were transferred, none of the entities maintained separate segregated accounts for the benefit of any other entity. Accordingly, during the time period analyzed by the Report, it is impossible to identify which funds were used to purchase specific properties, thereby destroying any ability to trace funds from specific investors to property purchase in nearly all instances. As such, during the years in question, no Investor could hope to successfully prove the legitimacy of their mortgage against any specific property due to the business practices and accounting methodologies employed by the Debtors.

3.    Many "Secured" Investor Claims Are Not Actually Secured for the Claimed Amounts

For these reasons and others discussed below, the Trustee believes that most of the alleged "secured" Investor claims would *not* be secured within the meaning of state law or 11 U.S.C. § 506(a), or would be subject to substantial reduction under various principles of bankruptcy law.

In this regard, while it is true that the Bankruptcy Code generally provides that claims which are secured by mortgages and liens on real estate and other collateral must be paid from proceeds from sale of the collateral ahead of unsecured claims, the issue of whether a particular transaction or document actually gives rise to a lien, mortgage or property interest is governed by state law. *Liebzeit v. Intercity State Bank,* 819 F.3d 981, 985 (7th Cir. 2016). In the context of *Ponzi* investment schemes such as the one here, where assets and liabilities are commingled, investments are not necessarily tied to acquisition of particular properties, and investors are all similarly situated in relation to the fraudsters, it is not uncommon for state courts to permit pro rata sharing among investors even where it may seemingly conflict with purported contracts entered into between defrauded investors and the wrongdoers. *See, e.g., Hyatt,* 2016 U.S. Dist. LEXIS 63347, 3-4 (N.D. Ill. 2016); *Quilling,* 572 F.3d 293, 298 (6th Cir. 2009); *Sunwest Mgt,* 2009 U.S. Dist. LEXIS 93181 (D. Oregon 2009); S*EC. v. Capital Consultants,* LLC, 397 F.3d 733 (9th Cir. 2005); *SEC v. Credit Bancorp., Ltd.,* 290 F.3d 80 (2nd Cir. 2002). Here, there is even reason to believe the debtors may have intentionally or fraudulently preferred some creditors over others. As noted earlier, the Trustee is aware of at least one instance in which a mortgage was falsified in 2015 by a debtor at the request of a creditor to make it appear the mortgage had been given in 2011. The falsification was only noticed in that instance because the creditor had objected to a proposed sale of real estate based on his alleged mortgage.

Furthermore, bankruptcy law provides that mortgages and liens are only treated as "secured" claims for purposes of receiving distributions only to the extent of the *value* of the collateral and the relative priority of the lien. Specifically, 11 U.S.C. § 506(a) states, in part, that

"[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest.
. . is a secured claim *to the extent of the value*" of the lien on the property. 11 U.S.C. §
506(a)(emphasis added).   In the present case, for each of the properties owned by Debtor
companies, the Debtors purported to grant *numerous* mortgages to different Investors, *which in
most instances significantly exceeded the actual values of the properties.*  In most cases, only one
or two of the alleged mortgage debts would be "secured" for purposes of receiving distributions.
To even resolve these issues, however, substantial attorney's fees and expenses would have to be
expended by the estate *and* the alleged secured creditor -- objections would have to be filed to
the vast majority of alleged secured claims in the case, real estate valuations would have to be
performed by appraisers, and any remaining legal issues would have to be litigated.  Such
expenses would obviously diminish net recoveries for all creditors, including the alleged secured
parties, with most all of the purported "secured" claims likely to be found to be unsecured under
§ 506(a).

        In addition, some of the purported secured mortgage claims may also be subject to
disallowance and "avoidance" under 11 U.S.C. § 502(d) and 11 U.S.C. §§ 544, 547 or 548.  In
this regard, §§ 544, 547 or 548 provide that the bankruptcy estate may recover money or other
property (including collateral) from a creditor where the property was transferred within certain
time periods when the Debtor was insolvent, where the Debtor did not receive "reasonably
equivalent value" in exchange for the transferred property, or the transfer was made in payment
of an "antecedent" debt. Under § 502(d) of the Bankruptcy Code, *any* claim held by recipient of
such recoverable transfers may be disallowed until the creditor has returned the payment or
property that was transferred.

        By way of example, in this case, as noted earlier, many investors "rolled over" their
investments when some properties owned by the Debtors were sold, receiving new notes and
mortgages, often from different companies. It appears no effort was made to insure that the legal
priority of any mortgage allegedly securing the new note would be consistent with the priority of
any previous mortgage and note held by the Investor, given to an Investor. To the degree such an
investor may have "enhanced" his position through the rollover process, without providing any
new investment, the bankruptcy estate may have a cause of action against the investor to set
aside or "avoid" the higher-priority mortgage, and in the meantime any claim asserted by the
investor could be disallowed.

        Finally, as also noted previously, the few alleged mortgages that might otherwise qualify
as true "secured" claims under state and bankruptcy law could also be subject to "surcharge"
reductions pursuant to 11 U.S.C. § 506(c), for the Trustee's efforts to preserve, insure and protect
the properties, and to potential "subordination" of  under 11 U.S.C. § 510.  Under § 506(c), the
Trustee may assert a *first priority* claim (ahead of a valid secured claim) against proceeds from
any sale all reasonable and necessary costs and expenses of preserving or disposing of the
property, where a benefit was provided to any holder of an alleged secured claim.  In this case,
the Trustee has already been paying from the bankruptcy estate the costs of insurance, taxes, and

utilities, and costs of marketing the properties, will continue to incur such expenses until the time of any sale, and will thereafter incur costs and commissions if and when any sale takes place. Again, such issues would likely have to be litigated if the alleged Investor "mortgages" were recognized.

Taking all of these factors into consideration, and the likely cost to the estate and to claimants of litigating the many potential issues, the Trustee believes the *pro rata* distribution proposed by the Plan is both fair and equitable, and likely to be approved by all creditors.

### C.     Discussion of Additional Bankruptcy Code Requirements Relating to Confirmation of the Trustee's Plan

1.      Unfair Discrimination/Fair and Equitable Test

Although the Trustee believes the Plan will be accepted by all Classes of creditors, even if each of the Impaired Classes does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Trustee, if it is accepted by at least one Impaired Class if, as to each Impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

A plan "does not discriminate unfairly," if the legal rights of a member of a dissenting Class are treated in a manner consistent with the treatment of the legal rights of members of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or equity interests receives more than they are legally entitled to receive for their Claims or equity interests. The Trustee's Plan "does not discriminate unfairly" because all similar Classes are treated consistently, and in the Trustee's opinion no Class receives more under the Plan than it is legally entitled to receive.

"Fair and equitable" has different meanings under the Bankruptcy Code for secured and unsecured claims within dissenting classes. With respect to a secured claim, "fair and equitable" means: (1) the impaired secured creditor retains its liens to the extent of its Allowed Secured Claim and receives deferred Cash payments at least equal in value to the allowed amount of its Claim with a present value as of the Effective Date at least equal in value to such creditor's interest in the Debtors' interest in the property securing the creditor's Claim; (2) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, claim, interests or encumbrance, the lien, claim, interest or encumbrance attaches to the proceeds of the sale, and such lien, claim, interests or encumbrance proceeds are treated in accordance with clause (1) or (3) of this paragraph; or (3) the impaired secured creditor realizes the "indubitable equivalent" of its Claim under the Plan.  These requirements are easily met with respect to Class 1 Secured Real Estate Tax Claims in this case, because the holders of Secured Real Estate Claims will be paid promptly, and will retain their liens until payment is made.

With respect to an unsecured claim, "fair and equitable" means either: (1) each impaired unsecured creditor receives or retains property of a value, as of the Effective Date, equal to the amount of its Allowed Claim, or (2) the Holders of Claims or Equity Interests that are junior to the Claims or interests of the dissenting Class will not receive or retain any property under the Plan. The Trustee's Plan contains only one class of unsecured claims, Class 2, whose claims must be paid in full before the junior class of equity interests, Class 3, would receive anything.

2.    Best Interests of Creditors

The Bankruptcy Code provides that the Plan will not be confirmed, regardless of whether or not anyone objects to Confirmation, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all Classes of Claims which are impaired.  The "best interests" test will be satisfied by a finding of the Bankruptcy Court that either: (1) all Holders of Impaired Claims have accepted the Plan, or (2) the Plan will provide such a Holder that has not accepted the Plan with a recovery at least equal in value to the recovery such Holder would receive if the Debtor was liquidating under chapter 7 of the Bankruptcy Code.

As stated previously, the Trustee expects the Plan to be accepted by all Classes of Creditors.  Even if, however, such acceptance does not occur, for the reasons set forth below, the Plan is in the "best interests" of each Class of Claims impaired under the Plan. The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtor's assets in the context of a chapter 7 liquidation.  Such value must then be reduced by the costs of such liquidation, including costs incurred during the chapter 11 Case and allowed under Chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses), a chapter 7 trustee's fees, and the fees and expenses of professionals retained by such a trustee.  The potential Chapter 7 liquidation distribution with respect to each Class must be further reduced by costs imposed by the delay caused by conversion of the Chapter 11 Case to a case under Chapter 7 of the Code.  The net present value of a hypothetical Chapter 7 liquidation distribution with respect to an impaired Class is then compared with the recovery in respect to such Class as provided for in the Plan.

Here, virtually all of  the claims in the case are held by Investors, all of which would be treated in the same fashion under the Plan, by pro rata payment with respect to each holder's Allowed claim.  For the reasons previously stated, the Trustee believes this is the most fair and equitable approach with respect to Investor claims, and the Plan will accordingly be broadly accepted by holders of Class 2 claims, notwithstanding the fact that some Investors have received mortgages purportedly securing their investments and have filed "secured" claims. The proposed Plan seeks to expeditiously achieve the goal of treating all Investors fairly and equally, while minimizing the delay and administrative expense of protracted litigation.

29

## VIII. TAX CONSEQUENCES OF A CONFIRMED PLAN

This description is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to Debtor and to holders of Claims who are entitled to vote or to accept or reject the Plan are discussed below.  No rulings or determination of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to Debtor's Estate or any holder of a Claim. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan regarding special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, Persons that are, or hold their Claims through, pass-through entities, Persons whose functional currency is not the United States dollar, foreign Persons, dealers in securities or foreign currency, employees, Persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and Persons holding Claims that are hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

**Each Creditor and Equity Interest Holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and foreign tax consequences of the transactions described herein and in the Plan. The following summary is not a substitute for careful tax planning and advice based on individual circumstances. All Creditors are advised to consult their own tax advisors.**

The United States federal income tax consequences to Claimants (including the character, timing and amount of income, gain or loss recognized) will depend upon, among other things, (1)

whether the Claim and the consideration received in respect thereof are "securities" for the United States federal income tax purposes; (2) the manner in which a Claimant acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Claimant has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (6) whether the Claimant has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Claimant's method of tax accounting; and (8) whether the Claim is an installment obligation for United States federal income tax purposes. Therefore, Claimants should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

## IX.  CLOSING STATEMENT

The information provided in this Disclosure Statement is intended to assist you in voting on the Plan of Reorganization in an informed fashion.  Due to the fact that your rights will be determined by the terms of the Plan if it is confirmed, you are urged to review this material and make such inquiries as you may deem appropriate and then cast an informed vote on the Plan. The Trustee believes the proposed Plan is fair and equitable, does not discriminate unfairly, and meets all other requirements of the Code.  The Trustee, therefore, recommends acceptance of the Plan.


Dated:  February 19, 2018                    Respectfully submitted,

                                             Douglas R. Adelsperger as Chapter 11 Trustee in
                                             bankruptcy for the Debtors' estates

                                              /s/ Douglas R. Adelsperger
                                                 Douglas R. Adelsperger, Chapter 11 Trustee

                                             RUBIN & LEVIN, P.C.,
                                             Counsel to the Trustee

                                             By:  /s/ Deborah J. Caruso
                                             Deborah J. Caruso
                                             John C. Hoard
                                             135 N. Pennsylvania St., Suite 1400
                                             Indianapolis, IN 46204
                                             (317) 634-0300/Fax: (317) 453-8616

**CERTIFICATE OF SERVICE**

      I hereby certify that on February 19, 2018, a copy of the foregoing *Disclosure Statement for Trustee's Plan of Liquidation (as Immaterially Modified)* was filed electronically.  Notice of this filing will be sent to the following parties through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Douglas R. Adelsperger    dra@adelspergerkleven.com
Mark J. Adey    madey@btlaw.com
Frederick L. Carpenter    fcarpenter@dfreeland.com
Deborah J. Caruso    dcaruso@rubin-levin.net, mcruser@rubin-levin.net
Angela D. Dodd    dodda@sec.gov, janssenj@sec.gov
Rebecca Hoyt Fischer    rebecca@ladfislaw.com, roberta@ladfislaw.com
Bridget A. Franklin    bfranklin@brouse.com
Daniel Freeland(MAG)    dlf9601@aol.com
Nancy J. Gargula    USTPRegion10.SO.ECF@usdoj.gov
John C. Hoard(CMB)    marie@rubin-levin.net, johnh@rubin-levin.net
Curt D. Hochbein    chochbein@rubin-levin.net
George E. Horn    george.horn@btlaw.com
R. William Jonas    rwj.haj@sbcglobal.net, krh.haj@sbcglobal.net
R. William Jonas(LP)    lindaplata@hajlaw.com
R. William Jonas(TT)    trt@hajlaw.com
Jay P. Kennedy    jpk@kgrlaw.com, srosner@kgrlaw.com
Yvette Gaff Kleven    ygk@adelspergerkleven.com
Edmund P. Kos    ekos@ekoslaw.com
James G. Lauck(KW)    kmw@kgrlaw.com, jgl@kgrlaw.com
Jeffrey L. Lund    jlund@yaub.com
Harley K. Means    hkm@kgrlaw.com
Kimberly A. Mouratides(TM)    tiffany@kmmglawfirm.com, kim2@kmmglawfirm.com
David M. Mustard    dmustard@ekoslaw.com, ecfmail.kos@gmail.com
Katherine C. O'Malley    komalley@cozen.com, akulbeik@cozen.com
Theora Ohaneson    theora2009@yahoo.com
Thomas Panowicz    teplaw@att.net, teplawecf@gmail.com
Susan Jaffe Roberts    susan.j.roberts@usdoj.gov
James E. Rossow    jim@rubin-levin.net, rjenkins@rubin-levin.net;susan@rubin-levin.net;atty_jer@trustesolutions.com;robin@rubin-levin.net
Wesley N. Steury    wsteury@burtblee.com
Mark P. Telloyan    MarkTelloyan@juno.com
J. Samuel Tenenbaum    s-tenenbaum@law.northwestern.edu
Meredith R. Theisen    mtheisen@rubin-levin.net, mcruser@rubin-levin.net
Susan E. Trent    strent@rlwlawfirm.com, kmiller@rlwlawfirm.com
Ellen L. Triebold    Ellen.L.Triebold@usdoj.gov

Mark E. Wagner     mark_wagner@embarqmail.com
Thomas G. Wallrich     twallrich@cozen.com, akulbeik@cozen.com; jaudette@cozen.com;
jnesset@cozen.com
James C. White     jwhite@ptwfirm.com


     I further certify that on February 20, 2018, a copy of the foregoing *Disclosure Statement for Trustee's Plan of Liquidation (as Immaterially Modified)* was mailed by first-class U.S. Mail, postage prepaid, and properly addressed to the following:


David W. Criswell
Brad T. Summers
Ball Janik LLP
101 SW Main Street, Suite 1100
Portland, OR 97204

Timothy Leiman
Jaclyn J. Janssen
U.S. Securities & Exchange
Commission
175 W. Jackson Blvd, Suite 900
Chicago, IL 60604

Jonathan Hochstetler
12855 County Road 50
Syracuse, IN 46567


Galen J Graber
8342 E Old US Hwy 50
Montgomery, IN 47558

Joe Schwartz
2012 S.E. 33rd St.
Okeechokee, FL 34974

Dwight Gosser
1857 Woodland Dr
Elkhart, IN 46514


Christopher Coblentz
6345 Helena Rd
Mayslick, KY 41055

Committee Chairman
Grant Swartzentruber
as Representative for Creditor
Omar Wagler
412 E. Flora St., Apt. 1

Washington, IN 47501

Marc Merklin
388 S. Main Street, Suite 500
Akron, OH  44311


                */s/ Deborah J. Caruso*
                Deborah J. Caruso


\\Pa1\data\WP80\TRUSTEE\Adelsperger\5 STAR 86717101\Plan\Revised Disclosure Statement for Trustee Plan 2.19.18.doc